ACCEPTED
04-14-00609-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
6/23/2015 10:04:40 AM
KEITH HOTTLE
CLERK

No. 04-14-00609-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

06/23/2015 10:04:40 AM
KEITH E. HOTTLE
Clerk

## COURT OF APPEALS
## FOURTH COURT OF APPEALS DISTRICT OF TEXAS
## SAN ANTONIO

**IRMA LEMUS AND MANUEL LEMUS, JR.,**

Appellants,

**v.**

**JOHN RENE AGUILAR, LAURA ASHLEY WELLS and
JOHNNY B. WELLS, and JOHNNY MONTOYA GARZA,**

Appellees

### BRIEF FOR APPELLEES

On Appeal from the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-00251
Honorable Antonia Arteaga, 73rd Judicial District Court, Presiding

**ANITA J. ANDERSON**
Law Office of Anita J. Anderson
303 West Sunset Suite 103
POB 830722
San Antonio, Texas 78283
Telephone:  (210) 533-8726
Telecopier:  (210) 533-0989
Email:      ajanderson1111@gmail.com

By */s/ Anita J. Anderson*
    Texas Bar No. 01165955

**NO ORAL ARGUMENT REQUESTED**

1

## IDENTITY OF PARTIES AND COUNSEL

**APPELLANTS**

Irma Lemus and Manuel Lemus, Jr.,
     Defendants in the Trial Court

**APPELLEES**

Jon Rene Aguilar, Johnny B. Wells, Laura Ashley Wells and Johnny Montoya Garza
     Plaintiffs in the Trial Court

**ATTORNEYS**

Anita J. Anderson
Law Office of Anita J. Anderson
303 West Sunset Suite 103
POB 830722
San Antonio, Texas 78283
Telephone: (210) 533-8726
Telecopier: (210) 533-0989
Email:     ajanderson1111@gmail.com

For Appellees John Rene Aguilar, Laura Ashley Wells, Johnny B. Wells & Johnny Montoya Garza

Sarah Anne Lishman
310 South St. Mary's St. Suite 845
San Antonio, Texas 78205
Telephone: (210) 308-6448
Telecopier: (210) 308-5669
Email:     sarahanne@jamiegrahamlaw.com

Ana Laura Hessbrook
Attorney at Law
4100 N.W. Loop 410, Suite 105
San Antonio, Texas 78229
Telephone: (210) 706-9466
Telecopier: (210) 706-9467
Email:     hessbrook@sbcglobal.net

For Appellants Irma Lemus and Manuel Lemus, Jr.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL…………………………………………….…..…….2

INDEX OF AUTHORITIES…………………………………………………….…….…..6

STATEMENT OF THE CASE …………………………………………………….. ....9

STATEMENT OF FACTS …………………………………………………….   …....11

      *Family History in the Home* …………………………………………………..13
      *Relationship to Lemuses* …………………………………………………………19
      *Aguilar "Will" (Issue I)*………………………………………………………..14
      *Aguilar's Mental Decline (Issue II)*……………………………………………....16
      *Lemus Deed (Issue II)* …………………………………………………………22
      *Claim for Improvements (Issue III)* ……………………………………….. 26
      *Signatures (Issue IV)*…………………………………………………………..29

REPLY TO ISSUES PRESENTED………………………………………………….....30

    Reply to Issue I:   The evidence is legally and factually sufficient to support
    the trial  court's finding that the Aguilar "Will" of March 11, 2005
    satisfies the requirements of a deed and conveys good and valid title

    Reply to Issue II:   The evidence is legally and factually sufficient
    to support the trial court's finding that Elvira Aguilar lacked the requisite
    capacity when she signed the Lemus Deed on January 7, 2009, and the trial
    court was correct in declaring the deed void.

    Reply to Issue III:  The evidence is legally and factually sufficient to support
    the trial court's finding that the Lemuses did not act in good faith in making
    improvements and paying taxes on 106 Cameo.

    Reply to Issue IV:   The evidence is legally and factually sufficient to support
    the trial court's implied finding that Elvira Aguilar signed the Aguilar "Will."

    Reply to Sub-issues I – III:    Attorneys fees were properly awarded to
    the prevailing party pursuant to Tex. Civ. Prac. & Rem. Code § 16.034.

SUMMARY OF ARGUMENTS………………………………………….....……………… 31

ARGUMENT AND AUTHORITIES ……………………………………...……………..31

    Standards of Review…………………..………………………………………………….31
    Trespass to Try Title ......…………………………………………….........………31

REPLY TO ISSUE I:   The evidence is legally and factually sufficient to support the trial  court's finding that the Aguilar "Will of March 11, 2005 satisfies the requirements of a deed and conveys good and valid  title ...............…………………...33

  *Basic Rule of Construction:  Intent of the Maker* .................................................33
  *"Will" = "Intent" of Elvira Aguilar and Johnny Garza* ....................................35
  *Requisites of a valid deed and of gift deed* ……………………………………...37
  *Operative words of grant established by intention shown*…………………... ……38
  *Present right of control and possession creates gift deed* ………………………....38
  *Delivery  presumed, need not be manual*……………………………………....39
  *Acknowledgement and recording not required as to Lemuses* ……………………40

REPLY TO ISSUE II:   The evidence is legally and factually sufficient to support the trial court's finding that Elvira Aguilar lacked the requisite capacity when she signed the Lemus Deed on January 7, 2009, and the trial court was correct in declaring the deed void ……………………………………………41

  *Standard for mental capacity to make a deed* …………...………………………..42
  *Relevant time period*………………………………………………………….....42
  *Persistence of the condition*……………………………………………..…....... .43
  *Nature of the disposition*..................................................................................43
  *Opinion evidence*………………………………………………………………...43

REPLY TO ISSUE III:  The evidence is legally and factually sufficient to support the trial court's finding that the Lemuses did not act in good faith in making improvements and paying taxes on 106 Cameo………………………….………………...44

  *Failure to properly plead for improvements*  ……………………………………44
  *Good faith – not belief but notice* ……………………………………………..…45
  *No reimbursement for taxes paid under fraudulent deed* ………………………..46
  *No proper proof of increase in value of house by improvements* …………………46
  *Any value offset by use and occupation* …………………………………………47

REPLY TO ISSUE IV:   The evidence is legally and factually sufficient to support the trial court's implied finding that Elvira Aguilar signed the Aguilar "Will" …............48

  *Verified denial of authenticity required* …………………………………………..48
  *Inherently unreliable exemplar* ..………………………………...………………..49

REPLY TO SUBISSUES I – III:   Attorneys fees were properly awarded to the prevailing party pursuant to Tex. Civ. Prac. & Rem. Code § 16.034 ....................... 49

CONCLUSION.................................................................................................................50

PRAYER ...................................................................................................................... 51

Certificate of Compliance ...........................................................................................52

Certificate of Service …................................................................................,,,............52

# INDEX OF AUTHORITIES

CASES:

*ACS Investors v. McLaughlin*, 943 S.W. 2d 426, 430 (Tex. 1997)…………………………………….31

*Bach v. Hudson*, 596 S.W. 2d 673 (Tex. App. – Corpus Christi, 1980 no writ hx.)… …….42, 43

*Burgess v. Easley,* 893 S.W. 2d 87, 90 (Tex. App. – Dallas, no writ)…………………………..39

*Bell v. Hinkle,* 562 S.W.2d 35, 37 Civ. App. – Houston [14th Dist.] 1978)……..…………...…32

*Benoit v. Wilson*, 239 S.W. 2d 792, 796-97 (Tex. 1951)………………………………...……..31, 48

*Bradshaw v. Naumann,* 528 S.W.2d 869, 873 (Tex.App.-Austin 1975, writ dism'd) …………..42

*Brown v. Payne* 176 S.W. 2d 306, 309   (Tex. – 1943)…………………….......................33

*Caddell v. Caddell,* 131 S.W. 432, 434 (Tex. App.– 1910 no writ) ................................ ..…41,46

*Cain v. Bain*, 709 S.W. 2d 175, 176 (Tex. 1986)..........................................................…42

*Carr v. Radkey* 393 S.W. 2d 806, 813 (Tex.-1965)…....................................………………… 42

*City of Keller v. Wilson*, 168 S. W. 3d 802, 816 (Tex. 2005) …....................................32,37,39.42.

*Chambers v. Wyatt,* 151 S.W. 864 (Tex. App. – El Paso, 1912, no writ....................................46

*Chew v. Jackson*, 102 S.W. 427 (Tex. App. 1907)…....................................................39

*Croucher v. Croucher,* 660 S.W. 2d 55 (Tex. 1983)..........................................……………..31

*Cushenberry v. Profit,* 153 S.W. 2d. 291 (Tex.  --Eastland, 1941writ ref'd).  ........................…34

*Davis v. Bond* 141 S.W.2d 979 (Tex. App. – Texarkana 1940, aff'd) ......................................39

*Decker v. Decker*, 192 S.W. 3d 648 (Tex. App. – Ft. Worth, 2006 no pet.)...........................…42

*Dickerson v. Keller* 521 S.W. 2d 288 (Tex. App. –Texarkana, 1975 writ ref'd n.r.e).........34, 36

*Estate of  Riggins* 937 S.W 2d 11 (Tex. App. – Amarillo, 1996 writ denied)…........................43

*Faglie v. Williams* 569 S.W.2d 557, 566 (Tex. App.—1978, writ ref. n.r.e) ...................... ….48

*Fox v. Lewis*, 344 S.W. 2d 731 (Tex. App. – Austin, 1961writ ref'd n.r.e.) …........................,...34

*Green v. Canon,* 33 S.W.3d 855 (Tex. App.—Houston [14th Dist.] 2000, pet. denied.)............38

*Haile v. Holtzclaw*, 414 S.W. 2d 916 (Tex. 1967)….................................................................33,38

*Jackson v. Henninger*, 482 S.W. 2d 323 (Tex. App. – Austin, 1972 no writ).......................... 42

*Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27 (Tex. 1993)……… ...............................................31

*Land v. Turner,* 377 S.W.2d 181 (Tex.1964)......…….................................................................32

*Lee v. Lee*, 424 S.W.2d 609 (Tex. - 1968)…. ..............................................................................43

*Low v. Low*,72 S.W. 590 (Tex.App.- Dallas, 9, 1914, writ ref'd …...........................................33

*Mandell and Wright v. Thomas* 441 S.W. 2d 841 (Tex. 1969)............................................. ….42

*Mason v. Mason* 369 S.W. 2d 829 (Tex. App. – Austin, 1963 writ ref'd. n.r.e.) ...................……43

*Massey v. Lewis*, 281 S.W. 2d 471 (Tex. App. – Texarkana 1955 writ ref'd n.r.e.) .............. ….32

*Mayfield v. de Benavides*, 893 S.W. 2d 500(Tex. App. – San Antonio, 1985, writ ref'd n.r.e.) ..46

*Osborn v. Cone*, 234 S.W.2d 88 (Tex. App. – Ft. Worth, 1950 no writ.) ......................................39

*Plumb v. Stuessy,* 617 S.W.2d 667, 668 (Tex.1981)……...................…………………………32

*Root v. Mecom,* 542 S.W. 2d 878, 881(Tex. App. -- Beaumont, 1976 writ dism'd)…................45

*Sanchez v. Telles,* 960 S.W.2d 762, 768 (Tex.App.- El Paso, 1997 pet. denied) ........................40

*Small v. Morris*, 252 S.W. 2d 772  (Tex. App. – El Paso, 1952 rev'd  on other grds.) ..............45

*Soper v. Medford,* 258 S.W. 2d 118, 122 (Tex.-1953).....................................……34,36,40

*Thompson v. Dart*, 746 S.W. 2d 821 (Tex. App. – San Antonio, 1988, no writ) ...................37,39

*Walsh v. Austin*, 590 S.W. 2d 612 (Tex. App.—Houston [1st Dist.]979….............…........... …32

*Woodworth v. Cortez*, 660 S.W.2d 561 (Tex. App.-- San Antonio, 1983, writ ref'd  n.r.e)…......38

**TEXAS STATUTES AND RULES:**

TEX. CIV. PRAC. & REM. CODE § 37.001 et seq. …………………………………..............9

TEX. CIV. PRAC. & REM. CODE § 16.034                                                      31, 49, 50

TEX. PROP. CODE § 5.021………………………….……………………......…………30, 37

TEX. PROP. CODE § 5.041 ……………………………………………….. …….36

TEX. PROP. CODE § 13.001 ……............................................................……...30, 41

TEX. PROP. CODE § 22.021…..................................................……………31, 44, 46, 47

TEX. R. CIV. PROC. 93 …………..................................................................………31, 48

**APPENDIX:**

1. Statutes and Rules
2. Final Pleadings, Judgment, and Injunctions
3. Medical Records
4. Signatures

IRMA LEMUS and MANUEL LEMUS, JR., Appellants

V.

JOHN RENE AGUILAR, LAURA ASHLEY WELLS and JOHNNY B. WELLS, and
JOHNNY MONTOYA GARZA, Appellees

## APPELLEE'S BRIEF

Appellees John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells, and Johnny Montoya Garza respectfully submit this brief in reply to Appellants Irma Lemus and Manuel Lemus, Jr.'s Brief on Appeal.

## STATEMENT OF THE CASE

Appellees agree with Appellant's statement of the procedural history of the case.

Appellees will refer to March 5, 2005 document executed by Elvira Aguilar and Johnny Montoya Garza as the **"Aguilar 'Will'"** and not, as Appellants have referred to it, as the "Contested Will." This was not a will contest, but a request for declaratory judgment under the Tex. Civ. Prac. & Rem. Code § 37.001 that the "will," while not enforceable as a will, conveyed a present interest to Appellees, satisfied the requirements of a deed, and effected a transfer of title. Contrary to Appellants' assertion in their brief (pp. 18 -19), Appellees never requested enforcement of the document as a will. Cf. Plaintiff's Original Petition, CR1: 1; Second Amended Petition, CR2: 1.

Appellees will refer to the January 7, 2009 voided deed to Irma Lemus and Manuel Lemus, Jr. as the **"Lemus Deed."** The real property in question is referred to as "**106 Cameo."**

## APPELLEES' STATEMENT OF FACTS

The Lemus Appellants' statement of facts ignores any and all of the facts supporting the judgment. This summary of facts is organized according to issues on appeal and background as relevant to the credibility of the witnesses: the family history of Elvira Aguilar's home at 106 Cameo, the relationship between her and the Lemuses, Elvira's "will" as a gift deed to her grandchildren, her loss of mental capacity due to Alzheimer's dementia, the "signing" of the deed to the Lemuses, the Appellants' lack of good faith in claims for improvements and comparisons of Elvira's signatures.

*Family history in the home*

The house at 106 Cameo in San Antonio, Texas was the home of Elvira Aguilar and her partner Johnny Montoya Garza, and John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells -- the grandchildren they had raised after their parents were killed in a motorcycle accident. It was home until Irma and Manuel Lemus, Jr. locked them out on the basis of a fraudulent deed supposedly executed by Elvira Aguilar when she was suffering from advanced Alzheimer's dementia.

Johnny Montoya Garza had met Elvira in 1984. Garza was working as a long haul trucker. Elvira Aguilar was unemployed due to an injury as a nurse's aide. They started living together at 106 Cameo in 1985, but never married to maintain Elvira's benefits. RR3: 11-13. Elvira's adult children were Irma Aguilar Lemus, Irene Aguilar Lambert, Nanette Aguilar and her twin Annette Aguilar Wells and son John David Aguilar. Court's Exhibit 1, RR7: 541-543.

When their parents, Annette Aguilar Wells and Johnny B. Wells, were killed in 1990, Johnny B. Wells was only thirteen days old, his brother John Rene Aguilar was ten, his sister Laura Ashley Wells was three. RR2: 42. The family had already been living with their grand-parents

10

after their mobile home burned so it was only natural that they stayed. R3: 18. The children came to call Elvira Aguilar "mom" and Johnny Garza dad or "grand-dad." RR2: 43.

Elvira Aguilar and Johnny Montoya Garza were named managing conservators by the court, but not without a challenge from Irma Aguilar Lemus, Elvira's oldest daughter, and her husband Manuel Lemus, Jr. who were granted possessory conservatorship. RR3: 19. There was money to be received and administered. The children were eligible for Social Security benefits due to the death of their parents, and there were auto insurance and life insurance policies which were put into trust funds for the children. RR2: 22. Elvira Aguilar was the trustee on the children's accounts. RR5: 23.

From the beginning, Elvira and Johnny wanted the grandchildren to have the house. They had built it for them. In 1992 Elvira Aguilar and Johnny Garza borrowed $31,800 to add a second story to Elvira's small house – to give the children their own rooms. Title to the house was in Elvira Aguilar's name – she was awarded it her 1982 divorce. Johnny Garza supplied the credit and the income. RR3: 26-27. Home Improvement Mortgage, Plaintiff's Exhibit 37, RR7: 82-85, Johnny Garza put in about $20,000 in labor himself. RR3: 98. The loan was repaid from their joint checking account. The children's social security money did not go into that account, just his paycheck.RR3:123.

*Relationship with Irma Lemus and Manuel Lemus, Jr. – 2000 to 2006*

There is much in the history of this family that is relevant to the credibility of Irma Lemus and Manuel Lemus, Jr. and that they were not the "natural object of the decedent's bounty." The Lemuses brought unwarranted custody fights, and had not just borrowed but stolen from the children's trust funds. At the time of the Lemus deed in 2009, Elvira Aguilar was not only

incapable of even recognizing her daughter, but had been furious at her and estranged from her for many years before.

Irma Lemus began "borrowing" money from members of the Aguilar household early on. Johnny Garza had helped Elvira get her Social Security disability benefits and had received a retroactive award of $8000. Irma Lemus asked her mother to lend her the money. She never paid it back although Elvira asked for it. RR3: 15-17.

In 1998, John Rene Aguilar, then around age 18, contracted cancer. John Rene moved to Boerne to live with Irma and Manuel Lemus because of their help with his medical insurance. RR3: 134. To her credit, Irma Lemus had carried the children on her health insurance policy with her employer AT&T. RR5: 17. While he stayed with her, Irma borrowed $4000 from him, which he had just received from his trust funds. It was never paid back. He moved back to San Antonio because he was lonely. Irma provided food and shelter and medical, but he spent most of his time alone. RR3: 134-135.

In 2002, the Lemuses filed a custody suit seeking managing conservatorship of Johnny B. Wells to which Elvira was strongly opposed. RR3: 38. The Lemuses claimed that Laura had begged them to sue for custody of Johnny B. and insisted they take money from her trust fund accounts to do it. Manuel Lemus claimed that Laura gave them about $7500 to file the suit. RR4: 50-51.

Laura Ashley Wells denied that she asked them to get custody or offering to pay for it -- although she did want her brother to come live with her at Irma's. She said that Irma did not tell her she had filed the suit until she had done it. RR3: 183.

After this, Johnny Garza said Elvira "did not want to see her around nowhere. She was real angry at Ms. Lemus. She did not want her around." RR3: 107, lines 19-21. The result of the

custody suit for Johnny B. Wells? Irma said it was dropped. Agreements were reached with Elvira. "Johnny would be allowed to visit and I would be allowed to see him." RR5: 33-34. Or nothing more than she already had as possessory conservator. But that was not the only thing Elvira was angry at her daughter for.

The custody suit was just one of the cover stories apparently for the Lemuses' theft of some $23,000 from Laura's trust fund. Laura testified that Irma had asked to borrow money to take the family on a trip to Hawaii. She had not agreed. RR3: 181. She did not have the authority by herself to get money out of her trust fund. Elvira Aguilar would have had to call. RR3: 162. Instead "Irma Lemus called as my grandmother, Elvira, and the second call was made by Alyssa (Irma's daughter) who said she was myself, me." *Id.* lines 11-13. Laura watched her make the call, but she did not think it was going to work. *Id.*

There was in fact a family trip to Hawaii where Irma Lemus was working for a short time for AT&T. Her brother Johnny B. went with them – for a weekend. RR3: 164. She did not know at the time of the trip that the money for it had come from her trust funds. *Id.* lines 8-10.

Irma Lemus denied that she had pretended to be Elvira Aguilar and said her mother – as trustee -- would have had to authorize the withdrawals. RR5: 23, lines 11-20. To further bolster her story she herself introduced copies of the checks from Laura's trust funds. RR5: 25-27. There were three checks of $7000 each from Hartford Stock Funds, dated June 10, 2003. Defendants' Exhibit 4 at RR7: 470-473, attached as Appendix 4: Signatures. The checks were made out to Laura A. Wells and Elvira Aguilar as Trustee, Laura A. Wells Trust. She swore it was her mother who had signed them.

Irma Lemus not only claimed that the endorsement signatures were genuine, even though she had been accused of forging them, but that Elvira's signature on the Aguilar "will" was forged by Johnny Garza. RR5: 29-31.

Irma's daughter Alyssa Mendoza said Laura Wells was too young and afraid to use the telephone to call about the money so she had asked her cousin to help her set up a user ID and Password on the Hartford website. RR4: 144-149. She claimed she herself had gone to Elvira Aguilar to have the checks signed.

Her defense attorney asked Irma why her mother would agree to lend this money knowing that she was going to file to get Johnny B? "I'm not for certain." "She knew because we had discussed it." RR5: 28, lines 14-18.

Because of the fraud, Laura moved out of the Lemus house in 2004, got a job and an apartment on her own and finished high school in Boerne. RR3: 170.

In 2006 Laura Wells was forced to sue her aunt and uncle to get her money back. After months of litigation the Lemuses settled the suit for less than what they had taken from her. RR3: 166-167. On cross-examination of Laura, the appellants introduced the settlement agreement, (Defendants' Exhibit D-1, RR7: 462- 465) apparently to impeach her about not being paid in full. The settlement was for $33,190. Laura explained that there were attorneys' fees to be paid, and after she moved out of the house, Irma continued to receive her Social Security checks. RR3: 187-189, Elvira Aguilar was so upset with Irma Lemus that she never spoke to her daughter again. RR3: 168.

**THE AGUILAR / GARZA "WILL" – THE DEED OF MARCH 11, 2005**

On March 11, 2005 Elvira Aguilar and Johnny Montoya Garza jointly executed a hand-written document they called a "will."

14

Johnny had printed it out by hand at the kitchen table. He and Elvira had both signed it. RR3: 46. "Elvira was telling me what to put in there." RR3: 57, line 2. Elvira had already given him the house as his own also, part of the house. The second floor. RR3: 42-44.

In the document Elvira acknowledges Johnny Montoya Garza as part owner of the house -- but they make it clear they both are now giving the house to the children:

> "We the above people agree that the house at 106 Cameo San Antonio
> Texas 78214 belongs to Elvira G. Aguilar and Johnny Montoya Garza
> part owner on 2d story of house was built because of the children that were
> awarded to Ms. Elvira G. Aguilar at the time of her daughter's death the
> state awarded the children to Ms. Elvira G. Aguilar then we decided
> to make rooms for the children there for we agree that the house be evenly
> owned by John Rene Aguilar, Johnny B. Wells, and Laura Ashley Wells.
> Nothing will be done without the authorization of John Rene Aguilar,
> Johnny B. Wells and Laura Ashley Wells. In case of a disagreement on the
> Aguilar part and the children listed above have the final say in what is to be
> done to the house at 106 Cameo, San Antonio, Texas 78214."

Garza testified that he considered that at this point the children actually owned the house. RR3: 48, lines 14-16. However, he and Elvira were to live there "until we both deceased," *Id.* lines 21-22. [1]

The "will" goes on to say that "John Rene must keep me informed of all dicissions so that I, Johnny Montoya Garza can be as helpful to the children so that there is no harsh discissions made."

Elvira and Johnny asked her adult children to abide by this. RR3: 49:

> "I am expecting that all family members except this will that Elvira G. Aguilar
> and Johnny Montoya Garza have decided to award the house at 106 Cameo
> to the children listed previously…so I hope that John David Aguilar and
> Nannette Aguilar and other family members respect the wishes of Elvira G.
> Aguilar and Johnny Montoya Garza. Please have all the family members
> sign this agreement will."

---

[2] Johnny Montoya Garza and the grandchildren waived any conflicts of interest and made an agreement for division of the proceeds of the litigation in consideration of Johnny Garza's life estate. RR3: 113 lines 23-25, 114 lines 1-18

Asked why they did not go to an attorney with it, Garza answered: "When we finished the paper, I told her that she needed to take it to any attorney and have it notarized or reprinted. My understanding is that she had already done it. I never questioned it again." RR3: 51, lines 22-25.

The "will" was kept at the home. RR3: 103. All the children were told about it. RR3: 51. Johnny B. Wells said knew that his grandparents wanted the children to have the house – "his whole life" and had given it to them in 2005. RR2: 114-115. So did John Rene Aguilar. RR3: 135

He also showed it John David Aguilar, Elvira's son. He asked Johnny Garza for a copy of the "will" and to intervene in the suit he had filed on his mother's behalf against the Lemuses. RR3: 75-77. That suit, the first lawsuit, was brought by John David Aguilar as next friend of Elvira Aguilar to have the Lemus deed declared void for want of mental capacity. Elvira Aguilar was in danger of losing the Medicaid benefits for her nursing home care because of the Lemus deed.

**THE DECLINE OF ELVIRA AGUILAR'S MENTAL CAPACITY: 2005 -- 2009**

Elvira's mind had begun to deteriorate in late 2005. Her grandson Johnny B. Wells was in the best position to describe his grandmother's decline. In the fall of 2005 Johnny B., then 15, had started high school at Harlandale and was home alone with Elvira when Johnny Garza was on the road. She would stutter a lot, but she was still herself. RR2: 48-49. She had not started showing any signs of mental problems, RR2: 51. However, he next year she began to be forgetful, taking food out and going to do something else. She would ask him where "Petry" (his nickname) was, and then say, "Oh I don't know what I was thinking." She was taking vitamins that helped but they were expensive and when they ran out later on it came back with a vengeance RR2: 54-55. In 2006 she stopped eating right – like eating a whole loaf of bread and nothing else. RR2:

16

Then she would be fine one minute and then get paranoid - she would come upstairs where his grandfather was playing a video game and ask where he was hiding the girl. RR2: 57.

Johnny Montoya Garza said it was in the middle of 2005 that she started not occasionally not recognizing him and Johnny B. He took her to the doctor who diagnosed her with Alzheimer's and she was put on medication. RR3: 54. The medication helped, but there were days that "She would look at you, she would live in the same house with you and she would stare at you and say 'who are you?'"

RR3: 55. He changed his job so that he could stay in town. RR3: 56. One time she chased him out of the house with an ax because she didn't recognize him. RR3: 5. In between these spells, Johnny Garza said, Elvira was a wonderful woman, sweet, and mentally with it. RR3: 59.

But it grew worse. In the summer of 2006 Elvira's son John David Aguilar came down from Columbia, Missouri to discuss Elvira's care – there was a caretaker coming to the house then. RR2: 60. A decision was made to move Elvira to her daughter Nanette's house that summer.

*Move to daughter Nanette's home*

Nanette Aguilar was the twin sister of the children's mother Annette. Her partner Sarah was in the medical field and she could help change and clean her because "she would defecate herself." RR2: 67 lines 14-18. She could not ask for what she needed. "Everything was timed. We had to feed her at certain times….Restroom was timed." RR2: 68, lines 19-21. Johnny B. moved in too because he wanted to be with his grandmother even though he had to change to Highland High School. RR2: 60-61.

Johnny Garza was still driving trucks and was gone for several weeks at a time, but still lived at 106 Cameo. He would come to visit Elvira at Nannette's house. She would be very happy to see him, but would cry and have to be calmed down because she couldn't go back with him.

RR2: 61-63.    Finally Nanette and Johnny B. said it was making it harder for them to care for her when he came over because she was going into rages and started fighting and slapping her daughter and her partner around because she could not go home with him.  When Johnny Garza saw that happen, he agreed that it would be better if he did not visit.  RR3: 67-69.

Johnny B. Wells lived with Nanette and his grandmother almost three years.   During that time he said Elvira was up and down.  She would be violent, she would be hysterical, and she would be fine. "I mean she was happy.  She would smile and laugh.  She wasn't really able to talk after a while.  She would just mumble." RR 64.

Did she have periods of lucidity? Was she able to understand?   "Yes.  Like she would be able to – well, I don't know if she understands --  because every time we told her something we would have to like bring her along, you know, and physically show her like say, 'please sit here.' … We'd have to actually bring her the chair and she would stand there and we'll tell her 'sit, grandma, sit' and we would have to kind of give her a little push to sit down…and give her a fork, and …she wasn't capable of using utensils.  She would use her hands a lot. "RR2:  66 -67.   She had good and bad days, which he explained meant that she was smiling not violent and scratching. RR2:  100.

There was no way she could have dialed a phone, he said.   She put it upside down. She would talk but it did not make sense.   She would laugh.  She could not put a sentence together, but "she would sing sometimes but without like actual words.  I thought that was pretty lovely." RR2:  117.

In the years during which Elvira lived with her daughter Nanette, Irma Lemus never came to see her mother or her sister.    Irma admitted that she had not visited and had not called her mother except once. Her excuse?  The caretaker Sarah would not allow it, although she claimed

she was on good terms with her sister Nanette.   "She had instructions I was not to visit."  RR5: 43-44.

Nanette Aguilar had been recovering from breast and lung cancer when Elvira moved in, and it returned in 2008.  RR2: 72.

As reflected in the nursing home records cited below, in November Nanette was hospitalized at Northeast Baptist Hospital.  Elvira was admitted also.  John David Aguilar helped move them into Normandy Terrace Nursing Home on November 14, 2008.  Nanette passed away the next day, November 15th of 2008.   Her mother was too confused due to dementia to understand that her daughter had died.

*Normandy Terrace Nursing Home and Rehabilitation Center*

Medical records from Normandy Terrace Nursing Home and Rehabilitation Center under a business records affidavit were admitted as Plaintiff's Exhibit 41, RR7: 114 - 425.   The documents referenced below are attached as Appellee's Appendix 3: Medical Records.

Elvira was admitted with a diagnosis of Alzheimer's disease, diabetes mellitus, hypertension, psychosis, and depressive disorder from Southeast Baptist Hospital.  RR7: 117. John David Aguilar was designated as the responsible party (referred to in the notes as RP), and Rene Aguilar is listed as an additional contact.  *Id.*

The social worker's initial evaluation of Elvira's family history summarizes her condition. She had been deteriorating for the last two years, but had been living with family.   Her daughter was admitted to NTNH at the same time she was but passed away the next day.  "Resident is too confused to understand her daughter has expired." Psychosocial Summary, Amber Franco, RR7: 408.

19

Dr. Gary Johnson became her treating psychiatrist at the nursing home. His initial diagnosis was Alzheimer's with depression and psychosis. Physician's Notes, RR7: 129 – 151. His diagnosis never changed, although her medications did. Entries from the weeks before and after the deed was signed are in Appendix 3. In none of his notes does he record any spontaneous remission of her symptoms or temporary lucidity.

On January 8, 2009, Dr. Johnson, under "mental status exam," notes like he had on all other records that she was physically aggressive at times, showed depression, psychosis, agitation and dementia and sometimes refused medication. She was on Aricept for dementia, Celexa for depression, Seroquel for psychosis, and Haldol for agitation. RR7: 132.

Daily nursing notes from her admission through January consistently indicate that she was very confused, wandered the halls and could not find her room without help, always needed help dressing and bathing, was sometimes combative and refused help, often refused medications and insulin shots, and was incontinent of bowel and bladder. RR7: 157 -389

Elvira's daily level of confusion and disorientation is illustrated in the note of 12/22/08. The nurses report she was calling another resident "mama," became combative when the nurses tried to take the other resident from her, and did not calm down until the other resident was put to bed. RR7: 332. On 12/25/08, Christmas day, she was in an altercation after she slapped someone else on the back of the head and another patient popped up and ripped off her blue necklace. She was combative, cursing and hitting the whole day. RR7: 338.

*January 7, 2009:*

Nursing notes from January 1st, the week before the Lemus deed was executed, through January 18, 2009, RR7: 352-387, are included in Appendix 3. The nursing notes do not indicate that anyone took her out of the nursing home on the 7th, but there was an apparent charting error,

20

and the evening notes are crossed out. RR7: 364. The check-off portion of the chart indicates she was alert but confused, and resisting care.

Irma Lemus admits that Laura Wells was at the nursing home on the 7th of January when she went to pick Elvia up. RR5: 132. She believed that Elvira recognized her because she called her "mija." RR6: 39.

However, Laura Wells says that when Irma walked in Elvira did not recognize her -- she reacted to her like any other person. She did not call her by name. She was not capable of recognizing any family members at that time. Her grandmother did not know who she, Laura, was. She was able only to ask about her son, who was with her, with questions such as "What's his name? How old is he?" Laura stayed until visiting hours were over about six or seven. She concluded Irma was going to take her out because she had her bag with her. RR3: 176- 180.

On January 11, 2009 there is a nursing note that the resident's daughter had taken her out for a visit around 3pm and was going to return her within a few hours. RR7: 372. The morning notes that day indicate that she was physically aggressive, confused and disoriented. *Id.*

On January 16, 2009, the date the power of attorney and medical power of attorney were purportedly signed at attorney North O. West's office, there is no indication that Elvira was out on a pass. The hand-written nurse's notes and the chart check-offs indicate she was anxious and confused, had to be constantly redirected to her room, and was occasionally combative with staff. She was still totally dependent on staff to dress and bathe, was incontinent of bladder and bowel, and otherwise unable to care for herself. Similar notes of confusion and disorientation appear on all the other entries between January 1 and January 18th.

Irma Lemus admitted that she knew her mother had a diagnosis of Alzheimer's but declined to offer any opinions on how that affected her ability to understand what she was doing. She said

21

she was "not qualified." RR6: 30-33. Other than being called "mija" Irma offered no other examples of behavior that indicated her mother was mental competent. So why did she think her mother had the mental capacity to sign the deed? "She expressed her desire for us to take over the house. She expressed to me her fear that that house would go to Johnny Garza and she expressed to me that that was not what she wanted to happen to the house. She expressed her fear on that." RR6: 33, lines 17-21.

The conflict between John David Aguilar and Irma Lemus is recorded in the nursing home records in March. Under "social progress notes" on 3/25/09, the staff noted that "there are family dynamics issues as resident's children are both obtaining POAs" and the daughter wants to take her mother out of the nursing home. Irma had not voiced any complaints to the staff about her mother's care, but did complain about her brother. The notes indicate that both David Aguilar and Irma Lemus were advised that their POAs were void, and they needed to consider a guardianship. The daughter also wanted to be able to take her mother out for visits and David said it would be fine as long as she did not have Elvira sign any legal documents. RR7: 416-417.

The deed created major problems for Elvira Aguilar's continued care. A transfer of an exempt asset, her home, within five years of an application for Medicaid benefits, would destroy her Medicaid eligibility. The rules are at Tex. Admn. Code §358.401.

**THE LEMUS DEED – JULY 7, 2009**

Plaintiff's Exhibit 1, RR7: 7-9, is the fraudulent deed purportedly conveying 106 Cameo from Elvira Aguilar to Irma Lemus and Manuel Lemus, Jr. It shows on its face that it was prepared at the office of West and West, attorneys, notarized on January 7, 2009 and e-filed on January 8[th.]

In the original lawsuit to set aside the deed filed by John David Aguilar, in her sworn answers to interrogatories, Irma Lemus had claimed that Elvira herself had called the lawyers

office to ask that the deed be prepared although she had to admit that was not true.  RR6: 28. Plaintiff's Exhibit 49, RR7:  447-454.

Manuel Lemus, Jr. claimed he was present at the law office when Elvira signed the deed giving the house to Irma and himself, as well as a durable power of attorney and medical power of attorney.   She wanted to give them the house, he claimed, because it was not being taken care of, and she wanted someone to take care of it.  RR4: 73.    Manuel claimed that she was able to recognize him -- she called him "mijo" when she had been at the Lemus home.  RR4: 57.

*The Notary*

The Lemus deed was notarized by Kimberley Wynns, however, who was *not* an employee of West and West.  Wynns claimed that she did not have her notary book from the time period because it had been water damaged.  RR4:  117.   However, she remembered the transaction because it was at a Starbucks not a law office.  RR4: 118.

She agreed that as a notary public her only obligation was to determine whether the signator was the person they represented themselves to be, but not to determine whether they understood what they were doing.   "If the person looks like they're in distress or being forceful (sic), yeah, I would recognize that. I can't, however, decide how they sign a document or whatever at that time." RR4: 119, lines 16-19.

However, Ms. Wynns claimed that it was her normal course of business to ask a person if they understood what they are signing.  "The best I can remember, this was five years ago, she was able to." RR4: 121 lines 21-22.  Asked if she had any concerns about anything in this situation, she volunteered that the when the request had come in "her daughter did mention she was not easily mobile and did ask if she needed to be present and I did confirm that yes, she did."  RR4: 122, lines 22-25.  On the Court's examination, the witness stated that the daughter had assisted her

mother by saying "mom you need to sign this." RR4: 124. Other than nodding, there was very little conversation. *Id.* Irma Lemus did not try to say otherwise: "Q: "Was there any communication or conversation between your mom and the notary? "A: Not that I recall." RR5: 136, lines 109-21.

*The Attorney*

North O. West, a real estate attorney, had prepared the warranty deed, durable power of attorney, and medical power of attorney RR5: 57-58. He had no independent recollection of these documents and where they were executed. RR5: 60 line 13-15, RR5:61, line 25. He could testify only as to the usual procedures in his office. He assumed , based on and assumed based on those procedures that a person signing documents at his office would understand what they were doing. RR5.

He *assumes* by the fact that Elvira's durable power of attorney and medical power of attorney appointing Irma Lemus were signed and notarized by people at his office, that there was no issue about the Elvira understanding the documents. RR5: 64 and RR5: 73, lines 9-13.

When asked how documents are prepared, he said someone would call or come in and ask for a deed or will and the staff would ask them the questions to fill in the blanks. RR5: 72. He said that sometimes they are requested by somebody calling by phone and can be sent by mail. RR5: 59-60. Usually questions are not asked of the person when they are signing the document unless there's reasonable suspicion that the person does not know what they are doing. RR5: 62, lines 19-21. Because intake has already occurred in which the questions are asked, he assumes that the person understands what they are signing. RR5: 72

However, West acknowledged that there have been four or five cases in which documents which were prepared and signed in his office were challenged in litigation as void for want of

24

capacity or made under duress. On those documents the signatures looked deteriorated or illegible and that "could be" a sign of deteriorated mental capacity. RR5: 79 lines 19-25 through RR5: 80.

He also admitted that things like medical power of attorney and durable power of attorney were prepared for elderly people who might not quite be competent –"all the time"-- as a matter of expediency to help the people who were trying to take care of them. RR5: 81-82

Plaintiffs objected to the Lemuses attempt to have West testify as an expert on legal issues when he had not been designated as an expert – but withdrew the objection after the court indicated she would be interested in hearing it. RR5: 67.

The court asked North O. West of the sufficiency of the Aguilar/Garza document as a will, and then whether it could nevertheless be offered as a deed. Appellants seriously misrepresent this part of his testimony in their brief (p. 30) by claiming that he said "unequivocally" that the Aguilar document was "nothing" i.e. of no legal effect, citing RR5: 117, lines 10-14. What he said is *if* it was intended to be a will "it fails by the technicality of the fact that that it wasn't witnessed: "So it's a failed will, and that's all it is, then it's nothing. If it is a present gift …" the court interrupts to ask a question about its sufficiency as a deed. RR5: 11711-25 to 118, line 1. West then says

> "The Witness: There's language in here that says "therefore we agree that the
> house be evenly owned by John , Laura, Johnny B. Nothing would be done to
> the house without the authorization of John , Johnny B. and Laura. It gives
> Laura a final say. And that's not correct.
> (Pause in the proceedings. Witness reading document.)
> The Witness: It looks like that it is an intent to make a present gift.
> The Court: I appreciate your expertise and I am going to allow –
> The Witness: I believe that's what it is.
> The Court: A present gift.
> The Witness: Right."
>
> RR5: 118, lines 2-16.

On examination by defense counsel he does say "no" to the question of whether the document has words of conveyance showing the intention of the grantor exist in the document. RR5: 119, lines 7-14. He agrees that there is no acknowledgment, but states that that could be cured by litigation. RR5: 119, lines 5-10. The court: could that be done by declaratory judgment? "Yes." RR5: 123, lines 5-15.

The only point on which Mr. West's testimony is unequivocal is on whether the document is a valid will, which it is not. It was of course not offered as a will. As to whether it constitutes a deed he declares it is ambiguous, but says it does show an intent to make a present gift. He equivocates thereafter. RR5: 116 to 131.

## THE LEMUS CLAIM FOR IMPROVEMENTS TO 106 CAMEO

*The Lockout*

After the death of Nanette, John Rene Aguilar had gone back to 106 Cameo to move in. Nanette's house was in foreclosure. He had the electricity switched from Johnny's name to his own. RR3: 146. He had planned to move there with his girlfriend. It had not felt like home since Elvira was gone. RR3: 148 – 149.

He did not stay very long. He received a threatening phone call from Ms. Lemus's daughter Alyssa saying to move out of the house because it belonged to her mother. That was the first he had heard about a deed to the Lemuses. RR3: 147.

Johnny Garza had gone back to long haul trucking. He was mostly living in his truck. He came back to 106 Cameo and found himself locked out after Nanette died. He found out about the Lemus deed through the children. RR3: 72-73. The children were able to continue to access the house through the garage even though the locks had been changed. RR3: 77. The Appellees there were conflicts with the Lemuses. They had been mowing the lawn, when the Lemuses called

the cops on them, saying they were trespassing. RR3: 78. No repairs or improvements were made inside the house between 2009 and 2012. RR3: 80.

John David Aguilar asked Johnny Garza to help with the suit to get the deed set aside and he filed a copy of the Aguilar "will" in that lawsuit. (The grandchildren had also intervened as heirs.) That case was nonsuited without prejudice to refile. RR3: 75-76.

The second lawsuit was filed on January 6, 2012. (CR1: 1). Soon after the locks were changed, the back door was chained and locked, and the garage door was locked from inside. There was no way to get in and no one had gotten notice it was going to happen. RR3: 79.

Johnny B. Wells went by the house and found his clothes in trash bags on the lawn. The Lemuses told him to stay clear of the house. He asked the Lemuses if he could get his things out of the house and they met him there. He discovered that a majority of his things had been stolen. They claimed people had been going in and out of the house. The Lemuses told him that John Rene and Laura would not be allowed to go to the house. RR2: 91-93.

It was only after plaintiffs brought a motion to inspect the house in 2014 -- to review the improvements the Lemuses were claiming -- that they were allowed back in. RR3: 81. The family's furniture that had been piled up in the garage. RR3: 82-83. Laura Wells was there that day. She had a big plastic box of photographs of the family which were prominently displayed at the house by Irma and Manuel. She asked Irma for it. Irma refused. Her family pictures have yet to be returned. RR3: 194.

*Lack of Good Faith*

Manuel Lemus, Jr. and Irma Lemus both denied that they knew that Johnny Montoya Garza or anyone else had an adverse interest in the house when they began making repairs and

improvements to the house in 2012. He even denied knowing that the reason John David Aguilar had sued them was to keep Elvira Aguilar from being disqualified for Medicaid. RR4: 108.

However, in the first lawsuit filed by John David Aguilar, Johnny Garza had not only intervened to assert his interest under the "will" but had done a mechanic's lien at the request of Aguilar which became necessary when the Lemus got their deed. RR3: 123.

In the first suit, Manuel Lemus, Jr. had filed an affidavit stating that Elvira had given them the property to "keep it from Johnny Garza." Plaintiff's Exhibit 45, RR4: 107. In the affidavit he also stated that she wanted the house to be sold so that she could use the proceeds as a source of income." However, he did not try to sell the house. RR4: 110.

In her responses to interrogatories in the first suit, Irma Lemus had verified that her mother wanted her to have to house to "keep it from Johnny Garza." RR4: 27. How would he have an interest if he was not her husband? She answered "She was the one who told me there was a possible will." RR6: 41.

The Lemuses had not started working on the property in 2009 because it was "unliveable," and had water damage. RR4: 16. When they started to work in 2012, they had to repair the roof. Yet they now claim the reason that Elvira wanted them to have the house because she wanted someone to take care of her home because it was not being taken care of. RR4: 71.

*Claim for Reimbursement*

Manuel claimed that the work and materials on the improvements totaled $51,328.73. RR4: 61, 63. However, the documentation he produced on discovery included over $40,000 in payroll checks all signed and annotated as relating to work on Cameo by Irma Lemus. RR4: 78.

The first time the Lemuses paid taxes on the property was in 2011. RR4:18

28

Manuel Lemus claimed that he had made all of the improvements before he got notice of the second lawsuit, and then he stopped. RR4: 35. However, suit was filed January 6, 2012, and he could not did not produce any checks or receipts dated prior to March of 2012. RR4: 80-82

*Value of use and occupation:*

The Lemuses excluded Elvira's grandchildren from 106 Cameo for over five and a half years. Appellants have several rental houses which Manuel stated rent from $500 to $600 for a 700 square foot house. However, he declined to admit that the reasonable rental value of a 2000 square foot house would be at least $1000. RR4: 8-14. He stipulated that the square footage of 106 Cameo was 2988 square feet based on the Bexar County Appraisal District figures. RR4: 86.

**AUTHENTICITY OF ELVIRA AGUILAR'S SIGNATURE**

Even though she had been accused of forging the signature, Irma Lemus tried to authenticate the endorsement signature on the Hartford trust fund checks as her mother's very own signature. Defendants Exhibit 4, RR7: 484. Irma Lemus then claimed that Elvira's signature on the Aguilar "will" was a forgery. That the E was wrong, the G was wrong, the A was wrong. RR5: 30-31.

There is an "independent" exemplar of Elvira's signature on the loan document for the improvements to the house. Plaintiff's Exhibit 37. RR7: 82-85. While the capital letters on the loan document are similar to the Hartford endorsements, the loan document signature and the one on her "will" show a more angled, tighter, jerkier hand-writing. The signatures on the Hartford checks (Defendants' Exhibit 4, RR7: 470-473.) are rounded and smoothly written, much like the hand-writing on payroll checks signed by Irma Lemus. Defendants' Exhibit 8, RR7: 486, et seq. All of the documents with Elvira Aguilar's real or faked signatures are grouped together at Appendix 4: Signatures.

**REPLY TO ISSUES PRESENTED**

Reply to Issue I:  The evidence is legally and factually sufficient to support the trial court's finding that the Aguilar "Will" - Deed of March 11, 2005 satisfies the requirements of a deed and conveys good and valid title.

Reply to Issue II:  The evidence is legally and factually sufficient to support the trial court's finding that Elvira Aguilar lacked the requisite mental capacity when she signed the Lemus Deed on January 7, 2009.

Reply to Issue III:  The evidence is legally and factually sufficient to support the trial court's finding that the Lemuses did not act in good faith in making improvements to 106 Cameo.

Reply to Issue IV:  The evidence is legally and factually sufficient to support the trial court's implied finding that Elvira Aguilar signed the Aguilar "Will" - Deed

Reply to Sub-issues I – III:  Attorneys fees were properly awarded to the prevailing party pursuant to Tex. Civ. Prac. & Rem. Code § 16.034

**SUMMARY OF ARGUMENTS**

The Aguilar "Will" of March 11, 2005 is effective as a deed.  It meets all the requirements of a deed under Tex. Prop. Code §5.021 and of a gift deed.   Whether a document is a "will" or a "deed" is determined by the intention of the grantor as apparent from the document.  Formal words of grant are not required. A writing is sufficient to convey an interest if it is clear that the donor has relinquished ownership and control, even if there is a reservation of right to possession. Delivery of a deed is presumed from the time it is executed, especially in the case of a deed from a parent to a minor, and does not need to be actual or manual. Lack of authentication and recording do not defeat it as a deed as to the Lemuses.  Tex. Prop. Code §13.001 provides that an unrecorded instrument is binding on heirs and persons who do not pay valuable consideration.

Elvira Aguilar was by an overwhelming preponderance of the evidence lacking the mental capacity to understand the nature and effect of her actions when she "signed" deed to the Lemuses on the 7th of January, 2009 as well as years before because of Alzheimer's disease.   The court correctly cancelled the deed as void.

The Lemuses' claims under Tex. Prop. Code § 22.021 for "good faith" improvements to 106 Cameo fail because they were fully on notice of adverse claims of title at the time they were made. If a trespasser makes improvements after suit is filed, a lack of good faith is conclusively established. Furthermore, they failed to offer proper evidence under the statute of the increase in the value of the property due to the improvements claimed, and any such value would have been offset by the value of the use and occupation of the property.

The authenticity of Elvira Aguilar's signature on the Aguilar "will" is presumed as if fully proven because Appellants failed to file a verified pleading under Rule 93 Tex. R. Civ. Proc. Appellants did not even raise the issue in their pleadings. Furthermore, the proof offered by Irma Lemus is inherently unreliable and the trial court could disregard it altogether.

Attorneys fees were properly awarded under Tex. Rev. Civ. Stat. § 16.034.

## ARGUMENT AND AUTHORITIES

*Standard of Review*

Appellants' brief appears to correctly state the standards of review for *legal sufficiency*. Appellees would add that when a party challenges the legal sufficiency of evidence supporting an adverse finding on an issue on which the other party has the burden of proof, the challenging party must *demonstrate* on appeal that there is *no* evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W. 2d 55, 58 (Tex. 1983) If the record contains *any* evidence of probative force to support the finding, the legal insufficiency challenge must be overruled. *ACS Investors v. McLaughlin*, 943 S.W. 2d 426, 430 (Tex. 1997).

Appellants' brief also appears to correctly state the standards of review for *factual sufficiency*. Appellees would add that the fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony and has the right to believe all, some, or none

31

of their testimony. *Benoit v. Wilson*, 239 S.W. 2d 792, 796-97 (Tex. 1951), *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex. 1993). Also, a fact can be *conclusively* established if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S. W. 3d 802, 816 (Tex. 2005)

TRESPASS TO TRY TITLE: [2]

To prevail in a trespass to try title action, a plaintiff must usually (1) prove a regular chain of conveyances from the sovereign, (2) establish superior title out of a common source, (3) prove title by limitations, *or* (4) prove title by prior possession coupled with proof that possession was not abandoned. *Plumb v. Stuessy,* 617 S.W.2d 667, 668 (Tex.1981); *Land v. Turner,* 377 S.W.2d 181, 183 (Tex.1964). Prior possession carries the presumption of an ownership interest against one having no title or a title that is void. *Walsh v. Austin*, 590 S.W. 2d 612, 615.(Tex. App.— Houston [1st Dist.] 1979 ) *Massey v. Lewis*, 281 S.W. 2d 471 (Tex. App. – Texarkana 1955 writ ref'd n.r.e.)

Appellees not only had prior possession, which they never abandoned, but they had a good and sufficient deed from Elvira Aguilar conveying the property to them as of March 11, 2005. Not only was the Lemus deed subsequent to the Aguilar "will," but it was void for want of the grantor's mental capacity.

---

[2] District court, not probate court has exclusive jurisdiction over a trespass to try title case even when it is brought by one claiming title as heir where there is no probate administration pending or necessary. *Bell v. Hinkle,* 562 S.W.2d 35, 37 Civ. App. – Houston [14th Dist.] 1978). At the time of her death Elvira's only asset would have been the house, to which recorded title was then in the name of the Lemuses.

**REPLY TO ISSUE I:**      The evidence is legally sufficient to support the trial court's finding that the document titled "will" signed by Elvira Aguilar on March 11, 2005, though not effective as a will, satisfies all the requirements of a gift deed and conveys good and valid title to 106 Cameo to her grandchildren, John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells.

Even though the document signed by Elvira Aguilar on March 11, 2005 is labelled as a "will" it meets all the requisites of a deed to convey the property at the time of its execution. The label does not control. The intention of the maker does.

*Basic Rule of Construction:  Intent of the Maker*

The basic rule of construction for interpreting an instrument – whether contract, deed or will – is determine the intent of the maker and give effect to that intent if possible.   *Brown v. Payne* 176 S.W. 2d 306, 309   (Tex. – 1943).  The difference between a deed and a will is whether the manifest intention of the instrument passes a present interest in the property, even if possession does not occur until the future.   But if the instrument does not pass an interest or right until the death of the maker it is a will or testamentary paper.  The question is determined by the intention of the parties derived from the whole instrument. *Id.* 309.  *Haile v. Holtzclaw*, 414 S.W. 2d 916, 922 (Tex. 1967).

The inquiry into whether a document is a deed or a will has been a frequent one for Texas courts.  The intention of the maker, not its form or self-description, s the controlling rule in determining whether an instrument is a deed or a will. *Low v. Low*, 72 S.W. 590 (Tex.App.- Dallas, 9, 1914, writ ref'd). (Grantor's instrument did not say it was a deed or a will – it conveyed the property to his wife and children, but reserved control and management of the property his death and made wife's retention of the property contingent on her not remarrying. Held to be a present conveyance.)

Merely because a conveyance is to take effect only on the death of the grantor does not make it testamentary *Cushenberry v. Profit,* 153 S.W. 2d. 291 (Tex. App. --Eastland, 1941writ ref'd). (Instrument which conveyed community property to a trustee, reserving life estate to themselves, for distribution to children after couple's death was not effective as a will, but was effective as a deed because it did not reserve a right to revoke it.)

In *Soper v. Medford,* 258 S.W. 2d 118, 122(Tex. 1953), the Supreme Court held that where there is language calling the instrument a "last will and testament" but it clearly conveys a present interest in the property, the surplusage will be disregarded. "Although inexpertly and crudely drawn, the deed shows a conveyance to the children" *Id.* 122. "…We harmonize seemingly inconsistent, but not irreconcilable parts of an instrument, and we will, if it can be reasonably and fairly done, construe an instrument so as to make it valid and operative rather than to make it a nullity. *Fox v. Lewis*, 344 S.W. 2d 731, 737 (Tex. App. – Austin, 1961,writ ref'd n.r.e.) (document stated that consideration for conveyance was the promise by sons to care for grantor parents for remainder of lives, that if they faithfully complied with their promises, that after their death title would pass to sons, but failing such consideration the conveyance would be null and void – held constituted deed transferring present interest, even though "defeasible.")

Intent is also construed by whether the grantor has retained the right to revoke or withdraw by express language or by necessary implication. *Dickerson v. Keller* 521 S.W. 2d 288, 293 (Tex. App. –Texarkana, 1975 writ ref'd n.r.e). (Stating that the grantor intends to remain in possession and that at her death the instrument would pass title did not make it testamentary. *Id.*)

Construed under these principles, the Aguilar "will" is in fact a deed.

*"Will" ="Intent" of Elvira G. Aguilar and Johnny Montoya Garza*

This simply worded – and heartfelt -- document was printed out by hand by Johnny Montoya Garza to express the "will," as in the sense of "the intent," as to the ownership of their home. This couple had lived together for twenty years and raised the children they meant to have it. The fact that it is called a "will" does not change the plain intent of the grantors: the house now belongs to the children.

First Elvira and Johnny declare who the house belongs to at the time they prepared the document. "We the above people agree that the house at 106 Cameo San Antonio Texas belongs to Elvira G. Aguilar and Johnny Montoya Garza …."

Then they recite the purpose of building the house as an explanation for the gift: "The house was built because of the children ….we decided to add on to the house to make rooms for the children."

"Therefore we agree that the house be evenly owned by John Rene Aguilar, Laura Ashley Wells and Johnny B. Wells."

There is no ambiguity about when the ownership and control of the house begins: "Nothing will be done to the house without the authorization of John Rene Aguilar, Johnny B. Wells and Laura Ashley Wells. In case of a disagreement on the Aguilar part and the children listed above (they will) have the final say in what is to be done to the house at 106 Cameo, San Antonio, Texas 78214. John Rene must keep me informed of all dicissions so that I, Johnny Montoya Garza can be as helpful to the children so that there is no harsh discissions made…"

The fact that Elvira remained in possession of the property or the two intended to stay in the house "until they were deceased," as Johnny Garza put it, does not defeat the immediate conveyance of ownership. A present interest in real property can be conveyed while retaining a

right to possess and enjoy the premises.   Cf. Tex. Prop. Code § 5.041.   There is no place in the document that even references that the property will pass only "upon our death" or the possibility of revocation.  *Dickerson*, 293.

What Johnny and Elvira called the document is not dispositive of the nature of the instrument.  *Soper,* 122.  If inconsistent parts of an instrument can be reconciled, the court should construe it so as to make it valid and operative rather than a nullity.  *Fox,* 737

There are three places where the word "will" is used. At each place, it appears to have the plain meaning of "this is our intention, what we want, what we are doing:"

First in the title:  "*Will* from Johnny Montoya Garza and Elvira G. Aguilar."

In the next two instances he is clearly asking that the adult children of the family respect that the transfer of ownership is a done deal, and not try to undo it.

> "I Johnny Montoya Garza am expecting that all family members except this *will* that Elvira  G. Aguilar and Johnny Montoya Garza have decided to award the house at 106 Cameo to the children listed previously."

> "I Johnny Montoya Garza am positively sure that there will be no disagreement between the families.  So I hope that John David Aguilar and Nannette Aguilar and other family members respect the wishes of Elvira G. Aguilar and Johnny Montoya Garza. Please have all family members sign this agreement *will.*"

The expression of their intentions and the request that the adult children not try to interfere with it ends with a blessing:

> "May God be with you all in these hard times please agree to your mom and my
>  discission.  We had discussed this between us when the children were put in our hands.

>> "Thank you all very much.
>> Johnny Montoya Garza
>> Elvira G. Aguilar
>> Signed this day of March 11-05."

Besides the grand-children and Irma Lemus, there are two other remaining heirs, John David Aguilar and Irene Lambert.  They did just that, i.e. respected the wishes of  Elvira Aguilar,

by quitclaiming any right title and interest to the house through the estate of Elvira Aguilar to Johnny Montoya Garza and the grandchildren John Rene Aguilar, Laura Ashley Wells and John Rene Aguilar." CR2: 14 and CR2: 18.

*Requisites of a valid deed and of gift deed*

The requisites of a valid deed are simple that it must be in writing, describe the property, be signed and delivered. Tex. Prop. Code. Ann. Sec. 5.021.

The requisites of a valid gift of real property are 1) donative intent of the grantor, 2) the delivery of the property to the grantee, and 3) acceptance of the property by the grantee. *Thompson v. Dart*, 746 S.W. 2d 821, 825 (Tex. App. – San Antonio, 1988, no writ.)

Appellants Irma Lemus and Manuel Lemus, Jr. challenge the legal sufficiency of the evidence that the Aguilar "will" constitutes a valid deed based on lack of evidence of three supposedly missing elements: no operative words of grant, no delivery, and no acknowledgement and recording.

A legal sufficiency challenge can be sustained only if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). Appellants have wholly failed to demonstrate that any of these elements is unsupported factually or that the evidence is excluded by law.

*Operative words of grant established by intention shown*

The intent to transfer immediately is clear: "Therefore we agree that the house be evenly owned by John Rene Aguilar, Laura Ashley Wells and Johnny B. Wells… the children listed above have the final say in what is to be done to the house at 106 Cameo."

The formality of the instrument or the words of grant do not matter as long as the intent is clear: "There is no longer a requirement that a deed have formal language of conveyance. If from the whole instrument a grantor and grantee can be ascertained, and there are *operative words* (emphasis added) or words of grant showing an *intention* by the grantor to convey title to a real property interest which is sufficiently described to the grantee, and it is signed and acknowledge by the grantor it is a deed which accomplishes a legally effective conveyance." *Green v. Canon*, 33 S.W. 3d 855, 858. (Tex. App. – Houston [14th Dist.] 2000 pet. denied.) (construing whether letter from mother to son and his wife suggesting they get a deed made up in their name for her former home where they were living and paying taxes, held not to constitute a deed or contract to convey because it contemplated future action).

*Present right of control and possession creates gift deed*

The children's ownership and control are immediate: "Nothing shall be done to the house without the authorization of John Rene Aguilar, Johnny B. Wells and Laura Ashley Wells. In case of a disagreement on the Aguilar part and the children listed above have the final say in what is to be done to the house."

In determining whether a gift was intended by the execution of a deed, we must look to the facts and circumstances surrounding its execution in addition to the recitation of the deed itself. *Haile v. Holtzclaw,* 414 S.W.2d 916 (Tex.1967). *Woodworth v. Cortez,* 660 S.W.2d 561, 563 (Tex. App. -- San Antonio, 1983, writ refused n.r.e.) Therefore, the testimony of Johnny Montoya Garza stating that they considered the house to belong to the grandchildren as soon as the "will"

38

was written up must be considered. RR3: 48, lines 14-16. Except for the interference of the Lemuses, the Appellees had possession of the house as completely as their grandparents, as well as having been given a greater right of control. *Id.* 563-564.

*Delivery presumed, need not be manual*

Appellants are correct in stating that the law presumes a grantor delivers a deed on the date of execution. *Burgess v. Easley,* 893 S.W. 2d 87, 90 (Tex. App. – Dallas, no writ). However, Appellants have not overcome the presumption by offering any evidence other than the fact that Elvira tucked it away in a file cabinet. To be conclusive evidence of non-delivery, as they contend, reasonable minds could not differ on whether it was delivered or not. *City of Keller,* 816.

The deed was kept in the house which the Appellees called home. Johnny Montoya Garza testified that he told John Rene Aguilar of the document, and the others knew about it. RR3: 51 lines 7-16. The children knew they owned the house. Johnny B. knew that his grandparents wanted the children to have the house – "his whole life." In 2005 he learned that they had been given the house. RR2 114-115. John Rene Aguilar testified he knew about the March 11, 2005 document. RR3: 136. The children and Johnny Garza all treated it as their home, even if not there all the time, John Rene would have lived there after his aunt's death and his grandmother's admission to the nursing home except for the interference of the Lemuses. Therefore, there is evidence of acceptance of the gift, as well as delivery. *Thompson*, 825.

An actual or manual delivery by grantor in person to the grantee is *not* essential to pass title. *Chew v. Jackson*, 102 S.W. 427 (Tex. App. 1907); *Davis v. Bond* 141 S.W.2d 979 (Tex. App. – Texarkana 1940, aff'd); *Osborn v. Cone*, 234 S.W.2d 88 (Tex. App. – Ft. Worth, 1950 no writ.)

Furthermore, a deed from a parent to minor children is ordinarily held to convey the grantor's estate although it remains in the possession of the grantor until the majority of the children because in such circumstances it is presumed that the possession is held for the children. *Soper,* 122. At the time of the execution of the Aguilar "will"- deed in March of 2005, both Johnny B. Wells and Laura Wells, were minors. (cf. Court's Exhibit 1, Corrected Affidavit of Heirship, RR7: 541- 543.). Johnny B. was fifteen and still living at home then. His sister Laura was seventeen. The document was kept in their home.

*Acknowledgement and recording not required as to Lemuses*

Tex. Prop. Code Sec. 13.001(b) provides that "A prior unrecorded conveyance is binding on a party to the instrument, **on the parties' heirs**, *and* on a subsequent purchaser who does not pay a valuable consideration *or* who has notice of the instrument."

By statute, the Aguilar "will"- deed is binding on the Lemuses even if their deed is ***not*** void for want of capacity. Irma Lemus is, of course, an heir. The Lemuses paid nothing for the property but "love and affection" (Irma Lemus Responses to Interrogatories, Plaintiffs' Exhibit 49, RR7: 447-454, Response No. 1). Because she initially took the position in the first suit that her mother did not want Johnny Garza to have the house, *id.* Interrogatory Response No. 18, it is reasonable to conclude that Irma and Manual Lemus, Jr. had notice that Elvira had given Johnny an interest in her property already.

The sole purpose of an acknowledgment is to authenticate an instrument as being the act of the person executing it and is required before it can be filed of record as notice to the general public. *Sanchez v. Telles,* 960 S.W.2d 762, 768 (Tex.App.- El Paso, 1997 pet. denied). Lack of a formal acknowledgment can be cured by authentication. *Id.* Recording with the county deed records is necessary to put innocent purchasers on notice of the ownership of the property.

*Sanchez*, 768.   However, no recording was necessary in order to make the deed binding on Irma and Manuel Lemus, Jr. by virtue of Tex. Prop. Code §13.001.  The fact that the instrument was not acknowledged or recorded is irrelevant as to the Lemuses.

The Appellants have not established a want of legal or factual sufficiency on the trial court's findings on any point raised.

**REPLY TO ISSUE II:     The evidence is both legally and factually sufficient to support the trial court's finding that Elvira Aguilar lacked the requisite mental capacity when she signed a deed granting 106 Cameo to Irma Lemus and Manuel Lemus, Jr. on January 7, 2009, and  the trial court was correct in declaring the deed void.**

It has always been a principle of law in Texas that a deed made without the effective consent of the owner is void.  Such a conveyance "will not be upheld as against the grantor or his heirs, where at the time of its execution the grantor was laboring under such a degree of mental infirmity as to make him incapable of understanding in a reasonable manner the nature and effect of the act he was doing."     *Caddell v. Caddell,* 131 S.W. 432, 434 (Tex. App.– 1910 no writ) A deed is **void** and "will be canceled and annulled for fraud arising from imposition and undue confidence or influence practiced upon a grantor of enfeebled mind produced by old age and added mental and bodily infirmities.  *Id.* 434.

The Appellants claim that the evidence is legally and factually insufficient to support the trial court's finding that Elvira Aguilar lacked the requisite mental capacity to execute a deed to the Lemuses is based on an attempt to restrict the evidence of her capacity solely to the date of the execution of the deed.  On that day, the Lemuses claim, the only evidence Appellees could offer was that of Laura Ashley Wells, who happened to be at the nursing home when Irma picked her up to whisk her to the notary public.

41

*Standard for mental capacity to make a deed*

The evidence that Elvira Aguilar did not have the requisite mental capacity to make a deed on January 7, 2009 is so compelling that it should be considered legally conclusive. Reasonable minds could not differ on this fact. *City of Keller*, 827. The evidence is so meager on the Appellants side as to be no more than a scintilla. The overwhelming weight of the evidence is so strong, that to hold that she knew what she was doing when made a scrawl on that deed would be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W. 2d 175, 176 (Tex. 1986).

The legal standards for determining whether a person has the mental capacity necessary for execution of a deed, will or contract are the same: does the actor appreciate the effect of what she is doing and understand the nature and consequences of her acts and the business she is conducting. *Mandell and Wright v. Thomas* 441 S.W. 2d 841, 845 (Tex. 1969); *Bach v. Hudson*, 596 S.W. 2d 673 (Tex. App. – Corpus Christi, 1980 no writ hx.). *Bradshaw v. Naumann,* 528 S.W.2d 869, 873 (Tex.App.-Austin 1975, writ dism'd);

*Relevant time period*

While the grantor's mental state at the time of the execution of the deed is the relevant inquiry (see *Decker v. Decker*, 192 S.W. 3d 648 (Tex. App. – Ft. Worth, 2006 no pet.), and while there is a presumption that the grantor had the capacity to make the deed, (see *Jackson v. Henninger*, 482 S.W. 2d 323 (Tex. App. – Austin, 1972 no writ), the determination of mental capacity must include more. Justice Greenhill, writing for the Supreme court in *Carr v. Radkey* 393 S.W. 2d 806, 813 (Tex.-1965) stated that "…in cases such as these the jury should be given ALL relevant and competent evidence with regard to the mental condition of the testatrix."

"Mental capacity may be established by (1) circumstantial evidence that shows a person's outward conduct, manifesting inward and causing condition; (2) pre-existing external

circumstances tending to produce a mental condition; and (3) prior or subsequent existence from which its existence at the time in question may be inferred." *Bach,* 676.

*Persistence of condition*

Evidence of incompetency at other times is probative if it demonstrates that the condition is one that persists and has some probability of being the same condition which existed at the time of the making of the instrument. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. - 1968)

*Nature of the disposition*

The foolishness or inequity of the transaction can be considered, *Bach,* 677, as can an "unnatural disposition," i.e. the lack of a reasonable basis for preference of the beneficiary in light of all the circumstances. *Mason v. Mason* 369 S.W. 2d 829, 839 (Tex. App. – Austin, 1963 writ ref'd.n.r.e.)

*Opinion evidence*

Lay or expert opinions on mental competency may be considered, however it cannot establish any material fact as a matter of law, because it is only opinion evidence. *Estate of Riggins* 937 S.W 2d 11 (Tex. App. – Amarillo, 1996 writ denied). However, Irma Lemus does admit the doctor would have a better ability to determine Elvira's mental condition. RR6: 36.

What Appellants have offered to establish that Elvira Aguilar had the requisite mental capacity is mere *ipsi dixit* by the Lemuses and their children. The Appellants claimed she recognized them because she called them "mijo" and "mija." There are no other specific examples of lucidity, only the Lemuses' conclusory generalities.

The only other evidence they offered of her capacity, is the rank *assumption* of the lawyer and the notary public that they or their staff would have recognized her inability to understand what she was signing and therefore "she must have understood."

43

There is no unbiased, clear, competent or even arguable evidence that Elvira Aguilar knew she was giving away her home.

The effects of Alzheimer's disease robbed Elvira Aguilar not only of her memory but of her ability to understand when she was being used by her daughter to do what she – in her right mind --  would never have done.

**REPLY TO ISSUE III:      The evidence is legally and factually sufficient to support the trial court's finding that the Lemuses did not act in good faith in making improvements and paying taxes on 106 Cameo.**

Tex. Prop. Code Sec.22.021(c) requires that "the defendant who makes a claim for improvements *must plead*:

> (1) that the defendant and those under whom the defendant claims have had good faith  adverse possession of the property in controversy for at least one year before the date the action began.

*Failure to properly plead for improvements*

The Appellants  filed their Second Amended Answer and Counter Claim  on April 24, 2014 (CR2: . 48-52 ) but did not plead that they had possessed the property *in good faith* at all, as required by the statute at Sec. 22.021(c).   Their counterclaim (para.8, p. 49) states that they "have an equitable lien for improvements, repairs, maintenance and upkeep, and taxes paid on the property" and that the plaintiffs would be "unjustly enriched "if they were not reimbursed. Having failed to properly plead for recovery under the statute, Appellants waived their right to recovery and the court was barred from considering it.

The statute incorporates equitable principals by its good faith requirement, offset for loss of use and occupation, and requirement of proof that the money invested in the property by a good faith purchaser actually improved the value of the property.    The equities in this case, however,

weigh most heavily in favor of the Appellees.   Even had they had properly pled the statute the Lemuses would not recover.

*Good faith – not belief but notice*

Merely because the Lemuses *believed* they had good title, despite the genesis of their deed, does not establish the good faith requirement.  The possessor must also be ignorant that anyone else is claiming superior title to the premises.   *Root v. Mecom,* 542 S.W. 2d 878, 881(Tex. App. -- Beaumont, 1976 writ dism'd).

The Lemuses knew from the original suit brought by John David Aguilar to declare their deed void for want of mental capacity, and the intervention by Johnny  Garza and the grandchildren, that Appellees claimed title to the property, either by the "will" operating as a deed, or because the Lemus's fraudulent deed deprived them of their inheritance.   They were fully on notice of Appellees claims to the property which were sure to be reasserted.

The second suit to void the Lemus deed and assert the Aguilar "will"- deed was filed on January 6, 2012.  (CR1: 3) All of the repairs were made after the second suit was filed.

Every check supposedly written for labor on the house by Irma Lemus and every receipt for materials was dated after March of 2012.  Defendant's Exhibits 8 and 9.  RR7: 486 – to 540.

Despite the Lemuses' testimony that Elvira Aguilar had given them the property so they could take care of it, despite the fact they claimed the roof was leaking and the house was "uninhabitable,  there had been no repairs to 106 Cameo between January 7, 2009, and the filing of the second suit on January 6, 2012.   RR3: 80.

A trespasser is **not** entitled to be reimbursed for repairs made after a trespass to try title suit is filed. *Small v. Morris*, 252 S.W. 2d 772 ,776 (Tex. App. – El Paso, 1952 rev'd on other grounds 255 S.W.2d 174.) When one enters into possession of land and makes improvements on it with

full knowledge of the pendency of an action to enforce an adverse claim to the premises, one is **conclusively** considered a trespasser in **bad faith.** *Mayfield v. de Benavides*, 893 S.W. 2d 500, 504 (Tex. App. – San Antonio, 1985, writ ref'd n.r.e.)

*No reimbursement for taxes paid under fraudulent deed*

The Lemuses repeatedly raised the complaint that Garza and the grandchildren did not help pay the taxes on the property – despite the fact that they had literally locked them out, and prevented them from living in the house on which they expected them to pay taxes.

Section 22.021 of the Property Code does not specifically address the equitable issues of whether the trespasser, i.e. the party without good title, should be reimbursed for taxes. However, common law does. Taxes need not be reimbursed to a person who obtained a deed by fraud. *Chambers v. Wyatt,* 151 S.W. 864 (Tex. App. – El Paso, 1912, no writ hx.). A deed obtained by preying on the infirmities and feeble-mindedness of the elderly is a fraudulent deed. *Caddell,* 434.

The trial judge not only found that the Lemuses did not act in good faith, but found that equity required that the Lemuses *continue t*o pay taxes and insurance, maintain the premises and otherwise protect the property if they wanted to appeal the judgment. At the same time as the court set bond, the court entered an Additional Injunction Pending Appeal. (Although bond and injunction hearings were on October 3rd, the orders were not signed and entered until October 27, 2014. The order was apparently not included in the Clerk's Record because the record was forwarded to the Court of Appeals on October 23th. It is not essential to the issues on appeal but is offered for the Court's reference at Appendix 2: Pleadings, Judgment, Injunctions)

*No proper proof of increase in value of house by improvements*

Even if the Lemuses had somehow established that they were possessors in good faith, they failed to make the necessary proof which would have allowed them to recover for the improvements they claimed. Section 22.021(b) allows for recovery for improvements only to the extent that the improvements increased the value of the property. There was absolutely no testimony offered by the Lemuses of the value of the house before the repairs were made or how much the work they had done had increased its value.

*Value of improvements offset by use and occupation*

Even if Irma and Manuel Lemus, Jr. had been found to have acted in good faith, their recovery is limited to the amount by which the estimated value of the defendant's improvements exceeds the estimated value of the use and occupation of the property. Tex. Prop. Code Sec. 22.021(a).

A rough measure of a reasonable rental value on the property was established through Manuel Lemus's testimony. He charged $600 a month for a 700 square foot rent house. The square footage of 106 Cameo was over 2500 feet. The Appellees were locked out of their home for five and a half years, The Lemuses claimed they had spent over $50,000 on the house, and offered no evidence on how that increased the value of the house. The rental value of the use and occupation of the house even at $1000 a month would have far outweighed the cost of improvements. The fact that the Lemuses did nothing with it is irrelevant.

The claim for reimbursement for improvements fails under the statute. It also fails in equity. It is only equitable that the Lemuses have made some repairs and improvements to 106 Cameo after keeping John Rene Aguilar, Laura Ashley Wells, Johnny B. Wells and Johnny Montoya Garza out of their home for so long.

**REPLY TO ISSUE IV:** The evidence is legally and factually sufficient to support the trial court's implied finding that Elvira Aguilar signed the deed to her grand-children on March 11, 2005.

Irma and Manuel Lemus, Jr. did not raise the issue of the genuineness of Elvira Aguilar's signature on the March 11, 2005 document by verified pleading, or for that matter by any pleading. (Defendant's Second Amended Answer CR2: 48)

*Verified denial of authenticity required*

Rule 93(7) Tex. R. Civ. Proc. requires verification of a denial of the execution of an instrument or a challenge to the authenticity of a signature on an instrument, such as a deed.

> "(7)….Where such instrument in writing is charged to have been executed by a person then deceased, the affidavit shall be sufficient if it states that the affiant has reason to believe and does believe that such instrument was not executed by the decedent or by his authority. In the absence of such a sworn plea, the instrument shall be received in evidence as fully proved."

The verification requirement is a strict one: a woman who pled and testified in action concerning title to certain tracts of land that she did not sign the deed by which her interest in tract was conveyed to man with whom she had resided could not complain. She had failed to deny the execution of deed by verified affidavit as required by this rule, so the deed in question was received in evidence as fully proved. *Faglie v. Williams* 569 S.W.2d 557, 566 (Tex. App.—1978, writ ref. n.r.e)

The Lemuses contend that there was "no evidence" that Elvira's signature on the Aguilar "will" was in fact hers. The burden of proof does not shift to the plaintiff in the absence of a verified pleading and Appellee Johnny Montoya Garza had already testified that the signature was hers.

*Inherently unreliable exemplar*

However, even if there were verified pleadings, the fact finder, as the sole judge of the credibility of the witness, is free to disregard Irma's testimony. *Benoit,* 796-97. Irma undermined her own credibility by introducing as her sole examplar of Elvira's hand-writing the Hartford trust fund distribution checks on which she had been charged with forging Elvira's signature. Defendants' Exhibit 4, RR7: 470-473.

There is an "independent" exemplar of Elvira's signature in the record – it appears on the loan document for the improvements to the house. Plaintiff's Exhibit 37, RR7: 82-83.

The loan document signature and the one on her "will" shows a more angular, jerkier, tighter hand-writing. The signatures on the Hartford checks are rounded and smoothly written, much like the hand-writing on payroll checks signed by Irma Lemus. Defendants' Exhibit 8, RR7: 486 et seq..

The various documents with exemplars are attached at Appendix 4: "Signatures."

**REPLY TO SUBISSUES I – III:    Attorneys fees were properly awarded to the prevailing party pursuant to Tex. Civ. Prac. & Rem. Code § 16.034**

Appellants complain that Appellees are not entitled to attorneys fees because the trial court erred in finding against the Lemuses on the sufficiency of the Aguilar "will" as a deed, the mental capacity of Elvira Aguilar to sign their deed, and alleged good faith improvements to 106 Cameo.

Appellees pled and proved their claims under the facts and law on each of the issues presented in this trespass to try title claim and pleaded for attorneys fees under Tex. Civ. Prac. Rem. Code § 16.034, which provides for attorneys fees in trespass to try title actions.    See Appellees Second Amended Original Petition, CR2: 2-13, para. 12.3, p. 13.  Appendix 2:  Final Pleadings and Orders

Tex. Civ. Prac. Rem. Code § 16.034 provides that attorneys fees *shall* be awarded

"(a) In a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court:

(1) shall award costs and reasonable attorney's fees to the prevailing party if the court finds that the person unlawfully in actual possession made a claim of adverse possession that was groundless and made in bad faith."

The statute requires notice to vacate prior to filing suit. Appellees provided the statutory notice to vacate within ten days. Appellees John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells are the prevailing parties although Appellants included Johnny Montoya Garza as well in the style of the appeal. Their intervention in the second suit was on May 18, 2012.

Manuel Lemus, Jr. was asked to to admit that he had been given notice to vacate under the statute but he denied receiving knowing anything about it on an objection of attorney client privilege. Plaintiffs' Exhibit 42, Letter 3/15/12, RR3: 29-30.

Appellants did not raise a challenge that Appellees had failed to give statutory notice to vacate by pleadings or otherwise.

## CONCLUSION

Appellees John Rene Aguilar, Laura Ashley Wells, Johnny B. Wells, and Johnny Montoya Garza respectfully submit that the document signed by Elvira Aguilar and Johnny Montoya Garza on March 11, 2005, although called their "will," expressed their intent to give the house at 106 Cameo, San Antonio, Texas, to the grand-children as of that day, and that they would have immediate control and ownership, and that the "will" in all things it satisfies the

50

requirement of a deed and that the trial court was correct in finding that it passed good and valid title to them.

Appellees John Rene Aguilar, Laura Ashley Wells, Johnny B. Wells, and Johnny Montoya Garza respectfully submit that the overwhelming preponderance of the evidence showed that Elvira Aguilar lacked the requisite mental capacity to sign a deed to Irma Lemus and Manuel Lemus, Jr. on January 7, 2009 and that the deed was properly cancelled by the trial court as void.

Appellees further submit that the Lemuses' claims for reimbursement under Tex. Prop. Code § 22.021 for repairs and improvements made to 106 Cameo were properly denied because they failed to establish they were made in good faith and that the proof offered did not entitle them to any recovery. Appellees further submit that inasmuch as the deed to the Lemuses was obtained by fraud on an elderly person of unsound mind, that Appellees are not liable for any taxes paid by the Lemuses.

Appellant Irma Lemus's contention that Elvira Aguilar's signature on the March 5, 2011 document granting ownership of her home to the children was properly denied inasmuch as her evidence was inherently unreliable and lacking in credibility, and she had failed to properly plead that defense.

As the prevailing parties in this trespass to try title action, Appellees are entitled to attorneys fees under Tex. Prop. Code § 16.034

PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellees respectfully pray that on consideration of the facts and the applicable law, that this Honorable Court affirm the judgment of the trial court in all things, and grant such other and further relief to which they may be justly entitled.

51

Respectfully submitted,

**ANITA J. ANDERSON**
Law Office of Anita J. Anderson
303 West Sunset Suite 103
POB 830722
San Antonio, Texas 78283
Telephone: (210) 533-8726
Telecopier: (210) 533-0989
Email: ajanderson1111@gmail.com

By */s/ Anita J. Anderson*
Texas Bar No. 01165955

## CERTIFICATE OF COMPLIANCE

Appellees certify that this document is within the size limits of the Tex. R. App. Proc. and contains 13,873 words exclusive of cover, table of contents and index of authorities.

*/s/ Anita J. Anderson*

## CERTIFICATE OF SERVICE

A true and correct copy of the above and forgoing has been forwarded o following counsel for Appellants per Rule 21a Tex. R. Civ. Proc. : Sarah Anne Lishman; 310 South St. Mary's St. Suite 845; San Antonio, Texas 78205, sarahanne@jamiegrahamlaw.com, Ana Laura Hessbrook, 4100 N.W. Loop 410, Suite 105, San Antonio, Texas 78229, hessbrook@sbcglobal.net

*/s/ Anita J. Anderson*

# APPELLEES'APPENDIX 1:

# STATUTES AND RULES

V.T.C.A., Civil Practice & Remedies Code § 37.004

§ 37.004. Subject Matter of Relief

Effective: June 15, 2007

Currentness

(a) A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

(b) A contract may be construed either before or after there has been a breach.

(c) Notwithstanding Section 22.001, Property Code, a person described by Subsection (a) may obtain a determination under this chapter when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 2007, 80th Leg., ch. 305, § 1, eff. June 15, 2007.

Notes of Decisions (469)

V. T. C. A., Civil Practice & Remedies Code § 37.004, TX CIV PRAC & REM § 37.004
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle B. Trial Matters
        Chapter 16. Limitations
          Subchapter B. Limitations of Real Property Actions

V.T.C.A., Civil Practice & Remedies Code § 16.034

§ 16.034. Attorney's Fees

Effective: September 1, 2009

Currentness

(a) In a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court:

  (1) shall award costs and reasonable attorney's fees to the prevailing party if the court finds that the person unlawfully in actual possession made a claim of adverse possession that was groundless and made in bad faith; and

  (2) may award costs and reasonable attorney's fees to the prevailing party in the absence of a finding described by Subdivision (1).

(b) To recover attorney's fees, the person seeking possession must give the person unlawfully in possession a written demand for that person to vacate the premises. The demand must be given by registered or certified mail at least 10 days before filing the claim for recovery of possession.

(c) The demand must state that if the person unlawfully in possession does not vacate the premises within 10 days and a claim is filed by the person seeking possession, the court may enter a judgment against the person unlawfully in possession for costs and attorney's fees in an amount determined by the court to be reasonable.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 2009, 81st Leg., ch. 901, § 1, eff. Sept. 1, 2009.

Notes of Decisions (22)

V. T. C. A., Civil Practice & Remedies Code § 16.034, TX CIV PRAC & REM § 16.034
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Property Code (Refs & Annos) |
| Title 2. Conveyances |
| Chapter 5. Conveyances (Refs & Annos) |
| Subchapter B. Form and Construction of Instruments |

V.T.C.A., Property Code § 5.021

§ 5.021. Instrument of Conveyance

Currentness

A conveyance of an estate of inheritance, a freehold, or an estate for more than one year, in land and tenements, must be in writing and must be subscribed and delivered by the conveyor or by the conveyor's agent authorized in writing.

**Credits**

Acts 1983, 68th Leg., p. 3481, ch. 576, § 1, eff. Jan. 1, 1984.

Notes of Decisions (2334)

V. T. C. A., Property Code § 5.021, TX PROPERTY § 5.021
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 2. Conveyances
      Chapter 5. Conveyances (Refs & Annos)
        Subchapter C. Future Estates

V.T.C.A., Property Code § 5.041

§ 5.041. Future Estates

[Currentness]

A person may make an inter vivos conveyance of an estate of freehold or inheritance that commences in the future, in the same manner as by a will.

**Credits**
Acts 1983, 68th Leg., p. 3483, ch. 576, § 1, eff. Jan. 1, 1984.

Notes of Decisions (30)

V. T. C. A., Property Code § 5.041, TX PROPERTY § 5.041
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

V.T.C.A., Property Code § 13.001

§ 13.001. Validity of Unrecorded Instrument

(a) A conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law.

(b) The unrecorded instrument is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument.

(c) This section does not apply to a financing statement, a security agreement filed as a financing statement, or a continuation statement filed for record under the Business & Commerce Code.

V.T.C.A., Property Code § 22.021

§ 22.021. Claim for Improvements

Currentness

(a) A defendant in a trespass to try title action who is not the rightful owner of the property, but who has possessed the property in good faith and made permanent and valuable improvements to it, is either:

(1) entitled to recover the amount by which the estimated value of the defendant's improvements exceeds the estimated value of the defendant's use and occupation of and waste or other injury to the property; or

(2) liable for the amount by which the value of the use and occupation of and waste and other injury to the property exceeds the value of the improvements and for costs.

(b) In estimating values of improvements or of use and occupation:

(1) improvements are valued at the time of trial, but only to the extent that the improvements increased the value of the property; and

(2) use and occupation is valued for the time before the date the action was filed that the defendant was in possession of the property, but excluding the value resulting from the improvements made by the defendant or those under whom the defendant claims.

(c) The defendant who makes a claim for improvements must plead:

(1) that the defendant and those under whom the defendant claims have had good faith adverse possession of the property in controversy for at least one year before the date the action began;

(2) that they or the defendant made permanent and valuable improvements to the property while in possession;

(3) the grounds for the claim;

(4) the identity of the improvements; and

(5) the value of each improvement.

(d) The defendant is not liable for damages under this section for injuries or for the value of the use and occupation more than two years before the date the action was filed, and the defendant is not liable for damages or for the value of the use and occupation in excess of the value of the improvements.

**Credits**

Acts 1983, 68th Leg., p. 3509, ch. 576, § 1, eff. Jan. 1, 1984.

Notes of Decisions (239)

V. T. C. A., Property Code § 22.021, TX PROPERTY § 22.021
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

TX Rules of Civil Procedure, Rule 93

Rule 93. Certain Pleas to Be

A pleading setting up any of the following matters, unless the truth of such matters appear of record, shall be verified by affidavit.

1. That the plaintiff has not legal capacity to sue or that the defendant has not legal capacity to be sued.

2. That the plaintiff is not entitled to recover in the capacity in which he sues, or that the defendant is not liable in the capacity in which he is sued.

3. That there is another suit pending in this State between the same parties involving the same claim.

4. That there is a defect of parties, plaintiff or defendant.

5. A denial of partnership as alleged in any pleading as to any party to the suit.

6. That any party alleged in any pleading to be a corporation is not incorporated as alleged.

7. Denial of the execution by himself or by his authority of any instrument in writing, upon which any pleading is founded, in whole or in part and charged to have been executed by him or by his authority, and not alleged to be lost or destroyed. Where such instrument in writing is charged to have been executed by a person then deceased, the affidavit shall be sufficient if it states that the affiant has reason to believe and does believe that such instrument was not executed by the decedent or by his authority. In the absence of such a sworn plea, the instrument shall be received in evidence as fully proved.

8. A denial of the genuineness of the indorsement or assignment of a written instrument upon which suit is brought by an indorsee or assignee and in the absence of such a sworn plea, the indorsement or assignment thereof shall be held as fully proved. The denial required by this subdivision of the rule may be made upon information and belief.

9. That a written instrument upon which a pleading is founded is without consideration, or that the consideration of the same has failed in whole or in part.

10. A denial of an account which is the foundation of the plaintiff's action, and supported by affidavit.

11. That a contract sued upon is usurious. Unless such plea is filed, no evidence of usurious interest as a defense shall be received.

12. That notice and proof of loss or claim for damage has not been given as alleged. Unless such plea is filed such notice and proof shall be presumed and no evidence to the contrary shall be admitted. A denial of such notice or such proof shall be made specifically and with particularity.

13. In the trial of any case appealed to the court from the Industrial Accident Board[1] the following, if pleaded, shall be presumed to be true as pleaded and have been done and filed in legal time and manner, unless denied by verified pleadings:

(a) Notice of injury.

(b) Claim for compensation.

(c) Award of the Board.

(d) Notice of intention not to abide by the award of the Board.

(e) Filing of suit to set aside the award.

(f) That the insurance company alleged to have been the carrier of the workers' compensation insurance at the time of the alleged injury was in fact the carrier thereof.

(g) That there was good cause for not filing claim with the Industrial Accident Board[1] within the one year period provided by statute.

(h) Wage rate.

A denial of any of the matters set forth in subdivisions (a) or (g) of paragraph 13 may be made on information and belief.

Any such denial may be made in original or amended pleadings; but if in amended pleadings the same must be filed not less than seven days before the case proceeds to trial. In case of such denial the things so denied shall not be presumed to be true, and if essential to the case of the party alleging them, must be proved.

14. That a party plaintiff or defendant is not doing business under an assumed name or trade name as alleged.

15. In the trial of any case brought against an automobile insurance company by an insured under the provisions of an insurance policy in force providing protection against uninsured motorists, an allegation that the insured has complied with all the terms of the policy as a condition precedent to bringing the suit shall be presumed to be true unless denied by verified pleadings which may be upon information and belief.

16. Any other matter required by statute to be pleaded under oath.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of March 31, 1941, eff. Sept. 1, 1941; Sept. 20, 1941, eff. Dec. 31, 1941; June 16, 1943, eff. Dec. 31, 1943; Oct. 12, 1949, eff. March 1, 1950; July 21, 1970, eff. Jan. 1, 1971; July 22, 1975, eff. Jan. 1, 1976; June 15, 1983, eff. Sept. 1, 1983; Dec. 5, 1983, eff. April 1, 1984.

Notes of Decisions (794)

Footnotes

[1]

The name of the Industrial Accident Board was changed to the Texas Workers' Compensation Commission pursuant to Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 17.01. The Texas Workers' Compensation Commission was abolished and the Workers' Compensation Division of the Texas Department of Insurance was established pursuant to Acts 2005, 79th Leg., ch. 265, § 1.003.

Vernon's Ann. Texas Rules Civ. Proc., Rule 93, TX R RCP Rule 93
Current with amendments received through 3/15/2015

# APPELLEES'APPENDIX 2:

# FINAL PLEADINGS, JUDGMENT AND INJUNCTIONS

FILED
3/10/2014 7:45:44 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Annabelle Kung

CAUSE NO. 2012-CI-00251

| | | |
|---|---|---|
| **JOHNNY MONTOYA GARZA,** | § | **IN THE DISTRICT COURT** |
| **JOHN RENE AGUILAR, JOHNNY B.** | § | |
| **WELLS and LAURA ASHLEY WELLS** | § | |
| | § | **225th  JUDICIAL DISTRICT** |
| **V.** | § | |
| | § | |
| **IRMA LEMUS and MANUEL LEMUS, JR.** | § | **BEXAR COUNTY, TEXAS** |

<u>SECOND AMENDED ORIGINAL PETITION</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs JOHNNY MONTOYA GARZA, JOHN RENE AGUILAR, JOHNNY B. WELLS and LAURA ASHLEY WELLS, and make and file this their Second Amended Original Petition complaining of Defendants IRMA LEMUS and MANUEL V. LEMUS, JR.  and seeking the following relief:

1.1    Plaintiffs request this Honorable Court to declare as void and set  aside a deed purportedly signed by Elvira Aguilar on January 7, 2009 conveying title to her home at 106 Cameo, San Antonio, Texas to Defendants, for reason that Elvira Aguilar was suffering from advanced Alzheimer's disease, and not mentally competent to understand that she was conveying ownership.   Furthermore, the deed should be set aside as it is void for want of consideration.

1.2    Plaintiffs further seek declaratory judgment that an instrument signed on March 11, 2005 by Elvira Aguilar concerning ownership and disposition of the property to plaintiffs, meets all the requirements of a deed and is sufficient to convey legal title.

1.3    In the alternative, Plaintiff Garza seeks declaration that by such document Elvira Aguilar acknowledged conveyance or parol gift of one-half interest in the property to him, and that in reliance and as consideration made permanent and significant improvements to the home.

1

1.4    Plaintiffs further sue for trespass to try title to establish that their title is superior to the purported title fraudulently obtained by Defendants IRMA LEMUS and MANUEL LEMUS, JR., that defendants took such title without consideration and with full knowledge of the Plaintiffs ownership interest, and wrongfully excluded them from their home in bad faith, and for attorneys fees and costs as provided by statute.  In support thereof, Plaintiffs would show as follows:

## II.   DISCOVERY PLAN

2.1    Discovery should be conducted under Level 2 of Rule 190.4 of the Tex. R. Civ. Proc.

## III.  OBJECTION TO ASSIGNMENT OF VISITING JUDGE

3.1    Plaintiffs object to the assignment of a retired, former, or senior judge to hear this case or any part thereof.

## IV.  JOINDER OF NECESSARY PARTIES

4.1    The necessary parties to this lawsuit are the surviving statutory heirs of Elvira Aguilar.

4.2    Defendants IRMA LEMUS, daughter of Elvira Aguilar and MANUEL LEMUS, Jr., Irma's husband, have been served with citation and made appearance herein.

4.3    JOHN DAVID AGUILAR is the sole son of Elvira Aguilar and has signed and filed a waiver of notice of citation and executed a deed quitclaiming any interest he has in the property as an heir of Elvira Aguilar to Plaintiffs.

4.4    IRENE LAMBERT is the sole surviving daughter of Elvira Aguilar other than Defendant and has appeared and answered herein and executed a deed quitclaiming any interest she has in the property as an heir of Elvira Aguilar to Plaintiffs.

4.5    NANETTE AGUILAR did not survive Elvira Aguilar and left no survivors.

2

4.6 ANNETTE AGUILAR did not survive Elvira Aguilar and left as survivors John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells, Plaintiffs.

## V. JURISDICTION AND VENUE

5.1 The property the subject of this suit is located in San Antonio, Bexar County, Texas and the amount in controversy is in excess of the Court's minimum jurisdictional limit.

5.2 The district court has exclusive jurisdiction over this dispute concerning title to real property.

## VI. STATEMENT OF FACTS

6.1 Plaintiff JOHNNY MONTOYA GARZA would respectfully show that, by reason of the instrument signed March 11, 2005 by Elvira Aguilar, hereinafter attached as Exhibit "A," he is one-half owner and Intervenors JOHN RENE AGUILAR, JOHNNY B. WELLS and LAURA ASHLEY WELLS are joint owners subject to the life estates of Johnny Montoya Garza and Elvira Aguilar, of the real property located at 106 Cameo, San Antonio, Bexar County, Texas, the legal description of which is described in the deed records of Bexar County as follows:

> Lot 4, Block 2, NCB 12291, Campo Gardens Addition, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 3525 Page 192, Deed and Plat Records of Bexar County.

6.2 Elvira Aguilar had acquired sole title to the property in 1983 by special warranty deed incident to her divorce from John B. Aguilar in 1983. Plaintiff Johnny Garza lived with Elvira Aguilar as her partner at 106 Cameo, San Antonio, Texas since 1984, and they occupied the same as their home.

6.3 In 1990, Plaintiffs JOHN RENE AGUILAR, LAURA ASHLEY WELLS, and JOHNNY B. WELLS were orphaned when their parents Annette Aguilar Wells and

3

Johnny Wells were killed in a motorcycle accident. The children were ten years, three years and eighteen months of age respectively when the tragedy occurred. The family was living with Elvira Aguilar and Johnny Garza at the time of the accident.

6.4    An insurance claim had been begun by Elvira Aguilar as next friend of the minor children against State Farm Insurance, when Defendant Irma Lemus filed suit for sole managing conservatorship although the children never lived with her. Elvira Aguilar and Johnny Montoya Garza were ultimately made managing conservators for the children, and raised them as their own. The insurance money was placed in trust for the children until they reached majority.

6.5    In 1992, in order to adequately house the children, Elvira Aguilar and Johnny Montoya Garza, Plaintiff, jointly borrowed $30,000 to build a second floor on the property. Johnny Garza provided the physical labor, tools and skill to build it, was personally liable and paid on the home improvement loan and for other materials from his income. Garza was co-signer on Elvira Aguilar's bank account, and deposited his earnings as a truck driver into her account.

6.6    The instrument attached as Exhibit "A," was executed in March of 2005, at a time when Elvira Aguilar was of sound mind and executory capacity. Although denominated as the "will " of both Elvira Aguilar and Johnny Montoya Garza, the instrument operates as a deed. In the instrument Elvira Aguilar acknowledges Johnny Montoya Garza as co-owner of the property at 106 Cameo, San Antonio, Texas and they jointly transfer their interests subject to a life estate in their favor to John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells.

6.7    Plaintiff Johnny Montoya Garza would respectfully show that in 2006 Elvira Aguilar began to show signs of dementia and was unable to care for herself while Johnny Garza was out

4

of town for trucking work. Her daughter Nanette Aguilar took her in to live with her in 2007. Nanette Aguilar was then in recovery from treatment for breast cancer. In late 2008, the cancer was terminal. Nanette was admitted to hospice care at Normandy Terrace Nursing Home for hospice and Elvira was admitted to the Alzheimer's unit. Her son David Aguilar, managed her affairs with the nursing home.

6.8 On November 15, 2008, Nanette Aguilar died. Elvira Aguilar was so mentally incapacitated by then that she could not apprehend or remember that Nanette had died, could not remember family members' names although she was glad to see them, confused her grand-sons with Johnny Garza, could not find her way to her own room, could not feed, dress, bathe or groom herself, wandered the hallways constantly, and was delusional and often violent.

6.9 Despite this clear mental incapacity, on or about January 7, 2009, her daughter, Defendant IRMA LEMUS, and her husband, MANUEL LEMUS, JR. had Elvira Aguilar "sign" the warranty deed instrument hereinafter attached as Exhibit "B" to this petition granting the home at 106 Cameo to themselves. The deed was purportedly made before Kimberly L. Wynns, notary public, at the offices of West and West Attorneys, P.C. in San Antonio, Texas. Irma Lemus admits there was no consideration paid for the deed other than "love and affection," although she had not talked to her in years.

6.10 At the time the deed was executed, the Lemuses knew that Elvira Aguilar considered Johnny Montoya Garza as one half owner of the house at 106 Cameo and that her mother wanted her grand-children John Rene Aguilar, Johnny B. Wells and Laura Ashley Wells to have it in the future.

5

6.11    After the Defendants fraudulently obtained the deed from Elvira Aguilar they dis-possessed Garza and the grand-children from the house by changing the locks and utilities  and telling the neighbors that they were the owners, and that Garza was not to enter the premises.  He but could not afford to legally challenge to legally challenge  Irma and Manuel Lemus, Jr. at the time.

6.12    David Aguilar brought suit against Irma Lemus and Manuel Lemus, Jr. to have the January 7th, 2009 deed declared void for want of capacity, in Cause No. 2009-CI-03469, *Elvira Aguilar by and through David Aguilar as Next Friend,* 285th Judicial District Court of Bexar County.   The deed was not only wrongful and fraudulent but it threatened the Medicaid eligibility of Elvira Aguilar.   Johnny Montoya Garza was invited to intervene to assert his interest pursuant to the "will "  and the children also joined.   When defendants brought a summary judgment motion on the "will," prior to any final rulings of the court, and in order to amend their pleadings, pursue additional evidence, and preserve their rights, Plaintiffs non-suited their case without prejudice to refile.

6.13    Johnny Montoya Garza's renewed claim for trespass to try title was filed within three years of the of January 7, 2009 purported deed to the Lemuses.   The statutory heirs John Rene Aguilar, Laura Ashley Wells and Johnny B. Wells joined to set aside the Lemus deed as void for want of capacity within four years.

   VII.   PETITION TO SET ASIDE DEED OF JANUARY 7, 2009 TO DEFENDANTS

7.1    A deed is *void* where at the time of its execution the grantor was laboring under such a degree of mental infirmity as made him incapable of understanding in a reasonable manner the nature and effect of his act.   Plaintiffs request this Honorable Court to declare void and to annul,

6

cancel, and set aside the deed of January 7, 2009 from Elvira Aguilar to Irma and Manuel Lemus, Jr.

7.2     Plaintiffs would show that Elvira Aguilar was unable to understand the nature and consequences of signing the document, if she even understood that she was signing her name, due to advanced Alzheimer's disease.   Furthermore, there was no consideration for the deed, other than by Irma Lemus's admission,  that consideration was  her "love and affection."

7.3     Plaintiffs would show that at the time of the making of the deed, Elvira Aguilar was mentally incapable of even identifying her children and grand-children, was totally unable to care for herself, could not remember or comprehend that the daughter who had been taking care of her for two years had just died, and otherwise incapable of making any kind of knowing and willful act of conveyance.

7.4     Plaintiffs therefore request this Honorable Court to find that at the time of the deed of January 7, 2009 allegedly transferring title to the Lemuses, Elvira G. Aguilar was mentally incapable of making such a transfer by reason of her Alzheimer's disease, and to declare the deed *void* for lack of mental capacity of the grantor.

VIII.   REQUEST FOR DECLARATORY JUDGMENT THAT ELVIRA AGUILAR CONVEYED HER REAL PROPERTY TO PLAINTIFFS BY MARCH 11, 2005 DOCUMENT

8.1     Plaintiffs seek declaratory judgment under the Texas Declaratory Judgment Act Sec. 37.001 et. seq.  Tex. Civ. Prac. & Rem. Code that the instrument denominated as "will" and attached as Exhibit "A" constitutes a good and valid deed, i.e.  a conveyance by Elvira Garibay Aguilar of the property at 106 Cameo, San Antonio, Texas to Johnny Montoya Garza of one-half ownership and a conveyance of the property by both Aguilar and Garza to the grand-children John Rene Aguilar, Johnny B. Wells and Laura Ashley Wells subject to a life estate.

7

8.2     Plaintiffs would show that the document attached as Exhibit "A" fully meets the requirements of a deed as stated in Tex. Prop. Code Sec. 5.021 that "a conveyance of an estate of inheritance, a freehold, or an estate for more than one year in land must be in writing and subscribed and delivered by the conveyor."

8.3     Additionally, even though denominated as a "will," Exhibit "A" clearly acknowledges that Garza already had a one-half ownership interest in the property at 106 Cameo. Property may be conveyed orally and such a conveyance enforced if the donee makes permanent and valuable improvements on the property, which Johnny Montoya Garza in fact made, i.e. the construction of the second story on the home.

8.4     Even though the document is denominated a "will," it clearly establishes a conveyance by both Garza and Aguilar of the property to the grand-children upon their death. The Tex. Prop. Code Sec. 5.041 provides that "a person may make an inter vivos conveyance of an estate of free hold or inheritance that commences in the future in the same manner as by a will." It even gives the children the right of approval on any changes that might be made by Garza, reflecting the statutory obligations of a life tenant in the property code.

8.5     Plaintiffs pray that this Honorable Court declare that Johnny Montoya Garza has an undivided one-half life interest in the real property the subject of this suit pursuant to this document and that it validly conveys title to the property to John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells subject to the life estates of Elvira Aguilar and Johnny Montoya Garza.

8.11     In the alternative Johnny Montoya Garza asks this Honorable Court to find that he is a done of one-half interest in the real property by reason of the memorialized gift or transfer by

Elvira Aguilar and for reason that he has made valuable and permanent improvements to the property.

8.11    Plaintiffs seek the attorneys' fees and costs under the Tex. Civ. Prac. & Rem. Code Sec. 38.001 *et seq.* awardable to prevailing parties.

## IX.   TRESPASS TO TRY TITLE – SUPERIOR RIGHT, TITLE AND INTEREST

9.1    In the event the Lemus deed is not declared void, Plaintiffs seek judgment by this Honorable Court that their right, title and interest in 106 Cameo, San Antonio, Texas is superior in all respects to that asserted by Irma Lemus and Manuel Lemus, Jr.

9.2    Plaintiffs would show that Section 13.001(b) Tex. Prop. Code provides that an unrecorded instrument is fully binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay valuable consideration *or* who has notice of the instrument.

9.3    The Lemus defendants fraudulently obtained their deed with full knowledge of Garza's ownership interest in the property and that Elvira Aguilar intended the property to ultimately go to John Rene Aguilar, Johnny B. Wells and Laura Ashley Wells.  The Lemuses wrongfully had the incapacitated Elvira Aguilar supposedly sign the instrument with knowledge and intent to defraud and dispossess Garza and the grand-children of the right to their own home.

9.4    The Lemus defendants fraudulently obtained their deed without consideration.   By Irma Lemus's own admission, the consideration for the deed was her "love and affection."

9.5    Irma Lemus is a statutory heir.   Manuel Lemus, Jr. is her spouse and bound by his own knowledge of the prior deed.

9

9.6     Therefore, Plaintiffs request that this Honorable Court find, pursuant to Tex. Prop. Code Sec. 13.001(b), that Plaintiffs title is superior to that of Irma Lemus and Manuel Lemus, Jr.  and adjudge the deed of January 7, 2009 invalid to convey the title to the property.

9.7      Plaintiffs would additionally show that Tex. Civ. Prac. Rem. Code § 16.034 provides that in a suit for the possession of real property, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court shall award costs and reasonable attorney's fees to the prevailing party.

## X.    DEMAND FOR PAYMENT FOR IMPROVEMENTS TO THE PROPERTY

10.1    In the alternative, in the event this Honorable Court does not find the Lemus deed void, or that Elvira Aguilar had previously conveyed the property at 106 Cameo to the Plaintiffs, then Johnny Montoya Garza requests that this Honorable Court order Defendants to pay him for the reasonable value of the improvements made to the home.

10.2     The costs of said improvements together with interest paid on the home improvement loan, and the reasonable value of his labor are in excess of $85,000.  Garza filed a Mechanic and Materialman's Lien on the property on May 28, 2010 prior to Elvira Aguilar's death. This figure does not include the increase in the value of the property due to the improvements.

10.3    Should his claim to legal title fail, Plaintiff prays this Honorable Court to find and rule that he retains a legal and equitable interest in the property for improvements which he made, for which he has not been compensated, and to order Irma Lemus and Manuel Lemus, Jr. to pay him compensation of $85,000 together with pre-judgment and post-judgment interest  plus attorneys fees and costs for the improvements to the property.

10

## XI. NO GOOD FAITH CREDIT TO LEMUSES FOR ALLEGED IMPROVEMENTS

11.1    Defendants have produced documents indicating that they may claim they have made improvements to the property at 106 Cameo, for which they should be compensated.  Defendants have not responded to a request to inspect the premises and Plaintiffs deny that any improvements have been made, or are of the value Defendants may contend.

11.2    Tex. Prop. Code Sec. 22.021 provides that a defendant in a trespass to try title action who is found not to be the  rightful owner may make a claim for improvements to the property on a finding that he possessed the property in *good faith.*

11.3    Even if there should be a finding of good faith possession, the party who is not the rightful owner may recover for improvements *only i*f they exceed  the value of their use and enjoyment of the property, whether they occupied it or not.   Defendants enjoyed the use of the property from the date of the deed.

11.4    Plaintiffs were deprived of the use and enjoyment of the property by Defendant's wrongful taking in total derogation of the known rights of the Plaintiffs and respectfully request this Honorable Court to deny aand all claims for improvements by the Lemuses for their bad faith.

## XII.    ATTORNEYS FEES AND COSTS

12.1    Plaintiffs were required by Defendant's wrongful possession of the property to incur reasonable and necessary attorneys' fees and costs, for which they seek judgment against Defendants.

12.2        Plaintiffs are entitled attorneys' fees and costs pursuant to Tex. Civ. Prac. & Rem. Code, and requests this Honorable Court to award the same on proof thereof.

11

12.3    Tex. Civ. Prac. Rem. Code § 16.034 provides that in a suit for the possession of real property, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court shall award costs and reasonable attorney's fees to the prevailing party, and seek such award of attorneys' fees and costs against Defendants.

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Plaintiffs JOHNNY MONTOYA GARZA, JOHN RENE AGUILAR, LAURA ASHLEY WELLS, and JOHNNY B. WELLS respectfully pray that this Honorable Court find, adjudge, declare and decree

a. That the January 7, 2009 will from Elvira Aguilar to Irma Lemus and Manuel Lemus is void by reason of the mental incapacity of Elvira Aguilar to execute the same;

b. That the March 11, 2005 instrument signed by Elvira Aguilar be declared a valid deed of conveyance and an acknowledgment of one-half of the ownership in the real property at 106 Cameo to Johnny Montoya Garza;

c. That the March 11, 2005 instrument signed by both Elvira Aguilar and Johnny Montoya Garza is a valid  conveyance of the property at 106 Cameo to John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells;

d.  That the title conveyed by the March 11, 2005 document of conveyance to plaintiffs is superior to the January 7, 2009 conveyance to defendants;

e.  That Johnny Montoya Garza made permanent improvements to 106 Cameo in reliance on the parol gift of one-half ownership of the property, and that such a transfer is enforceable as a valid conveyance of the property;

f.  That Johnny Montoya Garza is entitled to compensation by reason of improvements under a Mechanic and Materialman's lien.

g.  That defendants took possession of the property in bad faith and wrongfully excluded plaintiffs, and may not recover for any purported improvements to the property;

h.  That Defendants are liable to Plaintiffs for their attorneys' fees and costs for which let judgment issue;

12

FILED
4/28/2014 12:13:06 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Marissa Ugarte

## CAUSE NO. 2012-CI-00251

| | | |
|---|---|---|
| JOHHNY M. GARZA | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| VS. | § | 225th JUDICIAL DISTRICT |
| | § | |
| IRMA LEMUS and | § | |
| MANUEL LEMUS, Jr. | § | |
| Defendants. | § | BEXARC COUNTY, TEXAS |

## DEFENDANTS' SECOND AMENDED ANSWER AND COUNTER-CLAIM

COME NOW IRMA LEMUS and MANUEL LEMUS, JR., Defendants in the above-titled and numbered cause and file this Second Amended Answer to Plaintiffs' suit, and would show the Court the following:

### I. GENERAL DENIAL

1.      Defendants deny, each and every, all and singular, the allegations in Plaintiff's and Intervenors' Original Petition and Amendments thereto, and demand strict proof thereof as required by the Texas Rules of Civil Procedure.

### II. RULE 788 PLEA OF "NOT GUILTY"

2.      Pursuant to Texas Rule of Civil Procedure 788, Defendants plead "not guilty" to the allegation in Plaintiffs' suit.  Defendants allege and aver that the Warranty Deed on January 7, 2009 conveying the property described as Lot 4, Block 2, NCB 12291, Campo Gardens Addition, in the City of San Antonio, Bexar County Texas, accoding to plat thereof recorded in Vol. 3525, Page 192, Deed and Plat Records of Bexar County, Texas is a good and valid conveyance.  Defendants further allege and aver that they are entitled an allowance for improvements.

1

### III. SPECIFIC DENIALS

3.     Defendants specifically deny that the writing attached as Exhibit "A" to Plaintiffs' petition is a holographic will in that it does not meet the elements as required by section 60 of the Texas Probate Code.

4.     Defendants specifically deny that the writing attached as Exhibit "A" to Plaintiff's petition is a valid conveyance. The writing lacks a specific description, does not contain operative words or words of grant showing an intention to convey title to a real property interest, and the writing is not acknowledged.

### IV. SPECIAL EXCEPTIONS

5.     Defendants specially except to Plaintiffs' petition wherein in alleges that the January 7, 2009 warranty deed fails for lack of consideration. "Love and affection" is sufficient consideration for a conveyance in Texas.

### V. AFFIRMATIVE DEFENSE

6.     Defendants allege and aver that Plaintiff, Johnny Montoya Garza has not brought his claim as a putative spouse within the requisite period of limitations.

### VI. VERIFIED DENIAL

7.     Defendants allege and aver that Plaintiff Johnny M. Garza lacks legal capacity to sue and/or Plaintiff Johnny M. Garza is not entitled to recover in the capacity in which he sues in that he is not a lawful heir to Elvira Aguilar.

### VII. COUNTERCLAIM

8.     In the alternative, Defendants allege and aver that they have an equitable lien on the property as a result of improvements, repairs, maintenance, upkeep and the payment of the taxes on the real property made the basis of this suit.

2

Should Plaintiffs prevail on their claim, Plaintiffs would be unjustly enriched from the benefits of Defendants' labor and money.

## VIII. DECLARATORY JUDGMENT

9. In the event the Court declares both instruments ineffective to convey an interest, Defendants seek an adjudication of heirship regarding all parties' intestate share of the property described as Lot 4, Block 2, NCB 12291, Campo Gardens Addition, in the City of San Antonio, Bexar County Texas, accoding to plat thereof recorded in Vol. 3525, Page 192, Deed and Plat Records of Bexar County, Texas.

## VI. ATTORNEY'S FEES

10. It was necessary for Defendants to procure the services of Ana Laura Hessbrook, an attorney duly licensed in the State of Texas, to defend against this lawsuit brought by Plaintiffs. The fees charged by Ms. Hessbrook are reasonable in Bexar County, Texas, necessary to protect and defend Defendants' rights, equitable and just.

## VII. PRAYER

11. WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiffs take nothing by their suit. Defendants further pray that the Court enter judgment that Defendants are the lawful grantees of the Warranty Deed attached as Exhibit "1" hereto. Defendants further pray for an award of reasonable, necessary, equitable and just attorney's fees which have been incurred by Defendants as a result of this litigation and are properly awarded pursuant to Texas Civil Practice and Remedies Code section 37.009. In the alternative, Defendants pray the court

3

enters judgment that Defendants possess an equitable lien property as a result of improvements, repairs, maintenance, upkeep and the payment of the taxes on the real property made the basis of this suit. In the alternative, Defendants pray the Court determine all concerned parties' intestate share of the property described as Lot 4, Block 2, NCB 12291, Campo Gardens Addition, in the City of San Antonio, Bexar County Texas, accoding to plat thereof recorded in Vol. 3525, Page 192, Deed and Plat Records of Bexar County, Texas. Defendants pray for such other and further relief to which they may be justly entitled. Defendants pray for general relief.

Respectfully submitted

LAW OFFICE OF ANA LAURA
HESSBROOK
4100 NW LOOP 410, SUITE 105
SAN ANTONIO, TX 78229
Tel: (210) 706-9466
Fax: (210) 706-9467

By: _/S/ Ana Laura Hessbrook_
ANA LAURA HESSBROOK
State Bar No. 00791481
Email: hessbrook@sbcglobal.net
Attorney for Petitioner
Annette Ramirez

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded in accordance with the Texas Rules of Civil Procedure on April 24, 2014 to the following:

Anita J. Anderson
LAW OFFICE OF ANITA J. ANDERSON
303 W. Sunset, Suite 103
PO BOX 830722
San Antonio, Texas 78283
Telephone: (210) 533-8726
Telecopier: (210) 633-0989
*Attorney for Plaintiffs*

*Ana Laura Hessbrook*
ANA LAURA HESSBROOK

5



CAUSE NO. 2012-CI-00251

| | | |
|---|---|---|
| JOHNNY MONTOYA GARZA, | § | IN THE DISTRICT COURT |
| JOHN RENE AGUILAR, JOHNNY B. | § | |
| WELLS and LAURA ASHLEY WELLS | § | |
| | § | 225th JUDICIAL DISTRICT |
| V. | § | |
| | § | |
| IRMA LEMUS and MANUEL LEMUS, JR. | § | BEXAR COUNTY, TEXAS |

## CORRECTED FINAL JUDGMENT

BE IT REMEMBERED that on the 7th day of July, 2014 Plaintiffs' petition for declaratory judgment and trespass to try title as to the ownership of the real property 106 Cameo, San Antonio, Texas and Defendants' counterclaims thereto, came on to be heard for trial on the merits in the 57th Judicial District Court of Bexar County.

Plaintiffs Johnny Montoya Garza, John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells appeared in person and through their attorney of record. Defendants Irma Lemus and Manuel Lemus, Jr. appeared in person and by their attorney of record. A jury was waived.

After hearing the evidence offered by the parties and their witnesses, and after hearing the authorities and arguments presented by counsel, this Court is of the opinion that the relief sought is granted or denied as follows, and enters the following judgment.

I.   DEFENDANTS' DEED OF JANUARY 7, 2009 IS VOID FOR WANT OF CAPACITY

1.1   Plaintiffs Johnny Montoya Garza, partner to Elvira Aguilar, and her grand-children John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells, brought suit to set aside and declare as *void for want of capacity* that certain deed dated January 7, 2009 reciting a conveyance from Elvira Aguilar of her residence at 106 Cameo, San Antonio, Texas to her daughter Irma Lemus and son-in-law Manuel Lemus, Jr. , a true and correct copy of which is made a part of this judgment as Attachment "A."

Document scanned as filed.

119

1.2    Elvira G. Aguilar was the title owner of the two story home at at106 Cameo, San Antonio, Texas 78214, which the legal description is:

> Lot 4, Block 2, NCB 12291, Campo Gardens Addition, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 3525 Page 192, Deed and Plat Records of Bexar County, Texas.

1.3    The court having heard the testimony of the parties and witnesses, and having reviewed the medical records of the nursing home at which she was a resident, finds based on a preponderance of the evidence that on January 7, 2009, Elvira Garibay Aguilar was suffering from advanced Alzheimer's disease and did not have the requisite mental capacity to understand the nature of making the conveyance or its effect in transferring ownership of the property to Irma Lemus and Manuel Lemus, Jr.

1.4    Therefore, IT IS ORDERED, ADJUDGED AND DECREED that Attachment "A", the deed recorded at Book 13815 Page 441 of the Bexar County Deed Records, dated January 7, 2009 reciting a conveyance of the property at 106 Cameo, San Antonio, Texas from Elvira Aguilar, Grantor, to Irma Lemus and Manuel Lemus, Jr., Grantees, is VOID for want of capacity of the Grantor.

## II.    "WILL" OF MARCH 7, 2005 IS EFFECTIVE AS DEED

2.2    Plaintiffs further petitioned for declaratory judgment that the document labelled as the "Will" of Elvira G. Aguilar and Johnny Montoya Garza, while not effective as a will, nevertheless effected a present transfer of title of 106 Cameo, San Antonio, Texas, to Plaintiffs John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells, subject to a life estate of Elvira Aguilar and Johnny Montoya Garza.    A true and correct copy of the same is included in this judgment as Attachment "B."

120

2.3     The court having considered the evidence and reviewed the document of March 5, 2005, finds that Attachment "B" shows a present intent by Elvira Aguilar to convey the property at 106 Cameo, San Antonio, Texas to John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells. The Court further finds that the document sufficiently describes the property, and in all ways satisfies the requirements of a deed and conveys good and valid title to said parties, and their petition for declaratory relief should in all things be GRANTED.    Therefore, it is hereby

2.4     ORDERED, ADJUDGED, and DECREED that the document of March 7, 2005, Attachment "B," meets the requisites of a good and valid <u>GIFT DEED</u> and transfers title from Elvira G. Aguilar, as grantor, of ownership of the premises at 106 Cameo, San Antonio, Texas, to John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells, as grantees, and that JOHN RENE AGUILAR, LAURA ASHLEY WELLS, and JOHNNY B. WELLS are title owners of the premises at 106 Cameo, San Antonio, Texas.

### III.    OWNERSHIP INTEREST OF JOHNNY MONTOYA GARZA

3.1     Plaintiff Johnny Montoya Garza, the personal partner of Elvira Aguilar for over twenty years, also brought suit for declaratory judgment that the same document validly acknowledged an oral conveyance by Elvira Aguilar to him of one-half ownership interest in the property, and that this acknowledgement, together with valuable improvements he made on the house, established a one-half ownership interest in the property in his favor.

3.2     The Court finds that the document of March 7, 2005, Attachment "B," and the evidence submitted at trial do not establish a one-half ownership interest to Garza in the property.

3.3     Therefore, it is ORDERED, ADJUDGED AND DECREED that Johnny Montoya Garza's request for declaratory judgment that he has an undivided one-half interest in the property is in all things DENIED.

3.4 The Court further finds that the Mechanics and Materialman's Lien filed by Johnny Montoya Garza is not timely filed and invalid and is hereby set aside.

## IV. DEFENDANTS' CLAIMS FOR REIMBURSEMENT OF IMPROVEMENTS DENIED

4.1 Defendants Irma Lemus and Manuel Lemus, Jr. brought a counter-claim against Plaintiffs for improvements made to 106 Cameo, San Antonio, Texas. The court finds that the improvements were made by the Lemuses with knowledge that other parties claimed legal title to the property, and therefore have not established the good faith requirement of Tex. Prop. Code Sec. 22.021 for their claim for improvements to the property. The court further finds that the value of any improvements made is outweighed by the value of the use and occupation of the premises by the valid owners. Therefore it is

4.2 ORDERED, ADJUDGED AND DECREED that Defendants claims for the value of improvements to the property are DENIED and that Defendants take nothing by their suit.

## V. DECLARATION OF HEIRSHIP

5.1 Elvira G. Aguilar died intestate on July 1, 2010. There was no application for declaration of heirship and administration of her estate. The parties sought a declaration of heirship in this cause of action. James Rodriquez, Esq. was appointed attorney *ad litem*, and reported that there were no other heirs which could be determined other than the following:

5.2 The court finds Elvira G. Aguilar was the mother of Irma Lemus, Irene Aguilar Lambert, Annette Aguilar Wells, Nanette Wells, and John David Aguilar. Annette Aguilar Wells predeceased Elvira Aguilar leaving as her descendants John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells. Nanette Aguilar predeceased Elvira Aguilar and left no descendants.

5.3    Therefore, this court FINDS and DECLARES that the statutory heirs of Elvira Garibay Aguilar are Irma Lemus, daughter; Irene Aguilar Lambert, daughter, John David Aguilar, son, and John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells, grand-children.

5.4    The court further finds that John David Aguilar and Irene Aguilar Lambert were duly served as necessary parties.    They appeared and answered in this case, and were dismissed as parties when they quitclaimed any interest in the subject property they might have through the estate of Elvira Aguilar in favor of Johnny Montoya Garza, John Rene Aguilar, Laura Ashley Wells, and Johnny B. Wells.

## VI.    ATTORNEYS FEES AND COSTS

6.1    The court finds that pursuant to the provisions of the Texas Declaratory Judgments Act and the Texas Property Code, attorney's fees and costs should be awarded to the Plaintiffs.    The Court further finds that attorney's fees in the amount of Sixteen Thousand Seven Hundred and Fifty Dollars and no/100s ($16,750) are reasonable and necessary and that said fees and costs of court are assessed against Defendants IRMA LEMUS and MANUEL LEMUS, Jr. for payment to Plaintiffs JOHN RENE AGUILAR, LAURA ASHLEY WELLS, AND JOHNNY B. WELLS, for which let judgment issue.

6.2    The Court finds that attorney's fees for the services of the attorney *ad litem* are Three Hundred and Fifty Dollars and no/100s ($350.00) and assesses the same for payment by Plaintiffs.

Except for any injunctive relief which may be separately granted in this cause of action, any request for relief not expressly granted herein is denied.

123

SEP 2 3 2014

Signed this **23** day of **September**, 2014.

_____
HON. ANTONIA ARTEAGA, Presiding

APPROVED AS TO FORM:

_____
Anita J. Anderson
SBN 01165955
LAW OFFICE OF ANITA J. ANDERSON
POB 830722
San Antonio, Texas 78283
(210) 533-8726
Facs. 533-0989
ajanderson1111@gmail.com

*For Plaintiffs Johnny Montoya Garza, John Rene Aguilar, Laura Ashley Wells, Johnny B. Wells*

_____
Ana Laura Hessbrook
SBN 00791481
LAW OFFICE OF ANA LAURA HESSBROOK
4100 N.W. Loop 410 Suite 105
San Antonio, Texas 78229
(210) 706-9466
Facs: 706-9467
hessbrook@sbcglobal.net

*For Defendants Irma Lemus and Manuel Lemus, Jr.*

124

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

# WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF BEXAR | § | |

THAT, ELVIRA AGUILAR, hereinafter called Grantor (whether one or more), for and in consideration of the sum of TEN AND NO/100 DOLLARS and other good and valuable considerations to Grantor in hand paid by IRMA A. LEMUS and MANUEL V. LEMUS, JR., hereinafter called Grantee (whether one or more), the receipt of which is hereby acknowledged, has GRANTED, SOLD and CONVEYED, and by these presents does GRANT, SELL and CONVEY unto Grantee, whose mailing address is as hereinafter set forth, the following described real estate, together with all improvements thereon, situated in Bexar County, Texas, being more particularly described as follows, to-wit:

Lot 4, Block 2, New City Block 12291, CAMPO GARDENS ADDITION, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 3525, Page 192, Deed and Plat Records of Bexar County, Texas, also known as 106 Cameo, San Antonio, Texas.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto the said Grantee, Grantee's heirs, successors and/or assigns forever. And Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors and/or assigns TO WARRANT AND FOREVER DEFEND all and singular the said premises unto the said Grantee herein, Grantee's heirs, successors and/or assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

This conveyance and the warranties of title given herein are made subject to any and all restrictions, easements, setback lines, covenants, conditions and reservations, of record affecting the property herein conveyed.

EXECUTED ON THE FOLLOWING DATE: January ___, 2009.

ELVIRA AGUILAR

(ACKNOWLEDGEMENT)

STATE OF TEXAS §
COUNTY OF BEXAR §

This instrument was ACKNOWLEDGED before me, on this the ___ day of January, 2009, by ELVIRA AGUILAR.

KIMBERLY L. WYNNS
Notary Public, State of Texas
My Commission Expires
January 18, 2009

Notary Public, State of Texas

This instrument was prepared solely from information and on instructions given to this office by our client. No title opinion or other information has been furnished to or has been, or is being, given by this office to any person in connection with the preparation of this instrument or the accuracy of the information contained herein.

GRANTEE'S MAILING ADDRESS:
AFTER RECORDING RETURN TO
GRANTEE AT:
Irma A. Lemus
Manuel V. Lemus, Jr.
27213 Bent Trail
Boerne, TX 78006

PREPARED IN THE OFFICE OF:
WEST & WEST ATTORNEYS, P.C.
2929 Mossrock, Suite 204
San Antonio, Texas 78230

Attachment "A"

Will from Johnny Montoya Garza And Elvira G. Aguilar:

We the above people agree that the house at 106 Cameo San Antonio Texas 78214 belongs to Elvira G. Aguilar And Johnny Montoya Garza Part owner on 2nd story of house was built because of the children that were awarded to Ms Elvira G. Aguilar at the time of her daughters death the state awarded the children to Ms Elvira g Aguilar then we decided to Add onto the house to make Rooms for the Children there for We agree that the house be evenly owned By John Rene Aguilar Laura Ashley Wells And Johnny B. Wells. Nothing will be done to the house without the authorization of John Rene Aguilar Johnny B. Wells And Laura Ashley Wells. In Case of a disagreement on the Aguilar Part And the children Listed above have the final Say in what is to be done to the house at

Attachment "B"

106 Cameo SanAntonio Texas 78214.

John Rene Must keep me Informed of all dicissions so that I Johnny Montoya Garza Can be as heleful to the Children so that there is no harsh disicissions made. I Johnny Montoya Garza am expecting that all family members except this will that Elvira G. Aguilar And Johnny Montoya Garza have decided to award the house at 106 Cameo to the Children Listed Previously I Johnny Montoya Garza Am Positivly Sure that there will be no disagreement between the familyes. So I hope tha John David Aguilar And Nannette Aguilar And other family members Respect the wishes of Elvira G Aguilar + Johnny Montoya Garza please have all family members sign this agreement will. May God be with you All in these hard times please agree to Your Mom And

over→



CAUSE NO. 2012-CI-00251

| | | |
|---|---|---|
| JOHNNY MONTOYA GARZA, | § | IN THE DISTRICT COURT |
| JOHN RENE AGUILAR, JOHNNY B. | § | |
| WELLS and LAURA ASHLEY WELLS | § | |
| | § | 225th JUDICIAL DISTRICT |
| V. | § | |
| | § | |
| IRMA LEMUS and MANUEL LEMUS, JR. § | | BEXAR COUNTY, TEXAS |

## INJUNCTION PENDING FINAL JUDGMENT

BE IT REMEMBERED that on the 11th day of July, 2014, at the conclusion of trial came on to be considered Plaintiffs' Motion for Injunction pending Final Judgment, and the parties having appeared and arguments having been heard thereon, and the Court being of the opinion that it should be granted, it is hereby

ORDERED that except as expressly approved by the Court, or as agreed between counsel for the parties, and in the presence of opposing counsel, both Defendants and Plaintiffs are enjoined from taking any action or taking any action which would result in harm to the property the subject of this suit including but not limited to the following:

1. Entering the premises at 106 Cameo in person or by agent, employee or or family member;

2. Removing any fixtures, including fencing, hot water heater, air conditioning units, sinks and toilets;

3. Altering the house in any way;

4. Removing any vehicles in the yard;

**Document scanned as filed.**

5. Causing or allowing destruction to the premises in any way;

6. Cancelling any insurance policy on the house without an opportunity for replacement of such insurance;

7. Removing any equipment or materials on the premises without express permission of the court;

8. Moving or damaging plaintiffs' personal belongings;

9. Permitting any person other than plaintiffs to enter onto the premises for any purpose ~~not approved by the Court~~. *unless approved AND in the presence of opposing counsel.*

10. Committing an act or omission which harms or alters the premises.

1

70

This injunction shall continue until judgment is final and any appeals have been concluded.

_____
JUDGE ANTONIA ARTEAGA, Presiding

7/11/2014

_____
Anita J. Anderson
SBN 01165955
LAW OFFICE OF ANITA J. ANDERSON
POB 830722
San Antonio, Texas 78283
(210) 533-8726
Facs. 533-0989
ajanderson1111@gmail.com


_____
Ana Laura Hessbrook
SBN 00791481
LAW OFFICE OF ANA LAURA HESSBROOK
4100 N.W. Loop 410 Suite 105
San Antonio, Texas 78229
(210) 706-9466
Facs: 706-9467
hessbrook@sbcglobal.net

2

CAUSE NO. 2012-CI-00251

| | | |
|---|---|---|
| JOHNNY MONTOYA GARZA, | § | IN THE DISTRICT COURT |
| JOHN RENE AGUILAR, JOHNNY B. | § | |
| WELLS and LAURA ASHLEY WELLS | § | |
| | § | 225th JUDICIAL DISTRICT |
| V. | § | |
| | § | |
| IRMA LEMUS and MANUEL LEMUS, JR. § | | BEXAR COUNTY, TEXAS |

## ORDER -- ADDITIONAL INJUNCTION PENDING APPEAL

BE IT REMEMBERED that on the 3d day of October, 2014 came on to be considered Plaintiffs' Motion for Additional Injunctive Relief Pending Appeal. The parties appeared by and through their attorneys of record, and the Court heard evidence and arguments on said Motions.

WHEREAS, the Court finds that it has jurisdiction pursuant to Tex. R. App. Proc. 24.1 (e) to enter such orders as necessary to protect and enforce its judgments, and

WHEREAS this court has rendered judgment of ownership in favor of plaintiffs to the property at 106 Cameo, San Antonio, Texas, and entered prior injunctions against the parties for the protection of the property in accordance with its judgment, and

WHEREAS Defendants Irma Lemus and Manuel Lemus, Jr. have given notice of their intent to appeal, and

WHEREAS this Court has set bond in the amount of $25,750.00 payable to the Clerk of the Court no later than October 16, 2014 in order supersede and suspend execution of judgment pending appeal, and

WHEREAS the Court finds that the following additional orders enjoining the parties are necessary and reasonable in the event that Defendants timely post bond to suspend the enforcement of its judgment pending appeal, it is hereby

ORDERED, ADJUDGED AND DECREED that, the injunction issued by this court on July 11th, 2014 continues in force and effect and the parties are further enjoined as follows:

1. Defendants Irma Lemus and Manuel Lemus, Jr. shall provide copies of the keys to counsel for the Plaintiffs immediately;

2. Plaintiffs and Defendants are prohibited from entering the premises without the presence of their own counsel and only upon written notice of the time and date to the opposing parties;

3. Plaintiffs are permitted to remove personal items from the property subject to the provisions of paragraph 2;

4. Defendants shall maintain property casualty insurance on the property including coverage for vandalism until the conclusion of appeal and final orders and provide proof of such insurance to Plaintiffs;

5. Defendants shall pay all property taxes on appeal and provide proof of payment to Plaintiffs;

6. Defendants shall maintain the premises in all respects.

Signed this 27th day of October, 2014.

_____
Hon. Antonia Arteaga, Presiding

Approved as to Form:

_____
Ana Laura Hessbrook
Law Office of Ana Laura Hessbrook
4100 N.W. Loop 410 Suite 105
San Antonio, Texas 78229
(210)706-9466
Facs: 706-9467
hessbrook@sbcglobal.net

For Defendants

Additional Injunctions Pending Appeal , p. 2



ANITA J. ANDERSON
Law Office of Anita J. Anderson
POB 830722
San Antonio, Texas 78283
(210)533-8726
Facs. 533-0989
ajanderson1111@gmail.com

For Plaintiffs

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*June 17, 2015*

**DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS**

By: _____

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



# PLAINTIFF'S EXHIBIT 41

# BUSINESS RECORD AFFIDAVIT

COUNTY OF BEXAR      §

           KNOW ALL MEN BY THESE PRESENTS

STATE OF TEXAS      §

BEFORE ME, the undersigned authority, personally appeared MARY ANN KOSUB who, being by me duly sworn, deposed as follows:

My name is MARY ANN KOSUB. I am over 18 years of age, of sound mind and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the Custodian of Records for NORMANDY TERRACE NURSING & REHABILITATION CENTER.

Attached hereto are _300_ pages of records from NORMANDY TERRACE NURSING & REHABILITATION CENTER. These said _300_ pages of records are kept by NORMANDY TERRACE NURSING & REHABILITATION CENTER in the regular course of business, and it was the regular course of business of NORMANDY TERRACE NURSING & REHABILITATION CENTER, for an employee or representative of NORMANDY TERRACE NURSING & REHABILITATION CENTER with knowledge of the act, event, condition, or diagnosis, recorded to make the record or to transmit information thereof to be included in such records; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original records.

_____
MARY ANN KOSUB

STATE OF TEXAS      §
                     §
COUNTY OF BEXAR      §

SUBSCRIBED TO AND SWORN TO before me on this the 6th day of November 2009, to certify which, witness my Hand and Official Seal of Office.

_____
NOTARY PUBLIC, IN AND FOR THE
STATE OF TEXAS
MY COMMISSION EXPIRES: 7/6/13

LESLIE JEAN PEONIO
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
07-06-2013


PLAINTIFF'S EXHIBIT

| ELVIRA  AGUILAR | Res No.: | 28315 | Admit Date: | 11/14/08  5:30 pm | Admitted From: | 2 |
| 3338 STEPHEN FOSTER | Loc: | 02 222  A | ReAdmitted: | | Readmitted From: | |
| | Ph: | | Discharged: | | Discharged To: | |
| SAN ANTONIO, TX  78223 | Sex: | F | D.O.B.: | 3/11/1935 | SSN: | 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 |

## MEDICAL INFORMATION

Med Record no: 28315
Height:        63    in.
Admit Weight:   118.3  lbs.
Primary Phys:  ROBINSON, GIL          (210) 930-7908
               5150 BROADWAY #610
               SAN ANTONIO, TX 78209
Alternate Phys:

Referring Phys:  SHNEKER, AYHAM        (210) 447-3033
                4212 E. SOUTHCROSS #145
                SAN ANTONIO, TX 78222
QL Hospital stay: SOUTHEAST BAPTIST HOSP
From/Thru:  11/11/08  thru  11/14/08
Rehab Potential:

Allergies:

Admit Dx:
  V57.89 Rehabilitation Prc
Current Dx:
  331.0 Alzheimer's Disease
  728.2 Musc Disuse Atrophy Nec
  784.60 Symbolic Dysfunction Nos
  V57.89 Rehabilitation Proc Nec
  250.00 Dmii Wo Cmp Nt St Uncntr
  401.9 Hypertension Nos
  298.9 Psychosis Nos
  599.0 Urin Tract Infection Nos
  311 Depressive Disorder Nec

Admitted with:   ☐ Catheter present   ☐ Contractures   ☐ Restraint Orders   ☐ Pressure Sores (other than Stage 1)
                 ☑ Received pneumococcal vaccine          ☑ Received influenza immunization          ☑ In facility

## DEMOGRAPHICS

Marital Status:              County:      BEXAR
Race:  Hispanic or Latino    Primary Lang: English
Religion: Unknown            Birthplace:
Occupation:
  ☐ U.S. Citizen    ☐ Military Srv.

## SERVICE PROVIDERS and PREFERENCES

Pharmacy        PHARMERICA          (972) 602-7200

## BILLING INFORMATION

A/R Type:   MD1    CMG:  PD1   Resources:      394.40
Medicare #:   449421225B9       Ancillary A/R Type:      MCR
Medicaid #:   529280302         Ancillary Co-ins A/R Type:   MXA
Ins 1:                          Grp:
Pol:
Ins 2:
Pol:                            Grp:
Recurring Room Chg:
          ☑ Adv Bill         ☐ Resident is Self Responsible
TrustFund:  ☑ Apply Interest  ☑ Max Balance Reminder

Ambulance       ALLEN AMBULANCE SER    (210) 681-0111

Part D Plan:
Effective:          RxBIN:          RxPCN:
Cardholder ID:
Group No:              Issuer:

| RESPONSIBLE PARTY | SECOND CONTACT | THIRD CONTACT |
| DAVE AGUILAR | RENE  AGUILAR | |
| 2004 TADLEY STREET | | |
| COLUMBIA MI 65203 | | |
| Relationship:  SON | Relationship:  Nephew | Relationship: |
| Phone: (Day)  (573) 268-7220 | Phone: (Day) (210) 990-3498 | Phone: (Day) |
| (Eve) | (Eve) | (Eve) |
| (Cell)  (573) 234-1746 | (Cell) | (Cell) |

## ADDITIONAL INFORMATION

# DR. GARY JOHNSON
# PHYSICIAN PROGRESS NOTES

**Name:** Elvira Aguilar
**Rm. #** A115B
**11/20/08**

**Normandy Terrace**

**Brief History:** Patient is an elderly female born in 1935, admitted to this facility on 11/14/08. Patient has dementia, depression, and psychosis.

Patient also has Urinary Tract Infection and Diabetes Mellitus.

Medications include: Glipizide and Lisinopril. Psychotropic medications include: Aricept 10mg p q day for dementia, Celexa 10mg po q day for depression, Seroquel 75mg po q HS for psychosis, and Haldol 2mg IM q 4 hrs prn for agitation.

**Mental Status Examination:**

Patient is sitting in dining room this morning
Staff is present
Awake and alert
Fully clothed
Well groomed
Dementia
Disorientation
Confusion
Mild depression
Not a danger to self or others at this time

**Diagnosis:**

Alzheimer's Disease with Depression and Psychosis

**Current Medications:**

Aricept 10mg p q day for dementia
Celexa 10mg po q day for depression
Seroquel 75mg po q HS for psychosis
Haldol 2mg IM q 4 hrs prn for agitation

**Plan:** Medication reduction contraindicated at this time, benefits outweigh risks. We will continue to follow closely. We will observe for any side effects or drug interactions and for any alterations in mental status.

# DR. GARY JOHNSON
## PHYSICIAN PROGRESS NOTES

**Name:** Elvira Aguilar
**Rm. #** A115B
**12/04/08**

**Normandy Terrace**

**Chief Complaint:** Patient is a recent referral to this service. Patient has Alzheimer's Disease, depression, and psychosis. Staff is observing for any changes in status.

**Mental Status Examination:**

Fully clothed
Well groomed
Disorientation
Physically aggressive at times
Depression
Psychosis
Agitation
Dementia
Refusing medications at times

**Diagnosis:**

Alzheimer's Disease with Depression and Psychosis

**Current Medications:**

Aricept 10mg p q day for dementia
Celexa 10mg po q day for depression
Seroquel 75mg po q HS for psychosis
Haldol 2mg IM q 4 hrs prn for agitation

**Plan:** Medication reduction contraindicated at this time, benefits outweigh risks. We will continue to follow closely. We will observe for any side effects or drug interactions and for any alterations in mental status.

*GJ Johnson, MD*

# DR. GARY JOHNSON
# PHYSICIAN PROGRESS NOTES

**Name:** Elvira Aguilar
**Rm. #** A115B
**12/18/08**

**Normandy Terrace**

**Chief Complaint:** Patient has Alzheimer's Disease, depression, and psychosis. Staff is observing for any changes in status.

**Mental Status Examination:**

Fully clothed
Well groomed
Agitation
Dementia
Refusing medications at times
Disorientation
Physically aggressive at times
Depression
Psychosis

**Diagnosis:**

Alzheimer's Disease with Depression and Psychosis

**Current Medications:**

Aricept 10mg p q day for dementia
Celexa 10mg po q day for depression
Seroquel 75mg po q HS for psychosis
Haldol 2mg IM q 4 hrs prn for agitation

**Plan:** Medication reduction contraindicated at this time, benefits outweigh risks. We will continue to follow closely. We will observe for any side effects or drug interactions and for any alterations in mental status.

*GJ Johnson, MD*

# DR. GARY JOHNSON
## PHYSICIAN PROGRESS NOTES

**Name:** Elvira Aguilar
**Rm. #** A115B
**01/08/09**

**Normandy Terrace**

**Chief Complaint:** Patient has Alzheimer's Disease, depression, and psychosis. Staff is observing for any changes in status.

**Mental Status Examination:**

Disorientation
Physically aggressive at times
Depression
Psychosis
Fully clothed
Well groomed
Agitation
Dementia
Refusing medications at times

**Diagnosis:**

Alzheimer's Disease with Depression and Psychosis

**Current Medications:**

Aricept 10mg p q day for dementia
Celexa 10mg po q day for depression
Seroquel 75mg po q HS for psychosis
Haldol 2mg IM q 4 hrs prn for agitation

**Plan:** Medication reduction contraindicated at this time, benefits outweigh risks. We will continue to follow closely. We will observe for any side effects or drug interactions and for any alterations in mental status.

GJ Johnson, MD

# DAILY SKILLED NURSING NOTES (Continued)

| Time: | |
|-------|--|
| 0700 | Resting quietly @ this x. Appears in no distress. Out of bed c̄ no care prn. no behaviors noted. |
| 1000 | ~~Res + ambulate ad lib. Res Refuse to be fed — But when meal is cut into finger food type Res feed self. Res contus to resist care. + cont to be combative c̄ care + c̄ showers. Res incont B/B incont care pvided p̄ each episode. — Res q~~ |
| 12/22/08 | 1200 Resident continues to wander T + X hallways. Ambulates c̄ assist, gait slow + steady. Resist care when staff tries to to and clean her up. Requires 2x for showering, changing, etc. Feeds self p̄ tray set up, unwilled @ each meal to use silverware c̄ incont. of B+B, peri care prn as needed. Alert to self not to place or time. Memory unable to assess due to total confusion. Res q |
| 12/22/08 | Resident cont amb c̄ other residents. Each time you attempt to take the resident that she is calling moma she attempt to hit you or stop you. The resident (moma) was put to bed and the resident become very calm and was hugging staff. she is able to transfer self from bed to chair and T amb, feed self. Staff showers dresses and groom, peri care is done p̄ each episode of incontinence B/B. Will cont monitor. JBYoung |

---

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 128/78 | 16 | 64 | 97.4 |
| E | 111/54 | 14 | 66 | 96.8 |
| N | 90/43 | 18 | 65 | 96 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| | D | E | N | | D | E | N | | D | E | N | | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MOOD & BEHAVIOR** | | | | **SENSORY** | | | | **URINE** | | | | **DECREASED GRIP** | | | | **SKELETAL** | | | |
| Alert | ✓ | ✓ | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | ✓ | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | ✓ | | | | | | | | | | RLE  LLE | | | | Balance Unsteady | | | |
| Delusions | | | | **G.I.** | | | | | | | | RUE  LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | **SKIN** | | | | **RESPIRATORY** | | | | **SPECIAL TREATMENT** | | | |
| Insomnia | | | | Pain | | | | Decubitus/Wound | | | | Abn. breath sounds | | | | Dialysis | | | |
| Wandering | ✓ | ✓ | | Anorexia | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Combative | | | | Colostomy | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Resists Care | | | | Diarrhea | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Persistent Anger | | | | Constipation | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Clammy | ✓ | ✓ | | Oxygen Therapy | | | | Decubitus Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | ✓ | ✓ | | Chills | | | | | | | | I & O | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Stasis Ulcer | | | | **CARDIOVASCULAR** | | | | Hospice | | | |
| Physically Abusive | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| Crying/Tearful | | | | | | | | **NERVOUS SYSTEM** | | | | Chest Pain | | | | Internal Bleeding | | | |
| **PAIN SYMPTOMS** | | | | **G.U.** | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| | | | | Burning | | | | Headache | | | | RLE  LLE | | | | Hemiplegia/paresis | | | |
| Frequency | | | | Distention/Retention | | | | Tremors | | | | RUE  LUE | | | | Fx / Site: | | | |
| No Pain | ✓ | ✓ | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Less than daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Daily | | | | Incontinent Bladder | ✓ | ✓ | | | | | | **ACCIDENTS** | | | | | | | |
| Intensity | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | Ø | N | Ø | | | | |
| Mild | | | | Pain | | | | | | | | | | | | **PHYSICIAN VISIT** | Ø | N | Ø |
| Moderate | | | | Hesitancy | | | | | | | | Skin Tear this shift? | Ø | N | Ø | **NEW ORDERS NOTED** | Ø | N | Ø |
| Excruciating | | | | | | | | | | | | | | | | | | | |

**SERVICES PROVIDED:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Wound Dressing | | | Diabetic Care w/ Daily Inj | ✓ | ✓ | |
| Surgical Site Care | | | Antibiotic Therapy | | | |
| Venapuncture | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | Scheduled Toileting | | | |
| IV'S | | | | | | |
| Ostomy/Ileo Care | | | | | | |
| Anticoagulant tx | | | | | | |

**MODE OF LOCOMOTION**

| | | | | | | |
|---|---|---|---|---|---|---|
| W/C Primary Mode | | | Walker | | | |
| Other Person Wheels | | | Cane | | | |
| Wheels Self | | | Walks w/o assist | ✓ | ✓ | |

**ADLS: ANSWER ON BACK — THESE QUESTIONS IN A NARRATIVE**

1 HOW DOES RESIDENT MOVES TO/FROM A LYING POSTION, TURNS SIDE TO SIDE AND POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? MOVE FROM BED, CHAIR, W/C, (TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL? INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | INITIALS / TITLE: |
|---|---|
| Linda Tamayo RN | D  M RN |
| Juanita B. Joung | E  JBY LVN |
| | N |

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elvira | 12/22/03 | 115B | Shryller |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

Time:

| | |
|---|---|
| 0300 | Resting quietly @ this x. Free of s/s c̄ inc care prn - Appears in ō distress. ō behaviors noted - |
| 0845 | Res awake Pleasant at this. Res Difficult to Re direct Requires constal cueing. Res able to feed self c̄ D/R c̄ cueing. Res was Participates in activity c̄ some cueing. c̄ short attention span when Res attatches to a certain Res when Separated Res Becomes upset & will attempt to strike out _____ |
| 12/23/08 | Resident alert very quiet @ this time, orientated x1 aware of person unable to locate her room s̄ assist. She is able to transfer self. From Bed to chair and to stand. She amb thru out the area, she feed self usually eating a 100% using her fingers not a fork. peri care is given for bowel & Bladder incontinence after each episode. Grooming, dressing, showering is done per staff ō minimal assist. per Resident No acute changes noted @ this time will cont monitor. JK young |

---

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES (Continued)

| Time: | |
|---|---|
| 0330 | Resting quietly. Voices no c/o pain or discomfort. One of b/b's w/c care pt. o behavior noted this shift. |
| 6A | Heard a commotion @ nurses station while writer was passing meds & turned in time to see pt. slapping another pt. on the back of head. Other pt. (J.B.) then jumped up off of bench & grabbed pts. blue necklace off her neck breaking it. Both pts. separated. No injuries noted. |
| 12/25/08 | 1500 Alert to self, not to place or time. Does not know location of room. Directed daily to dining area, her room & activities. Does not stay in activities for long. 2 person for grooming & dressing. Resist care — attempts to hit staff and yells @ them when they do care. Wanders ↑↓ hallway. Ambulates c assist, gait slow, balance unsteady. No further aggression this shift. |
| 12/25/08 1550 | Res. Medicated c 0.5mg Haldol IM d/t combative fighting & cursing staff. Resisted care was held per staff on wrist. Both of cursing noted requiring 3 assist. Res. began to become calmer & further aggression reported or noted. Will monitor. |

Document above:
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES (Continued)

| Time: | |
|-------|---|
| 0300 | Resting quietly @ this x. Appears in no distress. Done of b/b/c inc care prn. No behavior noted @ this x. |
| 10³⁰ | Alert & responsive, but confused. Ambulates in hallway + is still steady gait. Becomes combative @ time for no known reason. Takes @ to B to ___ care at episode. Requires re-directing & ___ all shift 2° to short attention span & poor orientation. |
| 1/1/09 | Res alert, confused, naps at interval sometimes. Cooperative c staff other times uncooperative + combative during B + B + peri care done of each episode. ___ hallway in ___ other ___ of problem voice. ___ will monitor. |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTE

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | | | | |
| E | 158 174 | 20 | 70 | 674 |
| N | | | | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D E N | SENSORY | D E N | URINE | D E N | DECREASED GRIP | D E N | SKELETAL | D E N |
|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | Unable to speak | | Clarity | | Right | | Amputation | |
| Anxious | | Unable to hear | | Odor | | Left | | Weakness | |
| Disoriented | | Unable to see | | Testing | | Decreased Mvmt. | | Gait Unsteady | |
| Confused | ✓ | | | | | RLE    LLE | | Balance Unsteady | |
| Delusions | | G.I. | | | | RUE    LUE | | Splint / Brace | |
| Hallucination | | Nausea/Vomiting | | | | | | | |
| Insomnia | | Pain | | SKIN | | RESPIRATORY | | SPECIAL TREATMENT | |
| Wandering | | Anorexia | | Decubitus/Wound | | Abn.breath sounds | | Dialysis | |
| Combative | | Colostomy | | Burn | | Cough | | IV Medications | |
| Resists Care | ✓ | Diarrhea | | Abnormal Turgor | | Dyspnea/SOB | | Transfusions | |
| Persistent Anger | | Constipation | | Rash/Itching | | Suctioning | | Wanderguard | |
| Unrealistic Fears | | Difficulty Swallowing | | Abnormal Color | | Respiratory Therapy | | Trach Care | |
| Socially Inappropriate | | Bowel Incontinence | ✓ | Clammy | | Oxygen Therapy | | Decubitus Care | |
| Verbally Abusive | | Feeding Tube | | Chills | | | | I & O | |
| Physically Abusive | | | | Stasis Ulcer | | CARDIOVASCULAR | | Hospice | |
| Crying/Tearful | | | | | | Arrhythmia | | Psych. Intervention | |
| PAIN SYMPTOMS | | | | | | Chest Pain | | Internal Bleeding | |
| E: | | G.U. | | Syncope | | Edema-specify | | Septicemia | |
| Frequency | | Burning | | Headache | | RLE    LLE | | Hemiplegia/paresis | |
| No Pain | ✓ | Distention/Retention | | Tremors | | RUE    LUE | | Fx / Site: | |
| Less than daily | | Frequency/Urgency | | Vertigo | | | | | |
| Daily | | Hematuria | | | | | | | |
| Intensity | | Incontinent Bladder | ✓ | | | ACCIDENTS | | | |
| Mild | | Catheter/Ostomy | | | | Fall this shift? | | | |
| Moderate | | Pain | | | | | | PHYSICIAN VISIT | |
| Excruciating | | Hesitancy | | | | Skin Tear this shift? | | NEW ORDERS NOTED | |

### SERVICES PROVIDED:

| | | | |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ |
| Surgical Site Care | | Antibiotic Therapy | |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

### MODE OF LOCOMOTION

| | | | |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES TO/FROM A LYING POSTION, TURNS SIDE TO SIDE AND POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? (TRANSFERS) MOVE FROM BED, CHAIR, W/C,

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL? INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: | |
|---|---|---|---|
| | D | | |
| A. Benson | E | | |
| | N | | |

| | | | |
|---|---|---|---|
| Aguilar, Elmira | 1/1/19 | 115B | Shriver |
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES  (Continued)

| Time: | |
|-------|---|
| 0300 | Resting quietly @ present. Voices no c/o pain or discomfort. Rec'd b/b c̄ inc care prn. No behaviors noted. ___ [signature] |
| 0930 | Res ↑ ambulatory Ad-lib slow-gait per inc B/b inc care prod'l p̄ each epsode. Res able to feed self c̄ cueing + able to transfer self in room c̄ stand by assist per. Remains confused oriented to name only. Will cont to monitor ___ [signature] |
| 1700 | Res ↑ ambulatory A+O x 5 self only. Res inc B/b inc care prod'l p̄ each epsode. Res able to transfer self in room ___ [signature] |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

| SHIFT | B/P | RESP. | PULSE | TE: |
|---|---|---|---|---|
| D | 140/76 | 20 | 15 | 97m |
| E | | | | |
| N | | | | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D E N | SENSORY | D E N | URINE | D E N | DECREASED GRIP | D E N | SKELETAL | D E N |
|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | Unable to speak | | Clarity | | Right | | Amputation | |
| Anxious | | Unable to hear | | Odor | | Left | | Weakness | |
| Disoriented | | Unable to see | | Testing | | Decreased Mvmt. | | Galt Unsteady | |
| Confused | ✓ | | | | | RLE    LLE | | Balance Unsteady | |
| Delusions | | G.I. | | | | RUE    LUE | | Splint / Brace | |
| Hallucination | | Nausea/Vomiting | | | | | | | |
| Insomnia | | Pain | | SKIN | | RESPIRATORY | | SPECIAL TREATMENT | |
| Wandering | | Anorexia | | Decubitus/Wound | | Abn.breath sounds | | Dialysis | |
| Combative | | Colostomy | | Burn | | Cough | | IV Medications | |
| Resists Care | ✓ | Diarrhea | | Abnormal Turgor | | Dyspnea/SOB | | Transfusions | |
| Persistent Anger | | Constipation | | Rash/Itching | | Suctioning | | Wanderguard | |
| Unrealistic Fears | | Difficulty Swallowing | | Abnormal Color | | Respiratory Therapy | | Trach Care | |
| Socially Inappropriate | | Bowel Incontinence | ✓ | Clammy | | Oxygen Therapy | | Decubitus Care | |
| Verbally Abusive | | Feeding Tube | | Chills | | | | I & O | |
| Physically Abusive | | | | Stasis Ulcer | | CARDIOVASCULAR | | Hospice | |
| Crying/Tearful | | | | | | Arrhythmia | | Psych. Intervention | |
| PAIN SYMPTOMS | | | | NERVOUS SYSTEM | | Chest Pain | | Internal Bleeding | |
| TE: | | G.U. | | Syncope | | Edema-specify | | Septicemia | |
| Frequency | | Burning | | Headache | | RLE    LLE | | Hemiplegia/paresis | |
| No Pain | ✓ | Distention/Retention | | Tremors | | RUE    LUE | | Fx / Site: _____ | |
| Less than daily | | Frequency/Urgency | | Vertigo | | | | | |
| Daily | | Hematuria | | | | | | | |
| Intensity | | Incontinent Bladder | ✓ | | | ACCIDENTS | | | |
| Mild | | Catheter/Ostomy | | | | Fall this shift? | ✓ | | |
| Moderate | | Pain | | | | | | PHYSICIAN VISIT | ✓ |
| Excruciating | | Hesitancy | | | | Skin Tear this shift? | ✓ | NEW ORDERS-NOTED | ✓ |

### SERVICES PROVIDED:

| | D E N | | D E N |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ |
| Surgical Site Care | | Antibiotic Therapy | ✓ |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

### MODE OF LOCOMOTION

| | D E N | | D E N |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ |

**ADLS: ANSWER ON BACK**   THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES   TO/FROM A LYING POSTION,
TURNS SIDE TO SIDE AND   POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT   MOVE FROM BED,CHAIR, W/C,
STAND POSTION?
(TRANSFERS)

3  HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4  HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

OSTOMY OR CATHETER, AND ADJUST CLOTHES?

DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: | |
|---|---|---|---|
| _(signature)_ | D | _(initials)_ | |
| _(signature)_ | E | _(initials)_ | |
| _(signature)_ | N | _(initials)_ | |

| Aguilar, Elvira | 1/2/9 | 115B | Shrıker |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES  (Continued)

| Time: | |
|---|---|
| 0300 | Resting quietly. Voices no c/o pain or discomfort. One of Bibs c inc care pun. No behaviors noted @ this x— *(illegible signature)* |
| 1200 | Res ↑ ambulates Ad-lib c difficulty slow gait. Res confused cueing required to locate room & as to time of day & meal times Res incont B/B incont care provided p̄ each upisin; Res able to feed self c cueing —*(illegible signature)* |
| 1600 | Res ↑ Ambulates slow gait. Res confused unaware of time of day. Constant Redirection & Reorientation needed. Res incont B/B incont care provided p̄ each upisode Res able to feed self c cueing —*(illegible signature)* |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | | 50 | 74 | 97 |
| E | 130/76 | 20 | 97 | 97 |
| N | | | | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D E N | SENSORY | D E N | URINE | D E N | DECREASED GRIP | D E N | SKELETAL | D E N | D E N |
|---|---|---|---|---|---|---|---|---|---|---|
| Alert | | Unable to speak ✓ | | Clarity | | Right | | Amputation | | |
| Anxious | | Unable to hear | | Odor | | Left | | Weakness | | |
| Disoriented | | Unable to see | | Testing | | Decreased Mvmt. | | Gait Unsteady | | |
| Confused | | | | | | RLE     LLE | | Balance Unsteady | | |
| Delusions | | G.I. | | | | RUE     LUE | | Splint / Brace | | |
| Hallucination | | Nausea/Vomiting | | | | | | | | |
| Insomnia | | Pain | | SKIN | | RESPIRATORY | | SPECIAL TREATMENT | | |
| Wandering | | Anorexia | | Decubitus/Wound | | Abn. breath sounds | | Dialysis | | |
| Combative | | Colostomy | | Burn | | Cough | | IV Medications | | |
| Resists Care | | Diarrhea | | Abnormal Turgor | | Dyspnea/SOB | | Transfusions | | |
| Persistent Anger | | Constipation | | Rash/Itching | | Suctioning | | Wanderguard | | |
| Unrealistic Fears | | Difficulty Swallowing | | Abnormal Color | | Respiratory Therapy | | Trach Care | | |
| Socially Inappropriate | | Bowel Incontinence | | Clammy | | Oxygen Therapy | | Decubitus Care | | |
| Verbally Abusive | | Feeding Tube | | Chills | | | | I & O | | |
| Physically Abusive | | | | Stasis Ulcer | | CARDIOVASCULAR | | Hospice | | |
| Crying/Tearful | | | | | | Arrhythmia | | Psych. Intervention | | |
| PAIN SYMPTOMS | | | | | | Chest Pain | | Internal Bleeding | | |
| TE: | | G.U. | | Syncope | | Edema-specify | | Septicemia | | |
| Frequency | | Burning | | Headache | | RLE     LLE | | Hemiplegia/paresis | | |
| No Pain | | Distention/Retention | | Tremors | | RUE     LUE | | Fx / Site: | | |
| Less than daily | | Frequency/Urgency | | Vertigo | | | | | | |
| Daily | | Hematuria | | | | | | | | |
| Intensity | | Incontinent Bladder | | | | ACCIDENTS | | | | |
| Mild | | Catheter/Ostomy | | | | Fall this shift? | | | | |
| Moderate | | Pain | | | | | | PHYSICIAN VISIT | | |
| Excruciating | | Hesitancy | | | | Skin Tear this shift? | | NEW ORDERS NOTED | | |

### SERVICES PROVIDED:

| | | | |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ |
| Surgical Site Care | | Antibiotic Therapy | |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

### MODE OF LOCOMOTION

| | | | |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ |

**ADLS: ANSWER ON BACK**

**THESE QUESTIONS IN A NARRATIVE**

1 HOW DOES RESIDENT MOVES TURNS SIDE TO SIDE AND — TO/FROM A LYING POSTION, POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? (TRANSFERS) — MOVE FROM BED, CHAIR, W/C,

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL? INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: | |
|---|---|---|---|
| *(signature)* | D | *(initials)* | |
| *(signature)* | E | *(initials)* | |
| *(signature)* | N | *(initials)* | |

| Aguilar Elinore | 1/29 | 715B | Shreker |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

Time:

| | |
|---|---|
| 1-3-09 | 0100 Asleep on rounds no acute distress. Incont of B+B peri care given after each episode. Quiet at present. CNames |
| 1/3/09 | Mod Alert to self not to place or time. Long term memory intact. Able to transfer, turn + reposition self. Ambulates c assist gait slow + steady. Feeds self c tray set up per staff. Appetite good, ate 100%. Incont of B+B, peri care given as needed. Has been quiet, cooperative this shift. _____ |
| 1/3/09 | Medicated c [illegible] 0.5mg per MD order for agitation to Rt buttock, will monitor for calmness of behavior. Noted will monitor. [illegible] Ben |

**Document above:**

Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 122/83 | 20 | 68 | 97.8 |
| E | 128/70 | 20 | 70 | 97.4 |
| N | 118/56 | 16 | 74 | 98 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | X | ✓ | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | X | ✓ | | | | | | | | | | RLE  LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE  LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn. breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | | | | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | X | ✓ | | Clammy | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE  LLE | | | | Hemiplegia/paresis | | | |
| No Pain | X | ✓ | | Distention/Retention | | | | Tremors | | | | RUE  LUE | | | | Fx / Site: | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | X | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Frequency | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| Wound Dressing | | | | Diabetic Care w/ Daily Inj | X | ✓ | |
|---|---|---|---|---|---|---|---|
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| W/C Primary Mode | | | | Walker | | | |
|---|---|---|---|---|---|---|---|
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | X | ✓ | |

| NURSES SIGNATURE | | INITIALS / TITLE |
|---|---|---|
| Linda Tamaya RN | D | LT RN |
| A. Bensol | E | ABH |
| C. Miller | N | CM LVN |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES    TO/FROM A LYING POSTION,
TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT    MOVE FROM BED, CHAIR, W/C,
STAND POSTION?
(TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMO

BED PAN, OR URINAL, CLEANSES, CHANGES PAD, N

OSTOMY OR CATHETER, AND ADJUST CLOTHES?

DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elvira | 1-3-04 | 115B | Dr. Shreke |

SKILLED NURSING NOTES CONTINUED (BACK)

Time:

| | |
|---|---|
| 0330 | Resting quietly @ this x. Appears in no distress. Ing of s/s c inc compln. No behaviors noted @ this x ———— |
| 01/04/08 7⁴⁰P | Resident has been very quiet this PM she and her friend has been in + out of room has done it very quietly. Resident is able to feed self that her friend eat from one to the other of their dinner. pericare is done after each epsoid or incont B/B Grooming dressing and showering is done per staff. No acute changes noted @ this time. _____ |

**Document above:**
*Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.*
*Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.*

# DAILY SKILLED NURSING NOTE

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|-------|-----|-------|-------|-------|
| D | 130/74 | 16 | 70 | 97.C |
| E | | | | |
| N | | | | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | ✓ | | | | | | | | | | RLE    LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE    LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn. breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | | | | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | ✓ | | | Clammy | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE    LLE | | | | Hemiplegia/paresis | | | |
| No Pain | | | | Distention/Retention | | | | Tremors | | | | RUE    LUE | | | | Fx / Site: | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | ✓ | | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | (1) | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | ◌ | | |
| Excruciating | | | | Frequency | | | | | | | | Skin Tear this shift? | ◌ | | | NEW ORDERS NOTED | ◌ | | |

| SERVICES PROVIDED: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj | | | | |
| Surgical Site Care | | | | Antibiotic Therapy | | | | |
| Venapuncture | | | | Retrain ADL's | | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | | |
| Trach Care | | | | Scheduled Toileting | | | | |
| IV'S | | | | | | | | |
| Ostomy/Ileo Care | | | | | | | | |
| Anticoagulant tx | | | | | | | | |

| MODE OF LOCOMOTION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | | |
| Other Person Wheels | | | | Cane | | | | |
| Wheels Self | | | | Walks w/o assist | ✓ | | | |

ADLS: ANSWER ON BACK          THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES   TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT     MOVE FROM BED, CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

  INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

  BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

  OSTOMY OR CATHETER, AND ADJUST CLOTHES?

  DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE |
|---|---|---|
| | D | |
| Juanita B. Younis | E JBY LVN | |
| | N | |

| Aguilar, Eunice | 1/4/9 | 115B | Shrader |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

**Time:**

| Time | |
|------|---|
| 0300 | Resting quietly @ present. Appears in no distress. On [?] s/s [?] via care plan. No behaviors noted so far this shift [signature] |
| 1100 | Res [?] Ambulating well lib slow steady gait. Res able to feed self in D/R. at this res incont care & Becomes confused [?] care Res Requires constant Redirection & Reorientation as to time of day. — [signature] |
| 1630 | Res [?] Ambulating ad-lib slow steady gait — Res confused. A&O x1 only Requiring constant Redirection as to Dining Room + location of Room — [signature] |

---

**Document above:**

Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death

| SHIFT | B/P | RESP. | PULS | T |
|---|---|---|---|---|
| D | 154/9 | 20 | | 97.6 |
| E | 148/84 | 21 | 72 | 97 |
| N | | | | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | X | ✓ | ✓ | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | X | ✓ | | | | | | | | | | RLE    LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE    LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn.breath sounds | | | | Dialysis | | | |
| Combative | | ✓ | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | | | | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | X | ✓ | | Clammy | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE    LLE | | | | Hemiplegia/paresis | | | |
| No Pain | X | | | Distention/Retention | | | | Tremors | | | | RUE    LUE | | | | Fx / Site: _____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | X | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | ✓ | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | ✓ | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | ✓ | | NEW ORDERS NOTED | | ✓ | |

### SERVICES PROVIDED:

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj | X | ✓ | ✓ |
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | |
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | X | | |

ADLS: ANSWER ON BACK          THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES     TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND       POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT        MOVE FROM BED,CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3   HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

    INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4   HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

    BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

    OSTOMY OR CATHETER, AND ADJUST CLOTHES?

    DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: | |
|---|---|---|---|
| | D | | |
| | E | | |
| | N | | |

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elmira | 1/5/9 | 115B | Shreffler |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES   (Continued)

| Time: | |
|---|---|
| 0200 | Resting quietly @ this x. Appears in @ distress. Que of bibs c inc care prn. No behaviors noted. |
| 0830 | Res ↑ Ambulating ad-lib slow gait. Res Refused AM care today + Remains confused as to location of room. Q freq q meds + meals. Res incont 10/03 incont care provided p each episode — [signature] |
| 1630 | Res ↑ Ambulating ad-lib slow steady gait. Res Does not like to participate in things activities very short attention span only wishes to observe + going in + out of room — [signature] ERROR WRONG Res — [signature] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

| SHIFT | B/P | RESP. | PULSE | T |
|---|---|---|---|---|
| D | 132/68 | 20 | 76 | 974 |
| E | | | | |
| N | 122/68 | 16 | 72 | 95² |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | | ✓ | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | ✓ | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | ✓ | | | | | | | | | | RLE   LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE   LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn.breath sounds | | | | Dialysis | | | |
| Combative | ✓ | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | | | | Diarrhea | ✓ | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | ✓ | | | Clammy | ✓ | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | T & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE   LLE | | | | Hemiplegia/paresis | | | |
| No Pain | | | | Distention/Retention | | | | Tremors | | | | RUE   LUE | | | | Fx / Site: _____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | ✓ | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj | ✓ | ✓ | |
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | |
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | ✓ | ✓ | |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES    TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT    MOVE FROM BED,CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

  INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

  BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

  OSTOMY OR CATHETER, AND ADJUST CLOTHES?

  DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: |
|---|---|---|
| _(signature)_ | D | _(initials)_ |
| _(signature)_ | E | _(initials)_ |
| _(signature)_ | N | _(initials)_ |

| Aguilar, Elvira | 1/2/9 | 115B | Shreker |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES   (Continued)

| Time: | |
|---|---|
| 4-08/08 03³⁰ | Resident asleep on rounds. No acute changes noted on this time. will cont monitor. ———— L Bryann ○ |
| 13⁰¹ | Res ↑ activity ad-lib slow gait Res able to feed self in DR Res Remains confused. as to time & day. & med times Res at times Refuses care —uh ∕ |
| 1/8/09 9ᵖᵐ | Res Amle Adand ⊕ ō Confusion, Ø behavior Ø Changes will Monitor ——— H Benson |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care  or death.
Notification  of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTE

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 120/74 | 20 | 68 | 98 |
| E |  |  |  |  |
| N | 118/79 | 20 | 66 | 97 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert |  |  |  | Unable to speak |  |  |  | Clarity |  |  |  | Right |  |  |  | Amputation |  |  |  |
| Anxious |  |  |  | Unable to hear |  |  |  | Odor |  |  |  | Left |  |  |  | Weakness |  |  |  |
| Disoriented |  |  |  | Unable to see |  |  |  | Testing |  |  |  | Decreased Mvmt. |  |  |  | Gait Unsteady |  |  |  |
| Confused |  |  |  |  |  |  |  |  |  |  |  | RLE    LLE |  |  |  | Balance Unsteady |  |  |  |
| Delusions |  |  |  | G.I. |  |  |  |  |  |  |  | RUE    LUE |  |  |  | Splint / Brace |  |  |  |
| Hallucination |  |  |  | Nausea/Vomiting |  |  |  | SKIN |  |  |  | RESPIRATORY |  |  |  | SPECIAL TREATMENT |  |  |  |
| Insomnia |  |  |  | Pain |  |  |  | Decubitus/Wound |  |  |  | Abn. breath sounds |  |  |  | Dialysis |  |  |  |
| Wandering |  |  |  | Anorexia |  |  |  | Burn |  |  |  | Cough |  |  |  | IV Medications |  |  |  |
| Combative |  |  |  | Colostomy |  |  |  | Abnormal Turgor |  |  |  | Dyspnea/SOB |  |  |  | Transfusions |  |  |  |
| Resists Care |  |  |  | Diarrhea |  |  |  | Rash/Itching |  |  |  | Suctioning |  |  |  | Wanderguard |  |  |  |
| Persistent Anger |  |  |  | Constipation |  |  |  | Abnormal Color |  |  |  | Respiratory Therapy |  |  |  | Trach Care |  |  |  |
| Unrealistic Fears |  |  |  | Difficulty Swallowing |  |  |  | Clammy |  |  |  | Oxygen Therapy |  |  |  | Decubitus Care |  |  |  |
| Socially Inappropriate |  |  |  | Bowel Incontinence |  |  |  | Chills |  |  |  |  |  |  |  | I & O |  |  |  |
| Verbally Abusive |  |  |  | Feeding Tube |  |  |  | Stasis Ulcer |  |  |  | CARDIOVASCULAR |  |  |  | Hospice |  |  |  |
| Physically Abusive |  |  |  |  |  |  |  |  |  |  |  | Arrhythmia |  |  |  | Psych. Intervention |  |  |  |
| Crying/Tearful |  |  |  |  |  |  |  | NERVOUS SYSTEM |  |  |  | Chest Pain |  |  |  | Internal Bleeding |  |  |  |
| PAIN SYMPTOMS |  |  |  | G.U. |  |  |  | Syncope |  |  |  | Edema-specify |  |  |  | Septicemia |  |  |  |
| E: |  |  |  | Burning |  |  |  | Headache |  |  |  | RLE    LLE |  |  |  | Hemiplegia/paresis |  |  |  |
| Frequency |  |  |  | Distention/Retention |  |  |  | Tremors |  |  |  | RUE    LUE |  |  |  | Fx / Site: |  |  |  |
| No Pain |  |  |  | Frequency/Urgency |  |  |  | Vertigo |  |  |  |  |  |  |  |  |  |  |  |
| Less than daily |  |  |  | Hematuria |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Daily |  |  |  | Incontinent Bladder |  |  |  |  |  |  |  | ACCIDENTS |  |  |  |  |  |  |  |
| Intensity |  |  |  | Catheter/Ostomy |  |  |  |  |  |  |  | Fall this shift? |  |  |  |  |  |  |  |
| Mild |  |  |  | Pain |  |  |  |  |  |  |  |  |  |  |  | PHYSICIAN VISIT |  |  |  |
| Moderate |  |  |  | Hesitancy |  |  |  |  |  |  |  | Skin Tear this shift? |  |  |  | NEW ORDERS NOTED |  |  |  |
| Excruciating |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

| SERVICES PROVIDED: | | | | | |
|---|---|---|---|---|---|
| Wound Dressing |  |  | Diabetic Care w/ Daily Inj |  |  |
| Surgical Site Care |  |  | Antibiotic Therapy |  |  |
| Venapuncture |  |  | Retrain ADL's |  |  |
| Admin. IM/SQ Meds |  |  | Evaluate Diet/Fluid Intake |  |  |
| Trach Care |  |  | Scheduled Toileting |  |  |
| IV'S |  |  |  |  |  |
| Ostomy/Ileo Care |  |  |  |  |  |
| Anticoagulant tx |  |  |  |  |  |

| MODE OF LOCOMOTION | | | | | |
|---|---|---|---|---|---|
| W/C Primary Mode |  |  | Walker |  |  |
| Other Person Wheels |  |  | Cane |  |  |
| Wheels Self |  |  | Walks w/o assist |  |  |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES    TO/FROM A LYING POSTION,
TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT    MOVE FROM BED, CHAIR, W/C,
STAND POSTION?
(TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

OSTOMY OR CATHETER, AND ADJUST CLOTHES?

DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: | |
|---|---|---|---|
|  | D |  |  |
|  | E |  |  |
| Juanita B Young | N | FBX LVN |  |

| aguilar, Elvira | 01-08-08 | 115 B | Dr Shreker, Ashton |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES   (Continued)

Time:

| | |
|---|---|
| 0150-01-09-09 | Resident asleep on rounds. No physical changes noted, Ō pain notic on facial expression. Incont care given for bowel and bladder. will cont monitor. SBYevrgh |
| 0800 | Res ↑ ambulates ad-lib slow-steady gait. Res confused + Re-orientation Reqired for Room location — + Res usually does not Remember when she took — her meal. Res does not participate in activities — + will get up + walk out ō activities — ntr h/ |
| 1/9/09 8p | Res ank + swelling Alert, Confused, becomes physically + verbally abusive When care is being done. wrist ō for B peri care given ō each episode Ō Changes reported or noted will monitor. Accu-checks con't to be done DBank |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 142/58 | 18 | 80 | 98.5 |
| E | 135/79 | 20 | 72 | 97 |
| N | 138/96 | 20 | 74 | 97 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | | ✓ | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | ✓ | | | | | | | | | | RLE      LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE      LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Insomnia | | | | Pain | | | | | | | | Abn. breath sounds | | | | Dialysis | | | |
| Wandering | ✓ | | | Anorexia | | | | Decubitus/Wound | | | | Cough | | | | IV Medications | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Resists Care | | | | Diarrhea | | | | Abnormal Turgor | | | | Suctioning | | | | Wanderguard | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Respiratory Therapy | | | | Trach Care | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | | ✓ | | Clammy | | | | | | | | I & O | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | Arrhythmia | | | | Psych. Intervention | | | |
| Crying/Tearful | | | | | | | | | | | | Chest Pain | | | | Internal Bleeding | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Edema-specify | | | | Septicemia | | | |
| TE: | | | | G.U. | | | | Syncope | | | | RLE      LLE | | | | Hemiplegia/paresis | | | |
| Frequency | | | | Burning | | | | Headache | | | | RUE      LUE | | | | Fx / Site: ___ | | | |
| No Pain | | | | Distention/Retention | | | | Tremors | | | | | | | | | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | A | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | A |
| Excruciating | | | | Hesitancy | | | | Skin Tear this shift? | | | A | NEW ORDERS NOTED | | | A |

### SERVICES PROVIDED:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | Diabetic Care w/ Daily Inj | ✓ | | | |
| Surgical Site Care | | | Antibiotic Therapy | | | | |
| Venapuncture | | | Retrain ADL's | | | | |
| Admin. IM/SQ Meds | | | Evaluate Diet/Fluid Intake | | | | |
| Trach Care | | | Scheduled Toileting | | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | | | | | | |
|---|---|---|---|---|---|---|
| W/C Primary Mode | | | Walker | | | |
| Other Person Wheels | | | Cane | | | |
| Wheels Self | | | Walks w/o assist | ✓ | | |

**ADLS: ANSWER ON BACK** — **THESE QUESTIONS IN A NARRATIVE**

1 HOW DOES RESIDENT MOVES TO/FROM A LYING POSTION, TURNS SIDE TO SIDE AND POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? (TRANSFERS) — MOVE FROM BED, CHAIR, W/C,

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL? INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | INITIALS / TITLE: |
|---|---|
| D _(signature)_ | _(initials)_ |
| E _(signature)_ Benson | ABW |
| N Juanita B. Young Jr | JBY LVN |

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elvira | 01-09-09 | 115B | Dr. Skukerayhom |

SKILLED NURSING NOTES CONTINUED (BACK)

Time:

| | |
|---|---|
| 0330 | Resting quietly @ present. Appears in no distress. Due [symbol] b/b [symbol] one care plan - Ambulates at lib. No behaviors noted this shift. |
| 10³⁰ | Paces slowly in hall/way on unit. Feeds self in ok, sometimes requires verbal cueing, less than 50% time. Incont. of b&b [symbol] peri care [symbol] at episode. Remains forgetful & [symbol] unable to find pm. Redirected thru out day. Monitored closely. [signature] |
| 1/10/09 | Res ambul. hallway incont care given each episode. [symbol] changes in condition reported. [symbol] continue will monitor. [signature] |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

| SHIFT | B/P | RESP. | PUL. | |
|---|---|---|---|---|
| D | 126/76 | 20 | 74 | 97 |
| E | 136/74 | 20 | 74 | 574 |
| N | 140/54 | 20 | 74 | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| | D E N | SENSORY | D E N | URINE | D E N | DECREASED GRIP | D E N | SKELETAL | D E N |
|---|---|---|---|---|---|---|---|---|---|
| **MOOD & BEHAVIOR** | | Unable to speak | | Clarity | | Right | | Amputation | |
| Alert | ✓ | Unable to hear | | Odor | | Left | | Weakness | |
| Anxious | | Unable to see | | Testing | | Decreased Mvmt. | | Gait Unsteady | |
| Disoriented | | | | | | RLE LLE | | Balance Unsteady | |
| Confused | ✓ ✓ | **G.I.** | | | | RUE LUE | | Splint / Brace | |
| Delusions | | Nausea/Vomiting | | | | | | | |
| Hallucination | | Pain | | **SKIN** | | **RESPIRATORY** | | **SPECIAL TREATMENT** | |
| Insomnia | | Anorexia | | Decubitus/Wound | | Abn.breath sounds | | Dialysis | |
| Wandering | | Colostomy | | Burn | | Cough | | IV Medications | |
| Combative | | Diarrhea | | Abnormal Turgor | | Dyspnea/SOB | | Transfusions | |
| Resists Care | ✓ ✓ | Constipation | | Rash/Itching | | Suctioning | | Wanderguard | |
| Persistent Anger | | Difficulty Swallowing | | Abnormal Color | | Respiratory Therapy | | Trach Care | |
| Unrealistic Fears | | Bowel Incontinence | ✓ ✓ | Clammy | | Oxygen Therapy | | Decubitus Care | |
| Socially Inappropriate | | Feeding Tube | | Chills | | | | I & O | |
| Verbally Abusive | | | | Stasis Ulcer | | **CARDIOVASCULAR** | | Hospice | |
| Physically Abusive | | | | | | Arrhythmia | | Psych. Intervention | |
| Crying/Tearful | | | | | | Chest Pain | | Internal Bleeding | |
| **PAIN SYMPTOMS** | | **G.U.** | | **NERVOUS SYSTEM** | | Edema-specify | | Septicemia | |
| TE: ____ | | | | Syncope | | RLE LLE | | Hemiplegia/paresis | |
| Frequency | | Burning | | Headache | | RUE LUE | | Fx / Site: ____ | |
| No Pain | ✓ ✓ | Distention/Retention | | Tremors | | | | | |
| Less than daily | | Frequency/Urgency | | Vertigo | | | | | |
| Daily | | Hematuria | | | | | | | |
| Intensity | | Incontinent Bladder | ✓ ✓ | | | **ACCIDENTS** | | | |
| Mild | | Catheter/Ostomy | | | | Fall this shift? | | | |
| Moderate | | Pain | | | | | | **PHYSICIAN VISIT** | |
| Excruciating | | Hesitancy | | | | Skin Tear this shift? | | NEW ORDERS NOTED | |

**SERVICES PROVIDED:**

| | | | |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ ✓ |
| Surgical Site Care | | Antibiotic Therapy | |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

**MODE OF LOCOMOTION**

| | | | |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ ✓ |

**NURSES SIGNATURE** / **INITIALS / TITLE:**

| Signature | | Initials |
|---|---|---|
| | D | RC |
| | E | AB |
| | N | |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES    TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT    MOVE FROM BED, CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

  INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

  BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

  OSTOMY OR CATHETER, AND ADJUST CLOTHES?

  DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elvira | 1/10/9 | 115B | Shreker |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

Time:

| | |
|---|---|
| 0200 | Resting quietly @ present. Appears w̄ no distress. Turn & sḃ c̄ no care prn. No behaviors noted this shift. _[illegible signature]_ |
| 10³⁰ | Ambulates slowly about unit. Feeds self in D/R - Good appetite. Becomes physically aggressive during ADL's. Incont. of B & B - periᵢ care given. Remains confused & disoriented to reality. Re-direct thru out shift as PRN. O/C of activities. Observed active by other _[illegible]_ |
| 03/11/07 3¹⁰ | Resident out on pass c̄ her daughter. Daughter stated she would be out for 3-4° and she would be bringing her back. ————— L. Bryant |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

| SHIFT | B/P | RESP. | PUL | TEM |
|---|---|---|---|---|
| D | | | 24 | 7 |
| E | 165/87 | 17 | | 97 |
| N | 134/76 | 2C | 96 | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D E N | SENSORY | D E N | URINE | D E N | DECREASED GRIP | D E N | SKELETAL | D E N |
|---|---|---|---|---|---|---|---|---|---|
| Alert | | Unable to speak | ✓ | Clarity | | Right | | Amputation | |
| Anxious | | Unable to hear | | Odor | | Left | | Weakness | |
| Disoriented | | Unable to see | | Testing | | Decreased Mvmt. | | Gait Unsteady | |
| Confused | ✓ | | | | | RLE    LLE | | Balance Unsteady | |
| Delusions | | G.I. | | | | RUE    LUE | | Splint / Brace | |
| Hallucination | | Nausea/Vomiting | | | | | | | |
| Insomnia | | Pain | | SKIN | | RESPIRATORY | | SPECIAL TREATMENT | |
| Wandering | | Anorexia | | Decubitus/Wound | | Abn.breath sounds | | Dialysis | |
| Combative | | Colostomy | | Burn | | Cough | | IV Medications | |
| Resists Care | ✓ | Diarrhea | | Abnormal Turgor | | Dyspnea/SOB | | Transfusions | |
| Persistent Anger | | Constipation | | Rash/Itching | | Suctioning | | Wanderguard | |
| Unrealistic Fears | | Difficulty Swallowing | | Abnormal Color | | Respiratory Therapy | | Trach Care | |
| Socially Inappropriate | | Bowel Incontinence | ✓ | Clammy | | Oxygen Therapy | | Decubitus Care | |
| Verbally Abusive | | Feeding Tube | | Chills | | | | T & O | |
| Physically Abusive | | | | Stasis Ulcer | | CARDIOVASCULAR | | Hospice | |
| Crying/Tearful | | | | | | Arrhythmia | | Psych. Intervention | |
| PAIN SYMPTOMS | | | | NERVOUS SYSTEM | | Chest Pain | | Internal Bleeding | |
| TE: _____ | | G.U. | | Syncope | | Edema-specify | | Septicemia | |
| Frequency | | Burning | | Headache | | RLE    LLE | | Hemiplegia/paresis | |
| No Pain | ✓ | Distention/Retention | | Tremors | | RUE    LUE | | Fx / Site: _____ | |
| Less than daily | | Frequency/Urgency | | Vertigo | | | | | |
| Daily | | Hematuria | | | | | | | |
| Intensity | | Incontinent Bladder | ✓ ✓ | | | ACCIDENTS | | | |
| Mild | | Catheter/Ostomy | | | | Fall this shift? | | | |
| Moderate | | Pain | | | | | | PHYSICIAN VISIT | |
| Excruciating | | Hesitancy | | | | Skin Tear this shift? | | NEW ORDERS NOTED | |

| SERVICES PROVIDED: | | | |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ ✓ |
| Surgical Site Care | | Antibiotic Therapy | |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

| MODE OF LOCOMOTION | | | |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ |

**ADLS: ANSWER ON BACK**   **THESE QUESTIONS IN A NARRATIVE**

1 HOW DOES RESIDENT MOVES  TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT     MOVE FROM BED,CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3  HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

   INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4  HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

   BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

   OSTOMY OR CATHETER, AND ADJUST CLOTHES?

   DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: |
|---|---|---|
| | D | R |
| | E | |
| | N | |

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elvira | 1/11/9 | 115B | Shneller |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES  (Continued)

Time:

| Time | Note |
|------|------|
| 0330 | Resting quietly @ present. Appears in no distress. One of his c̄ no care plan - No erratic behaviors noted so far this shift ———— |
| 12⁰⁰ | Res ↑ ambulating ad-lib slow gait today. Res was resistant to care + today Res had required ↓ participate in activities. Res confused as to time & day + med time ———— *(signature)* |
| 1630 | Res ↑ ambulating ad-lib slow steady gait. Res presents c̄ mild confusion + Requires constant reorientation as to time & day + room location. Today Res had participated in activities (movie) Res new B/O new care posted in each episode ———— *(signature)* |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 126/67 | 16 | 68 | 98 |
| E | 132/60 | 18 | 70 | 97 |
| N | 120/64 | 16 | 72 | 95.4 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | ✓ | ✓ | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | | ✓ | | | | | | | | | | RLE   LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE   LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn. breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | | ✓ | ✓ | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | | | | Clammy | ✓ | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE   LLE | | | | Hemiplegia/paresis | | | |
| No Pain | | | | Distention/Retention | | | | Tremors | | | | RUE   LUE | | | | Fx / Site: _____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | | | | | ✓ | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj | | ✓ | |
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | |
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | | | ✓ |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES  TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND    POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT     MOVE FROM BED, CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3  HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

   INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4  HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

   BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

   OSTOMY OR CATHETER, AND ADJUST CLOTHES?

   DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | INITIALS / TITLE: | |
|---|---|---|
| | D | |
| | E | |
| | N | |

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Elmira | 1/12/9 | 115B | Shreller |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

| Time: | |
|---|---|
| 0400 | Resting quietly @ present. Appears in no distress. Turn & b's/b c̄ incont care prn - No erratic behaviors noted _____ |
| 0830 | Res in Bed Res Refused to get up & also Refused A m care today. Res Requires constant cuing for meals & to Participate in activities per incont B/P incont care - Needed p each episode. Is able to transfer self in Room _____ RN |
| 1115 | Res Refused Shower Being very aggressive c̄ staff will cont to attempt Shower _____ RN |
| 1645 | Res ↑ Resistive to care at this time Refused to Participate in activities & Refused snack or supplement will cont to monitor _____ RN |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | | | | |
| E | 132/70 | 20 | 72 | 97 |
| N | 124/72 | 20 | 76 | 95²  |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D E N | SENSORY | D E N | URINE | D E N | DECREASED GRIP | D E N | SKELETAL | D E N |
|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | Unable to speak | ✓ | Clarity | | Right | | Amputation | |
| Anxious | | Unable to hear | | Odor | | Left | | Weakness | |
| Disoriented | | Unable to see | | Testing | | Decreased Mvmt. | | Gait Unsteady | |
| Confused | ✓ | | | | | RLE   LLE | | Balance Unsteady | |
| Delusions | | **G.I.** | | | | RUE   LUE | | Splint / Brace | |
| Hallucination | | Nausea/Vomiting | | | | | | | |
| Insomnia | | Pain | | **SKIN** | | **RESPIRATORY** | | **SPECIAL TREATMENT** | |
| Wandering | | Anorexia | | Decubitus/Wound | | Abn. breath sounds | | Dialysis | |
| Combative | ✓ | Colostomy | | Burn | | Cough | | IV Medications | |
| Resists Care | | Diarrhea | ✓ | Abnormal Turgor | | Dyspnea/SOB | | Transfusions | |
| Persistent Anger | | Constipation | | Rash/Itching | | Suctioning | | Wanderguard | |
| Unrealistic Fears | | Difficulty Swallowing | | Abnormal Color | | Respiratory Therapy | | Trach Care | |
| Socially Inappropriate | | Bowel Incontinence | ✓ | Clammy | | Oxygen Therapy | | Decubitus Care | |
| Verbally Abusive | | Feeding Tube | | Chills | | | | I & O | |
| Physically Abusive | | | | Stasis Ulcer | | **CARDIOVASCULAR** | | Hospice | |
| Crying/Tearful | | | | | | Arrhythmia | | Psych. Intervention | |
| **PAIN SYMPTOMS** | | | | **NERVOUS SYSTEM** | | Chest Pain | | Internal Bleeding | |
| TE: | | **G.U.** | | Syncope | | Edema-specify | | Septicemia | |
| Frequency | ✓ | Burning | | Headache | | RLE   LLE | | Hemiplegia/paresis | |
| No Pain | | Distention/Retention | ✓ | Tremors | | RUE   LUE | | Fx / Site: _____ | |
| Less than daily | | Frequency/Urgency | | Vertigo | | | | | |
| Daily | | Hematuria | | | | | | | |
| Intensity | | Incontinent Bladder | ✓ | | | **ACCIDENTS** | | | |
| Mild | | Catheter/Ostomy | | | | Fall this shift? | | | |
| Moderate | | Pain | | | | | | **PHYSICIAN VISIT** | |
| Excruciating | | Hesitancy | | | | Skin Tear this shift? | | NEW ORDERS-NOTED | |

### SERVICES PROVIDED:

| | D E N | | D E N |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ |
| Surgical Site Care | | Antibiotic Therapy | |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

### MODE OF LOCOMOTION

| | D E N | | D E N |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ |

**ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE**

1 HOW DOES RESIDENT MOVES TO/FROM A LYING POSTION,
TURNS SIDE TO SIDE AND POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION?    MOVE FROM BED, CHAIR, W/C,
(TRANSFERS)

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

OSTOMY OR CATHETER, AND ADJUST CLOTHES?

DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: | |
|---|---|---|---|
| | D | | |
| | E | | |
| | N | | |

| Aguilar, Elnora | 1/13/9 | 115B | Shreka |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES   (Continued)

| Time: | |
|---|---|
| 0345 | Alert & responsive. Ø acute distress noted. Incont. of B+B. Peri care per staff as needed. Able to transfer self and turn & position self in bed. Ø c/o pain or discomfort. Resting quietly. — Jefferson c |
| 0830 | Res ↑ ambulate ad-lib Res Resisting care this Am. Res able to feed self c cuing Res incont B/B incont care pvided p each episode. Res able to transfer self in Room & Require constant Re-orientation as to Room location & time & day. — RN [initials] |
| 1500 | Res ↑ able to transfer self in Room & able to feed self in D/R Res Cont ↓ Resist care from staff Res incont B/B incont care pvided p each episode — when Res allows Res Require constant Re-orientation as to Room location & Med & meal times — RN [initials] |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or deat

# DAILY SKILLED NURSING NOTES

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 127/77 | #0 | 68 | 97 |
| E | | | | |
| N | 110/56 | 20 | 72 | 96.4 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | | | | | | | | | | | RLE   LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE   LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn. breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | ✓ | | | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | | | | Clammy | ✓ | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE   LLE | | | | Hemiplegia/paresis | | | |
| No Pain | | | | Distention/Retention | ✓ | | | Tremors | | | | RUE   LUE | | | | Fx / Site: _____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | ✓ | | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| | | | | | |
|---|---|---|---|---|---|
| Wound Dressing | | | Diabetic Care w/ Daily Inj | | ✓ |
| Surgical Site Care | | | Antibiotic Therapy | | |
| Venapuncture | | | Retrain ADL's | | |
| Admin. IM/SQ Meds | | | Evaluate Diet/Fluid Intake | | |
| Trach Care | | | Scheduled Toileting | | |
| IV'S | | | | | |
| Ostomy/Ileo Care | | | | | |
| Anticoagulant tx | | | | | |

### MODE OF LOCOMOTION

| | | | | | |
|---|---|---|---|---|---|
| W/C Primary Mode | | | Walker | | |
| Other Person Wheels | | | Cane | | |
| Wheels Self | | | Walks w/o assist | | ✓ |

ADLS: ANSWER ON BACK          THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES    TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND     POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT      MOVE FROM BED, CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3   HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

    INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4   HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

    BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

    OSTOMY OR CATHETER, AND ADJUST CLOTHES?

    DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

### NURSES SIGNATURE:

| NURSES SIGNATURE: | INITIALS / TITLE: | |
|---|---|---|
| *(signature)* | D | *(initials)* |
| *(signature)* | E | *(initials)* |
| Z. Jefferson | N | *(initials)* |

| Aguilar, Elvira | 1/14/09 | 115 B | Shreker |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES   (Continued)

| Time: | |
|-------|---|
| 0300 | Resting quietly @ this t. Appears in no distress. Incont of b/b c inc care prn. No erratic behaviors noted this shift |
| 0830 | Res ↑ ambulates ad-lib slow-steady gait. Res Requires AM care today. after lot of Re direction + Re orientation Res accepted AM care Res eat Breakfast c cueing — Res need B/B incont care provided f each episode — Res Remains confused + Re orientation Requred to Room location + time of day. will cue to nature — Res |
| 1/15 098pm | Res amb ↑ Hallways. Needs Constant Re-direction. Incont BOB. Peri Care given f each episode f Changes Reported or noted in Christian Will Monitor ——— A Benson |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NO

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|-------|------|-------|-------|-------|
| D | 142/72 | 18 | 72 | 97.4 |
| E | 130/80 | 20 | 76 | 98 |
| N | 120/68 | 20 | 74 | 97.2 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | ✓ | ✓ | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | ✓ | ✓ | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | | | | | | | | | | | RLE    LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE    LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn. breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | ✓ | ✓ | | Diarrhea | ✓ | ✓ | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | ✓ | ✓ | | Clammy | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| IE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE    LLE | | | | Hemiplegia/paresis | | | |
| No Pain | ✓ | | | Distention/Retention | ✓ | | | Tremors | | | | RUE    LUE | | | | Fx / Site: _____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | ✓ | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj | ✓ | ✓ | |
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | |
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | ✓ | ✓ | |

**NURSES SIGNATURE:** / **INITIALS / TITLE:**

| ADLS: ANSWER ON BACK | THESE QUESTIONS IN A NARRATIVE |
|---|---|

1 HOW DOES RESIDENT MOVES TURNS SIDE TO SIDE AND   TO/FROM A LYING POSTION, POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? (TRANSFERS)   MOVE FROM BED, CHAIR, W/C,

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar Elvira | 1/15/9 | 215B | Shreker |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

| Time: | |
|---|---|
| 0300 | Resting quietly @ present. Appears in no distress. Due to b/b c inc ccu pew no behaviors noted this shift. *[signature]* |
| 0838 | Res ↑ ambulates ↑↓ ↓ hallway Res today was difficult to Re direct Res Requires constant Reorientation as to floor location & meal times Res incont B/B — incont care provided p̄ each episode. Res allows. Res able to transfer self in room & able to Reposition self in bed Tolerating care continue — nursing staff cont to monitor B/P due to — anti hypertensive med use ———— *[signature]* |
| 1/16/09 *[initials]* | Res Asleep upon rounds. No Problem noted or voiced ———— A Benn *[signature]* |
| *[time]* | Res ↑ ad lib Amb ↑↓ hallway, Needs Constant re-direction, At times, Non Cooperative with the staff in ADL Care, becomes Combative, incont B & B, Peri Care given p̄ each episode Tolerates Actr Checks and S/S Coverage When needed occasionally will Refuse BS and Acu checks, No Changes reported or noted in Condition will Monitor ———— A Benn *[signature]* |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTES

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|-------|-----|-------|-------|-------|
| D | 128/74 | 20 20 | 80 | 97.8 |
| E | 130/72 | 20 | 82 | 98 |
| N | 124/76 | 20 | 72 | 97.4 |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | | | ✓ | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | | ✓ | | | | | | | | | | RLE    LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE    LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn.breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | | ✓ | | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | | ✓ | | Clammy | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: _____ | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE    LLE | | | | Hemiplegia/paresis | | | |
| No Pain | ✓ | | | Distention/Retention | | | | Tremors | | | | RUE    LUE | | | | Fx / Site: _____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS-NOTED | | | |

### SERVICES PROVIDED:

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj | | ✓ | |
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | |
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | | ✓ | |

NURSES SIGNATURE:

| Signature | Initials / Title |
|---|---|
| D | |
| E | |
| N | |

ADLS: ANSWER ON BACK    THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES    TO/FROM A LYING POSTION,
  TURNS SIDE TO SIDE AND     POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT      MOVE FROM BED,CHAIR, W/C,
  STAND POSTION?
  (TRANSFERS)

3    HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL?

     INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4    HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE,

     BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES

     OSTOMY OR CATHETER, AND ADJUST CLOTHES?

     DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |
|---|---|---|---|
| Aguilar, Eleanor | 1/14/9 | 115B | Shreffler |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

Time:

| Time | |
|------|---|
| 0230 | Resting quietly @ present. Appears in no distress. Voices no c/o pain or discomfort. Out of bed c inc care pm. *(illegible signature)* |
| 10A | Remains confused & disoriented to *(illegible)*. Redirected thru out shift. Pacing back & forth in hallway. Becomes verbally aggressive during ADL's. *(illegible)* BAB to peri care *(illegible)*. Monitored & *(illegible)* closely. *(illegible signature)* |
| 1/17/09 / 7P | *(illegible)* Alert + Confused, very aggressive c ADL care + incont care. *(illegible)* changes reported *(illegible)* condition will monitor. *(illegible signature)* |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

# DAILY SKILLED NURSING NOTE

| SHIFT | B/P | RESP. | PULSE | TEMP. |
|---|---|---|---|---|
| D | 124/85 | 20 | 76 | 98 |
| E | 130/70 | 20 | 72 | 98 |
| N | 120/70 | 20 | 74 | 97⁶ |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | ✓ | | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | | | | | | | | | | | RLE   LLE | | | | Balance Unsteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE   LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn.breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Medications | | | |
| Resists Care | ✓ | | | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | Wanderguard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care | | | |
| Socially Inappropriate | | | | Bowel Incontinence | | ✓ | | Clammy | | | | Oxygen Therapy | | | | Decubitus Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| RE: _____ | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | ✓ | | Burning | | | | Headache | | | | RLE   LLE | | | | Hemiplegia/paresis | | | |
| No Pain | ✓ | ✓ | ✓ | Distention/Retention | | | | Tremors | | | | RUE   LUE | | | | Fx / Site: ____ | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | ✓ | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| Wound Dressing | | | | Diabetic Care w/ Daily Inj. | ✓ | ✓ | |
| Surgical Site Care | | | | Antibiotic Therapy | | | |
| Venapuncture | | | | Retrain ADL's | | | |
| Admin. IM/SQ Meds | | | | Evaluate Diet/Fluid Intake | | | |
| Trach Care | | | | Scheduled Toileting | | | |
| IV'S | | | | | | | |
| Ostomy/Ileo Care | | | | | | | |
| Anticoagulant tx | | | | | | | |

### MODE OF LOCOMOTION

| | D | E | N | | D | E | N |
|---|---|---|---|---|---|---|---|
| W/C Primary Mode | | | | Walker | | | |
| Other Person Wheels | | | | Cane | | | |
| Wheels Self | | | | Walks w/o assist | ✓ | ✓ | |

ADLS: ANSWER ON BACK   THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES TO/FROM A LYING POSTION, TURNS SIDE TO SIDE AND POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? (TRANSFERS) MOVE FROM BED, CHAIR, W/C,

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL? INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: |
|---|---|---|
| _(signature)_ | D | _(initials)_ |
| _(signature)_ | E | AB |
| _(signature)_ | N | _(initials)_ |

| Aguilar, Elvira | 1/17/9 | 115B | Shuler |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

# DAILY SKILLED NURSING NOTES (Continued)

Time:

| Date/Time | Notes |
|---|---|
| 1-18-09 9ᵖ/A | Rested well throughout night no discomfort noted no complaints. ~ M Wozniak |
| | Alert & responsive. Remains confused & disoriented to X3. Refuses & resist care & VSS. Con't to have a good appetite. Incont'g. BxB c peri care c at incont. episode. Cont to be redirected as to position. O/k throughout shift ———— RN/LPN |
| 1-18-09 | Resident very confused. Able to transfer self from bed to ambl throughout the day unable to make needs known. Total care per staff. Does become abusive (@ times) when attempting to change her. Oriented X 2+ to person and place. She does not always remember where her room is. She don't feed self usually using her hands. Peri care is given after each episode. Bladder and bowel incont. No acute changes in behavior or physical cond. Will Cont to monitor ———— LPN |

**Document above:**
Notification of MD/PA/NP for resident change of condition, order change, accident/incident, other medical care or death.
Notification of Resident's RP/Family for change in condition, order change, accident/incident, other medical care or death.

## DAILY SKILLED

| SHIFT | B/P | R | PUL | P. |
|---|---|---|---|---|
| D | Refused / 104/57 | 20 | 87 | Refused |
| E | | 20 | | 96² |
| N | 161/43 | 18 | 64 | |

## NURSING ASSESSMENT: CHECK ALL APPLICABLE BOXES

| MOOD & BEHAVIOR | D | E | N | SENSORY | D | E | N | URINE | D | E | N | DECREASED GRIP | D | E | N | SKELETAL | D | E | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alert | ✓ | ✓ | ✓ | Unable to speak | | | | Clarity | | | | Right | | | | Amputation | | | |
| Anxious | | | | Unable to hear | | | | Odor | | | | Left | | | | Weakness | | | |
| Disoriented | ✓ | | | Unable to see | | | | Testing | | | | Decreased Mvmt. | | | | Gait Unsteady | | | |
| Confused | ✓ | ✓ | | | | | | | | | | RLE    LLE | | | | Balance Insteady | | | |
| Delusions | | | | G.I. | | | | | | | | RUE    LUE | | | | Splint / Brace | | | |
| Hallucination | | | | Nausea/Vomiting | | | | | | | | | | | | | | | |
| Insomnia | | | | Pain | | | | SKIN | | | | RESPIRATORY | | | | SPECIAL TREATMENT | | | |
| Wandering | | | | Anorexia | | | | Decubitus/Wound | | | | Abn.breath sounds | | | | Dialysis | | | |
| Combative | | | | Colostomy | | | | Burn | | | | Cough | | | | IV Mediations | | | |
| Resists Care | ✓ | ✓ | ✓ | Diarrhea | | | | Abnormal Turgor | | | | Dyspnea/SOB | | | | Transfusions | | | |
| Persistent Anger | | | | Constipation | | | | Rash/Itching | | | | Suctioning | | | | WanderGuard | | | |
| Unrealistic Fears | | | | Difficulty Swallowing | | | | Abnormal Color | | | | Respiratory Therapy | | | | Trach Care. | | | |
| Socially Inappropriate | | | | Bowel Incontinence | ✓ | ✓ | | Clammy | | | | Oxygen Therapy | | | | Decubitis Care | | | |
| Verbally Abusive | | | | Feeding Tube | | | | Chills | | | | | | | | I & O | | | |
| Physically Abusive | | | | | | | | Stasis Ulcer | | | | CARDIOVASCULAR | | | | Hospice | | | |
| Crying/Tearful | | | | | | | | | | | | Arrhythmia | | | | Psych. Intervention | | | |
| PAIN SYMPTOMS | | | | | | | | NERVOUS SYSTEM | | | | Chest Pain | | | | Internal Bleeding | | | |
| TE: | | | | G.U. | | | | Syncope | | | | Edema-specify | | | | Septicemia | | | |
| Frequency | | | | Burning | | | | Headache | | | | RLE    LLE | | | | Hemiplegia/paresis | | | |
| No Pain | ✓ | ✓ | | Distention/Retention | | | | Tremors | | | | RUE    LUE | | | | Fx / Site: | | | |
| Less than daily | | | | Frequency/Urgency | | | | Vertigo | | | | | | | | | | | |
| Daily | | | | Hematuria | | | | | | | | | | | | | | | |
| Intensity | | | | Incontinent Bladder | ✓ | ✓ | | | | | | ACCIDENTS | | | | | | | |
| Mild | | | | Catheter/Ostomy | | | | | | | | Fall this shift? | | N | | | | | |
| Moderate | | | | Pain | | | | | | | | | | | | PHYSICIAN VISIT | | N | |
| Excruciating | | | | Hesitancy | | | | | | | | Skin Tear this shift? | | N | | NEW ORDERS NOTED | | | |

### SERVICES PROVIDED:

| | | | |
|---|---|---|---|
| Wound Dressing | | Diabetic Care w/ Daily Inj | ✓ |
| Surgical Site Care | | Antibiotic Therapy | |
| Venapuncture | | Retrain ADL's | |
| Admin. IM/SQ Meds | | Evaluate Diet/Fluid Intake | |
| Trach Care | | Scheduled Toileting | |
| IV'S | | | |
| Ostomy/Ileo Care | | | |
| Anticoagulant tx | | | |

### MODE OF LOCOMOTION

| | | | |
|---|---|---|---|
| W/C Primary Mode | | Walker | |
| Other Person Wheels | | Cane | |
| Wheels Self | | Walks w/o assist | ✓ ✓ ✓ |

ADLS: ANSWER ON BACK      THESE QUESTIONS IN A NARRATIVE

1 HOW DOES RESIDENT MOVES TO/FROM A LYING POSTION, TURNS SIDE TO SIDE AND POSITON BODY WHILE IN BED?

2 HOW DOES THE RESIDENT STAND POSTION? (TRANSFERS) MOVE FROM BED, CHAIR, W/C,

3 HOW DOES RESIDENT EAT AND DRINK REGARDLESS OF SKILL? INCLUDE INTAKE OF NOURISHMENT BY TUBE FEEDING.

4 HOW DOES THE RESIDENT USE THE TOILET ROOM, COMMODE, BED PAN, OR URINAL, CLEANSES, CHANGES PAD, MANAGES OSTOMY OR CATHETER, AND ADJUST CLOTHES? DO NOT LIMIT ASSESSMENT TO BATHROOM USE ONLY.

| NURSES SIGNATURE: | | INITIALS / TITLE: |
|---|---|---|
| K Reed Rn | D | R  Rn |
| Juanita B Young | E | JBY / LVN |
| Mildred Worrald | N | MW / LVN |

| Aguilar Elvira | 1-18-09 | 115 ᴮ | Shneker |
|---|---|---|---|
| RESIDENT NAME | DATE | ROOM # | PHYSICIAN |

SKILLED NURSING NOTES CONTINUED (BACK)

## PSYCHOSOCIAL (CHECK ALL THAT CURRENTLY APPLY)

RESIDENT HAS HAD:    Dtr. on another unit deed of breast cancer on 11-14-08. Res. not aware d/t cognitive decline.

- [x] RECENT LOSS OF FAMILY MEMBER
- [ ] CONFLICT WITH STAFF
- [ ] CONFLICT WITH FAMILY
- [ ] CONFLICT WITH ROOMMATE
- [ ] CONFLICT WITH OTHER RESIDENT
- [ ] NONE   error

## DISCHARGE PROJECTION

- [x] NONE   LT2
- [ ] WITHIN 30 DAYS
- [ ] 31 – 90 DAYS
- [ ] UNCERTAIN

IF "NONE" IS ANSWERED EXPLAIN IN SUMMARY. SKIP ANTICIPATED DISCHARGE SECTIONS

## ANTICIPATED DISCHARGE TO N/A

- [ ] HOME
- [ ] ACUTE CARE HOSPITAL
- [ ] SNF
- [ ] OTHER NURSING HOME
- [ ] RESIDENTIAL CARE
- [ ] SPECIALTY HOSPITAL
- [ ] HOSPICE
- [ ] OTHER

## ANTICIPATED DISCHARGE NEEDS (CHECK ALL THAT APPLY) N/A

- [ ] FINANCIAL
- [ ] EDUCATION/TRAINING
- [ ] LIVING WILL
- [ ] DURABLE MEDICAL EQUIPMENT
- [ ] TRANSPORTATION
- [x] HOME HEALTH SERVICES
- [ ] OUTPATIENT THERAPY
- [ ] NONE OF THE ABOVE

## ASSESSMENT SUMMARY:

Early family history, relationship with spouse, parents, children, siblings, cultural heritage, etc.

73 year old Hispanic female admitted to NTHRC on 11-14-08 from SEBH admitting Dx include: Dementia HTN, DM, Psychosis, UTI's Depression. Resident was admitted to SEBH on 11/11/08. RP reports that res. began cognitive decline approx. 2 years ago. Hospital documentation states res. had begun wandering out of the home & during the last 2 wks has become violent. Res was living @ home prior to son visiting from Missouri. Family is very supportive & visits regularly. Res' dtr. was admitted to skilled unit on same date, however, she passed away next day. Res is too confused to understand that her dtr. expired. Res knows family ex's. Res. is able to make some needs known. Res is able to follow simple instructions. Resident walks independently & eats independently after tray set up. Res will eat c fingers @ x's Resident is in cont. of B & B & requires assist c dressing & grooming. Family reports that resident would be awake @ night & sleep during the day @ home but res. seems to be awake for most of the day @ N.H. Res attends activities ex's. Res was evaluated by Dr Gary Johnson psychiatrist on 11/20/08. Resident has DNR code status & is LTC. Sw to Res. to remain in secure unit rt wandering. Sw to Monitor & assist as needed.

COMPLETED BY: Amber Franco MSW    DATE: 11/24/08
NAME/TITLE

672 - Refers to items on the 672 Report

| NAME - Last | First | Middle | Attending Physician | Medical Record Number |
|---|---|---|---|---|
| | | | | |

# SOCIAL PROGRESS NOTES

| DATE | TIME | NOTES SHOULD BE SIGNED |
|------|------|------------------------|
| 1/21/09 | | SW informed that on 1/20/09 res. hit another res. on back. Residents separated & family informed. Res. has not exhibited aggression towards other residents since incident. SW to monitor & assist as needed. Plan of care updated. SW in communication c Dr. Gary Johnson's nurse. error ~~assistant~~ — Amber Franey SW |
| 2/13/09 | | SW contacted RP to invite to IDEPT meeting to discuss significant Δ. CP meeting scheduled for Tuesday 2/17/09 @ 1:00pm — Amber Franey SW |
| 2/16/09 Late entry | | Psychosocial assessment completed and Plan of care updated. SW received copy of Financial POA & affixed copy to financial folder & chart. SW to assist as needed. — Amber Franey SW |
| 2/17/09 | | IDCPT meeting held via phone c RP to discuss residents significant Δ. Plan of care reviewed including Δ in mood/behavior. Advanced Directives reviewed & res. to remain DNR code status. Unit mngr reviewed meds. SW discussed res. PT & approaching 100th medicare day. RP well informed as he keeps in contact c unit mngr routinely. SW to monitor & assist as needed. — Amber Franey SW |
| 3/5/09 | | SW had scheduled CP meeting c RP via phone as well as c local Ombudsman, Biviana Espinoza. There are family dynamic issues as res children are both obtaining POA's. RP is stating that his sister is making comments about res care. & would like to take |

| NAME–Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|-----------|-------|--------|---------------------|------------|----------|
| Aguilera, | Eliza | | Shreker | 2835 | 115B |

Form 3264 © BRIGGS, Des Moines, IA 50306 (800) 247-2343 www.Briggscorp.com
R404    PRINTED IN U.S.A.

SOCIAL PROGRESS NOTES

| NAME–Last | First | Middle | Attending Physician | Record No. | Room/Bed |
|---|---|---|---|---|---|
| | | | | | |

| DATE | TIME | NOTES SHOULD BE SIGNED |
|---|---|---|
| | | her mother here as well. Res' dtr has not expressed any concerns r/t care to staff, however makes comments & voices her opinion to unit mngr re: her brother (R.P.). Su had discussed c RP recently, however Ms. Espaya reemphasized that the POA's are VAD as res' was incompetent @ & time of signing. Ms. Espaya suggested guardianship & offered to assist c the process. Res. dtr has also expressed a desire to unit manager to take res- oop. RP stated that would be fine as long as they were not lengthy so as to not interrupt her schedule & not to sign legal documentation (apparently dtr. had assisted res. oop to sign a POA within the last 2 months). RP to possibly pursue guardianship. Su to monitor & assist as needed. ———— Amber Franco, SW |
| 4/29/09 | | Res was seen by Dr. Fummend, DDS this month. Dr. Fummend stated res. does have a loose ® front tooth, however due to res. cognitive condition she is resistant to exam & would be resistant to any tx. No further tx to occur @ this time. Su to monitor & assist as needed. ———— Amber Franco, SW |
| 5/4/09 | | Quarterly psychosocial assessment completed. Plan of care updated. Su left voy message for RP to schedule IDPT mtg. Su to assist as needed ———— Amber Franco, SW |
| 5/20/09 | | IDPT mtg held c family via phone. Plan of care reviewed including advanced Directives. Res to be DNR code status. Su discussed guardianship & progress. RP stated |

# DEFENDANT'S EXHIBIT
# 4



THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER • BACK CONTAINS WATERMARK — HOLD AT AN ANGLE TO VIEW

REDEMPTION CHECK    **THE HARTFORD STOCK FUND-A**

$\frac{17-2}{910}$

THE
HARTFORD
Mutual Funds

| CHECK NUMBER | ACCOUNT NUMBER | DATE OF CHECK |
| --- | --- | --- |
| 8409923 | 30046019 | 06/10/2003 |

**DOLLARS    CENTS**
***7,000.00

Pay To The Order Of
LAURA A WELLS &
ELVIRA AGUILAR TRUSTEE
THE LAURA A WELLS TRUST
DTD 02/11/1999
27213 BENT TRL
BOERNE TX 78006-5502

LB

PAYABLE AT
U.S. Bank
Minneapolis, MN 55480
VOID IF NOT CASHED IN 90 DAYS

AUTHORIZED SIGNATURE

⑈8409923⑈ ⑆091000022⑈ 170225141358⑈          ⑆0000700000⑈



## CDVolID/CIMSKey

Account    Serial Number    Amount

20030630142501    170225141    8409923    $7000.00

## Bank ID    Sequence    Location    Paid Date

9100002    714045973    2D    06/16/2003



DEPOSITION
EXHIBIT
B

DEFENDANT'S
EXHIBIT
4
MEF 7/10/14





## CDVolID/CIMSKey
20030630142501

## Account
17022514135

## Serial Number
8409959

## Amount
$7000.00

## Bank ID
9100002

## Sequence
6545833870

## Location
D

## Paid Date
06/26/2003

214
206 — 30046019
221
937



THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER • BACK CONTAINS WATERMARK — HOLD AT AN ANGLE TO VIEW

REDEMPTION CHECK | THE HARTFORD CAPITAL APPRECIATION FD-A

THE HARTFORD Mutual Funds

| CHECK NUMBER | ACCOUNT NUMBER | DATE OF CHECK | DOLLARS | CENTS |
|---|---|---|---|---|
| 8409912 | 30046019 | 06/10/2003 | ****7,000.00 | |

Pay To The Order Of

LAURA A WELLS &
ELVIRA AGUILAR TRUSTEE
THE LAURA A WELLS TRUST
DTD 02/11/1999
27213 BENT TRL
BOERNE TX 78006-5502

LB

PAYABLE AT
U.S. Bank
Minneapolis, MN 55480
VOID IF NOT CASHED IN 90 DAYS

AUTHORIZED SIGNATURE

⑈8409912⑈ ⑉091000022⑉ 170225141 1358⑈      ⑆0000700000⑈



| CDVolID/CIMSKey | Account | Serial Number | Amount |
|---|---|---|---|
| 20030731230101 | 170225141 | 8409912 | $7000.00 |

| Bank ID | Sequence | Location | Paid Date |
|---|---|---|---|
| 9100002 | 5947760940 | D | 07/23/2003 |

Printed using US Bank Image Check

# DEFENDANT'S EXHIBIT
# 6

# PLAINTIFF'S EXHIBIT 2

Will from Johnny Montoya Garza
And Elvira G. Aguilar.

We the above people agree that
the house at 106 Cameo San Antonio
Texas 78214 belongs to Elvira G.
Aguilar And Johnny Montoya Garza
Part owner on 2nd story of house
was built because of the children
that were awarded to Ms Elvira
G. Aguilar at the time of her
daughters death the state awarded
the children to Ms Elvira g Aguilar
then we decided to Add onto the
house to make Rooms for the
children there for we agree
that the house be evenly owned
By John Rene Aguilar Laura Ashley
Wells And Johnny B. Wells. Nothing
Will be done to the house With-
out the Authorization of John
Rene Aguilar Johnny B. Wells And
Laura Ashley Wells. In Case of a
disagreement on the Aguilar Part
And the children Listed above
have the final Say in what is
to be done to the house at

PLAINTIFF'S
EXHIBIT
2
MEF 7/7/14
PENGAD 800-631-6989

106 Cameo SanAntonio Texas 78214.

John Rene must keep me Informed of all dicissions So that I Johnny Montoya Garza Can be as helpful to the Children So that there is no harsh diseissions made. I Johnny Montoya Garza am expecting that all family members except this will that Elvira G. Aguilar And Johnny Montoya Garza have decided to award the haise at 106 Cameo to the Children Listed Previously I Johnny Montoya Garza Am Positivly Sure that there will be no disagreement between the familyes. So I hope tha John David Aguilar And Nannette Aguilar And other family members Respect the wishes of Elvira G Aguilar + Johnny Montoya Garza Please have all family members Sign this agreement will. May God be with you All in these hard times Please agree to Your mom And

over→

My discission. We had discussed this between us when the children were put in our hands

Thank-you All
Very much.
Johnny Montoya Longe
Elvira G. Aguillon
Signed this day
of March 11-05

# PLAINTIFF'S EXHIBIT 37

**NCNB**

## Home Improvement or Secondary Mortgage Promissory Note
### Simple Interest Fixed or Variable Rate

| NCNB Texas National Bank | 901 MAIN STREET PO BOX 831400 DALLAS, TEXAS 75283-1400 DALLAS COUNTY | Officer | Account Number | Date of Note |
|---|---|---|---|---|

**Borrower's Name & Address**

ELVIRA G AGUILAR & JOHNNY GARZA
106 CAMEO

SAN ANTONIO, TX 78214

| Interest Rate | |
|---|---|
| [X] Fixed Rate of 7.50 % per annum or | The Consumer Base Rate or Other Rate are defined to be that named rate as announced or published by the entity indicated in the adjoining box from time to time and which may not be the lowest interest rate charged by Lender. For purposes of this Note, the Interest Rate will be deemed to be at least N/A % per annum even if the actual rate is lower. |
| [ ] Lender's Consumer Base Rate plus % per annum or | |
| [ ] Other Rate | |

I promise to pay to the order of NCNB Texas National Bank ("Lender") the principal of $ 21,799.37 ("Amount of Note") plus interest on the unpaid principal balance at the interest rate indicated above. The Amount of Note may be extended to me from time to time on a non-revolving basis, or in one lump sum. Payment(s) will be made at the address shown above and in accordance with the Payment Schedule set out in the Federal Truth in Lending Disclosure. I also agree to pay any other charges authorized by this Promissory Note. As used in this Promissory Note, the words "You", "Your", and "Yours" mean the Lender. The words "I", "we", "my", "our", and "mine" mean each Borrower or Co-Borrower, jointly and severally, if there is more than one Borrower. Items preceded by a box are applicable only if checked.

**Federal Truth in Lending Disclosure**

| ANNUAL PERCENTAGE RATE The cost of my credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost me. | Amount Financed The amount of credit provided to me or on my behalf. | Total of Payments The amount I will have paid after I have made all payments as scheduled. |
|---|---|---|---|
| 7.50 % | $ 21,150.20 | $ 21,799.37 | $ 42,949.57 |

**My Payment Schedule Will Be:**

| No. of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 179 | $236.12 | MONTHLY BEGINNING MARCH 7, 1992 |
| 1 | $296.50 | FINAL PAYMENT DUE FEBRUARY 7, 2007 |

[ ] The amount of each payment varies because a finance charge is applied to the unpaid Amount of Note and the largest payment is $ and the smallest payment is $

Security: I am giving a security interest in:

[X] the following real estate: 106 CAMEO   SAN ANTONIO   TX

[ ]

Collateral securing other loans with you may also secure this loan.

**Variable Rate:**
[ ] Term one year and under or not secured by principal dwelling:
The interest rate will not exceed 21% per annum, or the state usury ceiling, whichever is less.

**Late Charge:** If this loan is payable in equal installments (except for a final balloon payment, if any), I will be charged a late fee of 5% of any payment not paid in full within ten (10) days after its scheduled due date.

**Prepayment:** If I pay this loan off early, I will not have to pay a penalty and I may be entitled to a refund of part of the finance charge.

**Filing Fees: $ N/A**

**Assumption:** Someone buying my residence cannot assume the remainder of the mortgage on the original terms.
I will see this Promissory Note and any other loan documents for additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and for further information about Lender's security interest.   (e means an estimate)

**Itemization of the Amount Financed:**

| | | | |
|---|---|---|---|
| 1. Amount given to me directly | | $ | 25,000.00 |
| 2. Amount paid on my NCNB loan account | | $ | .00 |
| 3. Amount paid to others on my behalf: | | | |
| A. Appraisal | | $ | .00 |
| B. For Credit Life and A/H Insurance | To: Insurance Company | $ | 6,799.37 |
| C. Filing Fees | To: Public Officials | $ | .00 |
| D. Attorney Fees | To: | $ | .00 |
| E. Survey | To: | $ | .00 |
| F. For: | To: | $ | .00 |
| G. For: | To: | $ | .00 |
| H. For: | To: | $ | .00 |
| I. For: | To: | $ | .00 |
| Total A through I | | $ | 6,799.37 |
| 4. Amount of Note (Add 1, 2 and 3) | | $ | 21,799.37 |
| 5. Prepaid Finance Charge: | | | |
| A. Points | | $ | .00 |
| B. Flood Fees | | $ | .00 |
| Total A and B | | $ | .00 |
| Total Amount Financed (4 minus 5) | | $ | 21,799.37 |

| I hereby authorize you to draft my deposit account for the loan payments. | Account Number N/A | Signature |
|---|---|---|

**Other Insurance:** I am not required to take credit life or credit accident and health insurance to obtain this loan. Such coverage will not be provided unless I sign the request below and agree to pay the additional cost. The amount of insurance coverage I have will be the amount stated in the insurance policy/certificate or the Total of Payments, whichever is less and the premium for this insurance is included in the Amount Financed. If a Co-Borrower also signs this Promissory Note, he or she is only entitled to take joint credit life insurance.

| Insurance | Premium | Term | | | Premium | Term |
|---|---|---|---|---|---|---|
| JOINT   Credit Life | 6,799.37 | 180 | | Accident and Health | N/A | N/A |

I elect the insurance indicated by the premiums shown above   Signature  X *Elvira G Aguilar*   X *Johnny Garza*

[X] REQUIRED PROPERTY INSURANCE - IF THIS BOX IS CHECKED, PROPERTY INSURANCE IS REQUIRED IN CONNECTION WITH THIS LOAN AND I HAVE THE OPTION OF FURNISHING THE REQUIRED INSURANCE EITHER THROUGH EXISTING POLICIES OF INSURANCE OWNED OR CONTROLLED BY ME OR OF PROCURING AND FURNISHING EQUIVALENT INSURANCE COVERAGES THROUGH ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS.

**ADDITIONAL TERMS of the PROMISSORY NOTE** (Words not defined elsewhere in this Promissory Note have the meanings shown in the Federal Truth in Lending Disclosure.)
**AMOUNT OF PAYMENTS:** The Amount of Payments shown in the Federal Truth in Lending Disclosure assumes I will make the payments exactly when they are due and, if the Interest Rate is tied to your Consumer Base Rate or Other Rate, that such Rates do not change. I will make payments in the Amount of Payments shown in the Federal Truth in Lending Disclosure. If this Promissory Note is payable in equal monthly installments (except for a final balloon payment, if any), and the Interest Rate is tied to your Consumer Base Rate or Other Rate, the amount of my monthly payment may change at the end of each 12-month period to an amount sufficient to repay in full at the then-current Interest Rate, in substantially equal monthly installments, the unpaid balance as if this Promissory Note were to be due and payable _____ months from its date. In such event, you will send me a new payment book specifying the new payment amount. If payments vary, I will pay the fixed part of the Amount of Payments as set out in the Truth in Lending Disclosure on each payment date plus all accrued and unpaid interest to the date of such payment. In any event, I will pay the unpaid principal balance of the Note plus all accrued and unpaid interest on the final payment due date as set out in the Truth in Lending Disclosure. If the Interest Rate is tied to your Consumer Base Rate or Other Rate, the Interest Rate shall change with each change in your Consumer Base Rate or Other Rate as of the date of any such change without notice to me, but shall not exceed the higher of the indicated rate ceiling in effect from time to time under Article 5069-1.04 of V.A.T.S., or any ceiling authorized by any other applicable law.
**PLEASE READ THE ADDITIONAL TERMS OF THIS PROMISSORY NOTE ON THE REVERSE SIDE BEFORE SIGNING.**

**BORROWER'S SIGNATURE(S) FOR PROMISSORY NOTE.** I/We agree to the terms of this Promissory Note and acknowledge receiving a completed copy of this Promissory Note and all other documents signed by Borrower in connection with this loan. The terms and conditions on the reverse side are made a part of this Promissory Note and are incorporated herein by reference. If signing as a Co-Borrower, I/We acknowledge reading the Notice to Cosigner on the reverse side.

**IMPORTANT NOTICE:** You and your contractor are responsible for meeting the terms and conditions of this contract. If you sign this contract and you fail to meet the terms and conditions of this contract, you may lose your legal ownership rights in your home. KNOW YOUR RIGHTS AND DUTIES UNDER THE LAW.

X *Elvira G Aguilar*     X *Johnny Garza*

ELVIRA G AGUILAR          JOHNNY GARZA

The additional Terms and Conditions printed on the reverse side are incorporated into this Promissory Note.
05-250-140-00 (0-91)

ORIGINAL NOTE

PLAINTIFF'S EXHIBIT 37
MEF 7/8/14
PENGAD 800-631-6989

**Additional Terms of the Promissory Note** (Words in this Promissory Note have the meanings shown in the Federal Truth in Lending Disclosure.)

**MAXIMUM RATE:** The maximum interest rate will not exceed 24% per annum, or the state usury ceiling, whichever is less.

**DELINQUENCY CHARGES:** If this loan is payable in equal installments (except for a final balloon payment, if any), I will be charged a late fee of 5% of any payment not paid in full within ten (10) days after its scheduled due date.

**ACCELERATION OF PAYMENT.** You may accelerate payment or performance of this Promissory Note without prior written notice to me if: (a) I am in default on the performance of any of my obligations under this Promissory Note or the Security Agreement or (b) you in good faith believe that the prospect of payment or performance is impaired.

**RIGHTS AFTER DEFAULT:** After you accelerate the maturity of this Promissory Note or after the maturity of the Promissory Note, whichever occurs first, I agree to pay interest from that date calculated upon the amount legally owed by me at an annual rate of interest equal to 18%, provided that interest paid or agreed to be paid shall not exceed the maximum amount permissible under applicable law and, in any contingency whatsoever, if you shall receive anything of value deemed interest under applicable law, which would exceed the maximum amount of interest permissible under applicable law, the excessive interest shall be applied to the reduction of the unpaid amount of the Promissory Note or refunded to me. In addition, you will have a right to set off any debt you owe me against the debt I owe you. The rights and remedies provided for in this Promissory Note and in any other documents executed in connection with this Promissory Note are cumulative of each other and of any and all other rights and remedies existing at law or in equity.

**WAIVERS.** I and anyone who endorses or guarantees this Promissory Note each and all waive presentment for payment, demand, protest, notice of protest, notice of dishonor, notice of intent to accelerate, notice of acceleration, and diligence in bringing or prosecuting any action under this Promissory Note and we agree you may renew or extend this Promissory Note, accept partial payments, and release or substitute collateral, all without notice to us, before or after maturity, and that you may also extend the time of payment, and that additional makers, comakers, guarantors, and sureties may become parties hereto without notice to us or any of us and without affecting my liability hereon. If you accept partial payments or performance it shall not operate as a waiver of any requirement of this Promissory Note.

**OTHER FEES:** If this Promissory Note is referred to an attorney for collection, I agree to pay reasonable attorneys fees and any court costs and fees incurred in the collection of the loan or foreclosure of any lien created by the loan. I agree to pay reasonable fees or charges to a trustee in connection with a builders and mechanics lien contract, deed of trust or similar instrument executed in connection with this loan, including but not limited to fees for enforcing the lien, posting for sale, selling or releasing the property secured by the deed of trust. Attorney's fees assessed by a court. I agree to pay a reasonable fee not to exceed $15.00 for the return of a dishonored check given in payment of any amount due under this Promissory Note.

**RENEWAL.** This Promissory Note renews and extends, but does not pay or satisfy, the indebtedness, now owned by you, as defined in and evidenced by the Builders and Mechanics Lien Contract of even date herewith between me and my contractor. All liens and other security rights under that Contract have been assigned to you and are hereby continued, renewed, and extended as security for this Promissory Note.

**GENERAL PROVISIONS.**

1. No waiver of any default by you shall operate as a waiver of any other default.

2. The terms of this Promissory Note shall be binding upon the heirs, executors, administrators, successors, and assigns of you and me.

3. If any provision of this Promissory Note shall, for any reason, be held to be invalid or unenforceable, such shall not affect any other provision hereof, but this Promissory Note shall be construed as if such invalid or unenforceable provision had never been contained herein.

4. This Promissory Note is performable by me in Dallas County, Texas.

5. Notwithstanding any provision of this Promissory Note or any other agreements signed by me to the contrary, I shall have all rights granted by, and you shall be limited by, all prohibitions of any Chapter of the Texas Credit Code applicable to this Promissory Note.

6. Credit Life or Credit Life and Credit Accident and Health Insurance written at my option in connection with the Promissory Note is subject to all provisions of the life insurance policy issued to me and may not be available to me for the full Total of Payments.

7. As used herein, the singular number shall include the plural.

8. The paragraph headings in this Promissory Note are for convenience only and they will not limit any of the provisions of this Promissory Note. This Promissory Note shall be governed by the laws of the State of Texas, and by applicable United States federal law.

You may have to pay up to the full amount of the debt if the Borrower does not pay.

The bank can collect this debt from you without first trying to collect from the Borrower. The bank can use the same collection methods against you that can be used against the Borrower, such as suing you, etc. If this debt is ever in default, that fact may become a part of your credit record.

This Notice is not the contract that makes you liable for the debt.

**GUARANTY**

I hereby unconditionally guarantee full payment of this loan, including, without limitation, all principal and interest, and all expenses and attorney's fees incurred by you or by your successor in enforcing this Promissory Note. I am jointly and individually liable for payment in full, and I am bound by the same terms and conditions as applicable to each Borrower. You may collect from the undersigned first without attempting to collect from any Borrower or other Guarantor and without first liquidating the Collateral. If any Borrower has or takes out other loans from you, you may apply any payment that you receive from the Borrower or from any Guarantor, or from the liquidation of the Collateral, in whatever order and to whatever debts that you elect, and I will be discharged only to the extent that I have paid you up to the full amount covered by this Guaranty. I consent to all extensions or renewals of this Promissory Note, and waive presentment, demand, protest, notice of protest, notice of dishonor, notice of intent to accelerate, notice of acceleration and notice of acceptance of this Guaranty, and all other rights that may be legally waived. By signing as Guarantor, I/We acknowledge reading the Notice To Cosigner above.

Signature of Guarantor _____  Address _____

Signature of Guarantor _____  Address _____

*Paid at Bank america*
*9-17-P*

**Bank of America**

September 9, 2010

Johnny Garza
370 Riverside Dr Lot 15
San Antonio, TX  78210

Account Number:  874895401

Dear Johnny Garza,

Thank you for contacting Bank of America.  Here are the documents you requested.

We value your business and want to provide you the best service.  Please call toll free 1-800-756-3333 and speak to any Support Associate if we may be of additional assistance.

Thank you for banking with Bank of America.

Sincerely,

Consumer Real Estate
Consumer Credit Services

Enclosure

♻ Recycled Paper

00-14-2427B  02-2005

# DEFENDANT'S EXHIBIT
# 8

GREAT AMERICA CUSTOM BUILDERS
27213 BENT TRAIL
BOERNE, TX 78006
210-223-4482
5919

PAY TO THE
ORDER OF Alejandro Herrera P.

Two Hundred Seventy-Nine Dollars & 12/100 DOLLARS

$ 279.12

FROST NATIONAL BANK
SAN ANTONIO, TEXAS 78299

FOR Maintenance & Repairs

005919 114000093 010430366

---

GREAT AMERICA CUSTOM BUILDERS
27213 BENT TRAIL
BOERNE, TX 78006
210-223-4482
5920

PAY TO THE
ORDER OF Peter Renteria

Two Hundred Ninety-Nine Dollars & 35/100 DOLLARS

$ 299.35

FROST NATIONAL BANK
SAN ANTONIO, TEXAS 78299

FOR Maintenance & Repairs

005920 114000093 010430366

---

GREAT AMERICA CUSTOM BUILDERS
27213 BENT TRAIL
BOERNE, TX 78006
210-223-4482
5921

PAY TO THE
ORDER OF David Botello

Two Hundred Twenty-eight Dollars & 00/100 DOLLARS

$ 228.00

FROST NATIONAL BANK
SAN ANTONIO, TEXAS 78299

FOR Maintenance & Repairs

005921 114000093 010430366

---

GREAT AMERICA CUSTOM BUILDERS
27213 BENT TRAIL
BOERNE, TX 78006
210-223-4482
5922

PAY TO THE
ORDER OF Rocky Guerrero

Two Hundred Thirty-Four Dollars & 12/100 DOLLARS

$ 234.12

FROST NATIONAL BANK
SAN ANTONIO, TEXAS 78299

FOR Maintenance & Repairs

005922 114000093 010430366

---

GREAT AMERICA CUSTOM BUILDERS
27213 BENT TRAIL
BOERNE, TX 78006
210-223-4482
5923

PAY TO THE
ORDER OF Benito Vazquez

Three Hundred Eighty Dollars & No/100 DOLLARS

$ 380.00

FROST NATIONAL BANK
SAN ANTONIO, TEXAS 78299

FOR Maintenance & Repairs

005923 114000093 010430366

CC 11/5/2012
0248-87616
>314089681< -0016

DEFENDANT'S EXHIBIT
8
PENGAD 800-631-6989
MEF 7/10/14

2497

PLAINTIFF'S EXHIBIT
4
PENGAD 800-631-6989
MEF 7/9/14

000018

$1778